# In The Matter Of:

*David Lee v.*
*City of Moraine Fire Department, et al.*

---

*David Brian Lee*
*July 17, 2014*

---

*Charlene Nicholas & Associates, LLC*
*5136 Phillipsburg-Union Road*
*Englewood, Ohio  45322-8707*
*Tel: 937-836-7878*
*Fax: 937-836-1718*

Original File Lee_David_07.17.14_LJ.txt
**Min-U-Script® with Word Index**

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT DAYTON

- - -

DAVID LEE,                          :
                                    :
            Plaintiff,      :
                                    :
      vs.                      :   CASE NO.   13-CV-00222
                                    :
CITY OF MORAINE FIRE        :
DEPARTMENT, et al.,         :
                                    :
            Defendants.     :

- - -

DEPOSITION

of DAVID BRIAN LEE, taken before me, Lori Jay, a

Registered Professional Reporter and Notary Public in and

for the State of Ohio at large, pursuant to notice and

agreement of counsel, as on Cross Examination, at the law

offices of Surdyk, Dowd & Turner, One Prestige Place,

Suite 700, in the City of Miamisburg, County of

Montgomery, and State of Ohio, on Thursday, the 17th day

of July, 2014, beginning at 9:32 A.M.

- - -

2

1    APPEARANCES:

2

        On Behalf of the Plaintiff(s):
3
            ADAM R. WEBBER, ESQ.
4           FALKE AND DUNPHY
            30 Wyoming Street
5           Dayton, OH  45409

6

        On Behalf of the Defendant(s) City of Moraine Fire
7       Department and City of Moraine, OH:

8           JOSHUA R. SCHIERLOH, ESQ.
            SURDYK, DOWD & TURNER
9           One Prestige Place
            Suite 700
10          Miamisburg, OH  45342

11

        On Behalf of the Defendant(s) Moraine Professional
12      Firefighters Association, & IAFF 2981:

13          MEGAN K. MECHAK, ESQ.
            WOODLEY & MCGILLIVARY
14          Suite 1000
            1101 Vermont Avenue, N.W.
15          Washington, D.C.  20005

16

        On Behalf of the Defendant(s) City of Moraine:
17
            MARY E. LENTZ, ESQ.
18          GOTTSCHLICH AND PORTUNE
            The Armory
19          201 East Sixth Street
            Dayton, OH  45402-2836
20

21      Also Present:

22          Anthony Trick

23                       - - -

24

25

3

1                    INDEX TO EXAMINATION

2    DAVID BRIAN LEE                                    PAGE

3         Cross Examination by Mr. Schierloh........      5

4         Cross Examination by Ms. Mechak..........      92

5         Cont'd Cross Examination by Mr. Schierloh.    127

6         Cont'd Cross Examination by Ms. Mechak....    130

7         Examination by Mr. Webber................    131

8         Cont'd Cross Examination by Mr. Schierloh.    132

9                         - - -

10

11                     INDEX OF EXHIBITS

12   DEFENDANT'S EXHIBITS                          INTRODUCED

13    A - Standard Operating Guidelines 100.5.13....    22

14    B - Collective Bargaining Agreement..........    23

15    C - Comprehensive Occupational Medical Program

16        For Fire Departments, 2007 Edition........    41

17    D - 11-23-10 E-Mail From Mark Erby to Anthony

18        Trick, et al.............................    45

19    E - 12-28-11 E-Mail From Dave Cooper to David

20        Lee......................................    48

21    F - Public Safety Health & Wellness

22        Questionnaire............................    51

23    G - 2-08-12 Memo From Anthony Trick to David

24        Lee......................................    64

25                      (Continued)

4

1                    INDEX OF EXHIBITS

2   DEFENDANT'S EXHIBITS                          INTRODUCED

3    H - 3-09-12 Memo From David Hicks to David

4        Lee...................................    66

5    I - 3-15-12 Memo From Chief Schenck to David

6        Hicks.................................    68

7    J - 3-28-12 Memo From David Hicks to David

8        Lee...................................    70

9    K - Rule/Regulation and Chain of Command

10       Chart.................................    71

11   L - Section 7, Discipline And Grievances......    72

12   M - Record of Written Reprimand..............    84

13   N - 3-06-12 Memo From Chief Schenck to David

14       Hicks.................................    85

15   O - Record Of Suspension.....................    87

16   P - Record Of Suspension.....................    87

17   Q - Record Of Written Reprimand..............    88

18                    - - -

19

20   PLAINTIFF'S EXHIBITS                          INTRODUCED

21   32 - Charge of Discrimination................    110

22                    - - -

23

24

25

David Brian Lee - July 17, 2014

5

1          MR. SCHIERLOH:  Will you please swear the
2   witness.
3                    - - -
4                 DAVID BRIAN LEE
5   a witness of lawful age, being by me first duly
6   cautioned and sworn, testified on his oath as follows:
7                    - - -
8                 CROSS EXAMINATION
9   BY MR. SCHIERLOH:
10       Q.   Good morning.
11       A.   Good morning.
12       Q.   How are you?
13       A.   I'm good.  How are you?
14       Q.   Good.  Thank you.
15            I'm Joshua Schierloh.  I'm one of the attorneys
16   for the City of Moraine and its fire department in this
17   case.
18            For the record will you please state your name.
19       A.   It's David Brian Lee.
20       Q.   Mr. Lee, have you ever had your deposition taken
21   prior to today?
22       A.   No.
23       Q.   A couple of general rules we have to go by.
24   Your attorney may have advised you of these already, but
25   the first rule is we can't talk over each other.  All

David Brian Lee - July 17, 2014

6

1  right?

2       A.    Okay.

3       Q.    I will give you all the time you need to respond

4  to my questions, but you'll have to let me finish my

5  question before you begin responding.  Is that fair?

6       A.    That's fair.

7       Q.    Otherwise it becomes very difficult for the

8  court reporter to take down your testimony.

9       A.    Okay.

10      Q.    The second rule is you have to respond with

11  audible, verbal answers.

12      A.    Okay.

13      Q.    No grunts, groans, uh-huhs, huh-uhs, things like

14  that, that may not translate well to a written document.

15  Fair enough?

16      A.    Okay.

17      Q.    And I tend to ask poorly-wooded questions from

18  time to time.  If you don't understand one of my questions

19  please let me know.  I will do my best to rephrase so that

20  you understand.

21      A.    Okay.

22      Q.    However, if you answer the question I'm going to

23  assume you understood what I was asking you.

24      A.    Okay.

25      Q.    Is that fair?

David Brian Lee - July 17, 2014

7

1      A.   That's fair.

2      Q.   All right.  And with those admonitions we shall

3 begin.

4           Mr. Lee, how old are you?

5      A.   I'm currently forty-six.

6      Q.   Forty-six years old.

7           And if you could, just generally, starting with

8 high school give me just a general understanding of your

9 educational history.

10     A.   I graduated from Meadowdale High School in

11 Dayton, Ohio.

12     Q.   Meadowdale?

13     A.   Meadowdale.

14     Q.   Okay.  What year?

15     A.   1986.

16     Q.   All right.  Any education post high school?

17     A.   I attended Montgomery County Joint Vocational

18 School for my firefighting --

19     Q.   All right.

20     A.   -- and Sinclair Community College for

21 paramedics.

22     Q.   All right.  Other than --

23     A.   And I'm sorry.  I did also attend Wright State

24 for one quarter right out of high school.

25     Q.   Was that related to your fire training in

David Brian Lee - July 17, 2014

8

1   any way?

2        A.   No.

3        Q.   What was that?  What was that education?

4        A.   That was just general education, and I don't

5   remember what classes I took so --

6        Q.   Okay.  I may have -- I may have misheard you.

7   Did you begin at Wright State prior to your fire studies

8   and your fire training?

9        A.   Correct.

10        Q.   Okay.  So at some point while you were at Wright

11   State you said this isn't for me, I want to be a fireman,

12   and then you went into the curriculum necessary to become

13   a fireman?

14        A.   Not directly.

15        Q.   Okay.  When did you become -- or when did you

16   graduate from the Montgomery County Joint Vocational

17   Academy for your firefighter training?

18        A.   I want to say in the end of '92, approximately.

19        Q.   And from there did you go to Sinclair for

20   additional education and training?

21        A.   Yes.

22        Q.   When did you graduate from Sinclair?

23        A.   End of '93.

24        Q.   Now, following, or at some point during your

25   educational experience at Sinclair did you become employed

9

1    by a fire department in the area?

2        A.    Yes.

3        Q.    And where was your first job with the fire

4    department?

5        A.    Butler Township Fire Department.

6        Q.    Do you recall what year you became employed at

7    Butler Township?

8        A.    I believe it was 1993.

9        Q.    How long did you remain employed at Butler

10   Township?

11       A.    It was approximately four years.

12       Q.    Four years.  So roughly to '97?

13       A.    Yes.

14       Q.    All right.  What positions did you hold at

15   Butler Township during the course of your employment

16   there?

17       A.    I was a EMT initially.

18       Q.    All right.

19       A.    A firefighter/EMT at one point, and then a

20   paramedic/firefighter, so as I progressed through my EMT

21   certificates.

22       Q.    So you were brought on or you were hired as an

23   EMT/Firefighter?

24       A.    No.  I was hired as an EMT.

25       Q.    Hired as an EMT.  And then as you progressed you

David Brian Lee - July 17, 2014

10

1    became a firefighter/paramedic at Butler Township?

2        A.   Correct.

3        Q.   What's the difference between an EMT and a

4    paramedic?

5        A.   EMT, I consider the EMT, it's an EMT-B position,

6    so it's the basic, so they have less skills.

7        Q.   Okay.  Is it a matter of training and

8    certification?

9        A.   Correct.  It's different certifications.

10       Q.   So as you progress with your training and your

11   certification you translate from an EMT to a paramedic at

12   some point?

13       A.   Correct.

14       Q.   All right.  And paramedic just means you're

15   advanced in terms of the certifications you received and

16   the training you received?

17       A.   Correct.

18       Q.   You can provide additional care to the patients

19   or the subjects that you're treating?

20       A.   Correct.

21       Q.   All right.  In 1997 I take it that you left

22   Butler Township to pursue another job; is that fair?

23       A.   No.

24       Q.   Okay.  What was your reason for leaving Butler

25   Township in 1997?

David Brian Lee - July 17, 2014

11

1       A.    I was employed with Moraine.

2       Q.    So when you left Butler Township you left Butler

3   Township to take a job at the City of Moraine?

4       A.    No.

5       Q.    Explain to me then why you left Butler Township,

6   your employment at Butler Township.

7       A.    I was employed with Moraine and I no longer

8   needed the part-time job at Butler.

9       Q.    Okay.  So Butler Township was a part-time job

10  for you?

11      A.    Correct.

12      Q.    Okay.  You accepted a job at Moraine at some

13  point?

14      A.    Correct.

15      Q.    You no longer needed to work part time at Butler

16  Township?

17      A.    Correct.

18      Q.    Okay.  And you left Butler Township on good

19  terms?

20      A.    Correct.

21      Q.    All right.  When did you become employed with

22  the City of Moraine?

23      A.    1996.

24      Q.    1996.  Got it.

25            From 1996 to March of 2012 you were employed at

David Brian Lee - July 17, 2014

12

1    the City of Moraine in its fire division?

2         A.    Correct.

3         Q.    During your time with the City of Moraine it's

4    my understanding that you had other business interests

5    that you were involved in on the side, a private business

6    perhaps?

7         A.    Excuse me?

8         Q.    Did you maintain any other types of employment

9    or other types of business interests --

10        A.    Yes.

11        Q.    -- while you were with the City of Moraine?

12        A.    Yes.

13        Q.    Okay.  Tell me about that.  What was it?

14        A.    I worked for Sugar Creek Township for a while.

15        Q.    When did you work for Sugar Creek?

16        A.    You know, I don't recall the dates.

17        Q.    Okay.  Was this more than ten years, fifteen

18   years?

19        A.    No.  It was probably less than a year.

20        Q.    I'm sorry.  When you worked for Sugar Creek was

21   this more than ten years ago, fifteen years ago?  Was this

22   sometime --

23        A.    It would have been, I want to say, in the 2004,

24   2006 time frame.

25        Q.    Okay.

David Brian Lee - July 17, 2014

13

1       A.    Somewhere in that area, so --

2       Q.    And was this also kind of a part-time position?

3       A.    Correct.

4       Q.    And what position did you hold at Sugar Creek?

5       A.    I was working on their computer stuff.

6       Q.    Mr. Lee, explain that to me a little bit more.

7   When you say you were working on their computer stuff what

8   type of service would you provide to Sugar Creek?

9       A.    They needed basically their computer network set

10  up and ran, e-mail system, stuff like that, so I went down

11  there to set that up for them.

12      Q.    Okay.  And was this part -- the services that

13  you provided for Sugar Creek, was that in your capacity as

14  the owner and proprietor of a business that you

15  maintained?

16      A.    No.  I was an employee of them.

17      Q.    So you were hired as an employee of Sugar

18  Creek --

19      A.    Correct.

20      Q.    -- Township to perform these, what I will call,

21  IT services?

22      A.    Correct.

23      Q.    Is that fair?

24      A.    Correct.

25      Q.    You did not perform any additional services for

David Brian Lee - July 17, 2014

14

1    Sugar Creek beyond 2006?

2         A.    I don't know the date.

3         Q.    Roughly around that time?  When your part-time

4    position ended with Sugar Creek you haven't provided any

5    additional services for them?

6         A.    No.

7         Q.    Why did your part-time employment with Sugar

8    Creek end?

9         A.    I just didn't need it anymore, just didn't want

10   to do it.

11        Q.    It was a decision on your part?

12        A.    Correct.

13        Q.    And it was -- the relationship ended on good

14   terms?

15        A.    Correct.

16        Q.    Any other between the time that you were hired

17   and then up until March 2012, any other employment that

18   you maintained other than with the City of Moraine?

19        A.    No.

20        Q.    Okay.  During that same time period did you have

21   any businesses or were you the proprietor of any

22   businesses where you provided services privately either

23   under some type of trade name or under your own name?

24        A.    No.

25        Q.    You did not have any type of computer or IT side

David Brian Lee - July 17, 2014

15

1    business that you ran?

2         A.    No.

3         Q.    Okay.  Following March of 2012 at some point you

4    became employed with JEMS; is that correct?

5         A.    Can you repeat that, please?

6         Q.    Following March of 2012, at some point

7    thereafter, you became employed by JEMS?

8         A.    Correct.

9         Q.    And that's the Joint Emergency Medical Services?

10        A.    Correct.

11        Q.    Am I saying that correctly?

12        A.    Uh-huh.

13        Q.    Yes?

14        A.    It may be service or services.  I'm sorry.

15        Q.    You've got to say yes though.

16        A.    Oh, sorry.  Yes.

17        Q.    I may remind you from time to time, not trying

18   to be rude.

19              What is JEMS?  Can you just generally kind of

20   explain that to me?

21        A.    JEMS is a joint ambulance service that provides

22   EMS care to Franklin Township and the city -- or the

23   Village of Carlisle.

24        Q.    And is this a group or businesses that's -- are

25   you employed by certain hospitals to provide ambulance

David Brian Lee - July 17, 2014

16

1   services, or how does this work?

2        A.   No.  We're a government agency.

3        Q.   You're a government agency.  I see.  So you're

4   your own entity?

5        A.   Correct.

6        Q.   When did you begin work at JEMS?

7        A.   August of 2012.

8        Q.   August of 2012.  Okay.

9             And have you been employed with JEMS from August

10  of 2012 up until today's date?

11       A.   Correct.

12       Q.   All right.  Between March of 2012 and August of

13  2012 were you employed anywhere else?

14       A.   No.

15       Q.   What were you doing for income during that time?

16       A.   Unemployment.

17       Q.   Unemployment.  Okay.

18            Currently do you maintain any type of private

19  business or are you the proprietor of any business?

20       A.   I need to back up to one question because I

21  forgot about employment.

22       Q.   Okay.

23       A.   I do do National Registry for Sinclair Community

24  College.

25       Q.   Okay.

David Brian Lee - July 17, 2014

17

1      A.   So that's a -- I don't know how you want to call

2   that.  You go in once or twice a year.  I'm not sure how

3   they -- we're not employees but I mean it's not a business

4   that I run, so -- but I did receive income from that,

5   so --

6      Q.   And you would do this once or twice a year you

7   say?

8      A.   Yeah, occasionally.

9      Q.   What is that?  What does that mean?

10     A.   National Registry is where new EMTs and

11  paramedics, after they graduated from their school are

12  tested by the State.  They use the National Registry as a

13  testing agency, and I do the skills testing for them.

14     Q.   Okay.  And what type of services do you provide

15  with the skills testing?  I mean what are you testing them

16  on?

17     A.   Typically I test just whatever station they need

18  that day, so --

19     Q.   Give me some examples of things that you've

20  done.

21     A.   For example, I think the last time I did it I

22  did IV.  So basically they have a skills -- set of skills

23  that they need to do and I evaluate whether they do those

24  correctly.

25     Q.   Okay.  And if I understood you, you said IV?

David Brian Lee - July 17, 2014

18

1        A.    Yes.

2        Q.    Like --

3        A.    Intravenous lines.

4        Q.    Got it.

5        A.    IV lines.

6        Q.    All right.  Okay.  So I think question I asked
7    was between March of 2012 and August of 2012 did you have
8    any other forms of employment, and you said no, and any
9    other sources of income, and I think you indicated
10   unemployment during that time?

11       A.    Correct.

12       Q.    Okay.  And since August of 2012 up to today's
13   date you've been employed with JEMS.  Have you maintained
14   any other employment from August of 2012 up to today's
15   date other than JEMS?

16       A.    No.

17       Q.    All right.  Any other sources of income that
18   you've been receiving from August of 2012 up to today's
19   date?

20       A.    No.

21       Q.    All right.

22             MR. WEBBER:  Do you still do the Community
23   College National Registry?

24             THE WITNESS:  Yes, but I don't think I've done
25   that in a year or two.

David Brian Lee - July 17, 2014

19

1           MR. WEBBER:  Okay.

2           THE WITNESS:  I don't recall the last time I did

3    that, so, yeah.

4           MR. SCHIERLOH:  Okay.

5    BY MR. SCHIERLOH:

6       Q.   Mr. Lee, are you married?

7       A.   Yes.

8       Q.   What's your wife's name?

9       A.   ███████

10      Q.   How long have you and █████ been married?

11      A.   Don't quote me on this.

12      Q.   It's on the record.  Approximately?

13      A.   We got married in 2009.

14      Q.   All right.

15      A.   September of 2009.

16      Q.   Is that your only marriage?

17      A.   Yes.

18      Q.   All right.  Do you have any kids?

19      A.   No.

20      Q.   All right.  Prior to this lawsuit have you been

21   involved in any other lawsuits, Mr. Lee?  And let me

22   qualify that further; as a party, either as a plaintiff or

23   defendant.

24      A.   I was involved in a bankruptcy so I would assume

25   that's -- that's involved.

David Brian Lee - July 17, 2014

20

1     Q.   Is that a bankruptcy that you filed for or

2 petitioned for bankruptcy relief?

3     A.   Yes.

4     Q.   Okay.  Fair enough.

5          That's the only legal matter that you've been

6 involved in personally as a party, either as a plaintiff,

7 or a defendant, or a petitioner?

8     A.   The only one that's possible is I had a auto

9 accident where somebody hit me.

10    Q.   All right.

11    A.   And the insurance company went after the person,

12 but, again, I never did anything with that so whether I

13 was a party to that or not I don't know.

14    Q.   The insurance company took care of it it sounds

15 like?

16    A.   Correct.

17    Q.   All right.  Approximately when did that occur?

18    A.   Oh, now you're really --

19    Q.   It's a memory contest.

20    A.   I can't recall.

21    Q.   All right.  Is it fair to assume like more than

22 ten years ago?

23    A.   Yes.

24    Q.   All right.  Some time ago.  Okay.

25         Mr. Lee, today we'll talk about your lawsuit,

David Brian Lee - July 17, 2014

21

1    and generally your lawsuit alleges that the City maintains

2    certain guidelines, health and physical guidelines under

3    SOG 100.5.13, that you believe were unlawful and

4    discriminatory, based on age, of state and federal law.

5            We will also talk about the fact that you've

6    alleged that in your opinion and your attorney's opinion

7    that the City's guidelines have unlawfully requested

8    certain genetic information from you in violation of GINA.

9    Okay?

10       A.   Okay.

11       Q.   All right.  But, you know, just so we're clear,

12   the specific guideline that we'll be referring to today is

13   SOG 100.5.3 -- excuse me -- .13, and I'd like to just

14   refer to that as the Health And Wellness Physical Standard

15   so I don't have to keep reciting 100.5.13.

16       A.   Okay.

17       Q.   So if I just say the Health And Wellness

18   Standard do you know what I'm referring to?

19       A.   Yes.

20           MR. SCHIERLOH:  And we'll go ahead and admit

21   this as an exhibit right now.

22           I've got some exhibit stickers on there.  Is

23   that okay for you?

24           THE REPORTER:  That's fine.

25           MR. SCHIERLOH:  You used numbers, Adam?

David Brian Lee - July 17, 2014

22

1          MR. WEBBER:  Yes, I did.

2          MR. SCHIERLOH:  Then we'll use letters.  It will

3   be Defendant's Exhibit A.

4          Here's a copy for you, Megan.

5          MS. MECHAK:  Thanks.

6          (Marked Defendant's Exhibit A.)

7   BY MR. SCHIERLOH:

8      Q.   Mr. Lee, have you seen this document before?

9      A.   Yes.

10     Q.   And this is, in fact, a copy of the Moraine Fire

11  Department Standard Operating Guideline 100.5.13 entitled

12  Health And Wellness Physical?

13     A.   That's what it's labeled.

14     Q.   And actually it bears your attorney's mark

15  there.  It's Bates numbered Lee 0094 to Lee 0097, and it

16  also indicates that it was revised on April 1, 2011,

17  correct?

18     A.   That's what it says.

19     Q.   And is it your understanding, Mr. Lee, that this

20  is the most updated version of this, this guideline?

21         MR. WEBBER:  Objection.

22         MR. SCHIERLOH:  If you know.

23         THE WITNESS:  I don't know.

24         MR. SCHIERLOH:  Okay.

25  BY MR. SCHIERLOH:

David Brian Lee - July 17, 2014

23

1        Q.    This particular Standard Operating Guideline was

2    incorporated into the fire department's guidelines

3    pursuant to the Collective Bargaining Agreement that was

4    executed in June of 2011; is that true?

5        A.    Yes.

6        Q.    Okay.

7              (Marked Defendant's Exhibit B.)

8    BY MR. SCHIERLOH:

9        Q.    I'll hand you what I've marked here as B.

10   Mr. Lee, if you'll take a moment to review this document

11   for me.

12       A.    Okay.

13       Q.    Does that appear to be a fair and accurate copy

14   of the Collective Bargaining Agreement that was executed

15   between the City and the Moraine Professional Firefighters

16   Association, Local 2981, on or about June 1, 2012 or

17   thereafter?

18       A.    It appears to be.

19       Q.    And again just to keep me from talking too much

20   this morning, if I refer to the Moraine Profession

21   Firefighters Association, Local IAFF 2981 as the Union you

22   know who I'm referring to, right?

23       A.    Correct.

24       Q.    Okay.  That makes it easier for me, so I

25   appreciate that.

David Brian Lee - July 17, 2014

24

1          A.    Okay.

2          Q.    So if we turn to Page 14 of the Collective

3    Bargaining Agreement we see Section 5 there.  It's

4    actually Page 13 and 14, Section 5 of Article 10, which

5    talks about the City's program to monitor employees'

6    safety and health.  Do you see that, Safety And Health?

7          A.    What section are you referring to?

8          Q.    Or I'm sorry.  Section 5.

9          A.    Section 5, yes.

10          Q.    And if you read through the second sentence

11    there, the program is intended to comply with requirements

12    as set forth in the Ohio Administrative Code, as set forth

13    there, and the Moraine Fire Division non emergency SOG

14    Health And Wellness Physicals, revised August 1, 2011.  Do

15    you see that there, sir?

16          A.    Yes.

17          Q.    Okay.  Thank you.

18                Now, Mr. Lee, on June first of 2011 what was

19    your position with the City of Moraine?

20          A.    I was a firefighter/paramedic.

21          Q.    Firefighter/paramedic.

22                Tell me a little bit about generally the

23    responsibilities of a firefighter employed by the City of

24    Moraine.  What would you do on a daily basis?

25          A.    On a daily basis our tasks were to provide fire

David Brian Lee - July 17, 2014

25

1 suppression and medical care to the public.

2      Q.   Okay.

3      A.   And to -- just general house duties and stuff

4 around the station, maintenance of equipment, training,

5 those.

6      Q.   Okay.  Let's focus on your fire suppression and

7 rescue efforts.  That's undoubtedly one of your

8 responsibilities as a firefighter, correct?

9      A.   Correct.

10     Q.   That would include responding to fires?

11     A.   Yes.

12     Q.   That would include using certain tools of your

13 trade such as hoses, I think people commonly associate an

14 ax with a firefighter, or other types of tools, correct?

15     A.   Yes.

16     Q.   It includes climbing steps?

17     A.   Yes.

18     Q.   I assume firefighters aren't allowed to use an

19 elevator in a burning building, correct?

20     A.   Yes.

21     Q.   Okay.  That includes breaking barriers in some

22 cases?

23     A.   Yes.

24     Q.   That includes lifting certain individuals that

25 may be in some type of residence or building that you need

David Brian Lee - July 17, 2014

26

1    to carry out?

2        A.   Yes.

3        Q.   Would that be fair?

4        A.   Yes.

5        Q.   You know, there's a whole host or variety of

6    different responsibilities that a firefighter has to do in

7    the course and scope of their employment with the City of

8    Moraine, correct?

9        A.   Yes.

10       Q.   And these are very physically demanding

11   activities?

12           MR. WEBBER:  Objection.

13           THE WITNESS:  Can be.

14   BY MR. SCHIERLOH:

15       Q.   And these are strenuous activities in some

16   cases, correct, climbing steps, using an ax, holding a

17   hose?  What's the water pressure on a hose of something

18   that the City of Moraine would use?

19           MR. WEBBER:  Objection to form.  Can you just

20   ask one question?

21           MR. SCHIERLOH:  Sure.

22   BY MR. SCHIERLOH:

23       Q.   What's the average water pressure from the hoses

24   that you guys use with the City of Moraine?

25       A.   Approximately 150 PSI.

David Brian Lee - July 17, 2014

27

1    Q.   That's a lot, correct?

2    A.   I don't consider it a lot.

3    Q.   You don't?

4    A.   No.

5    Q.   That's more than a garden hose that I would use

6  to water my flowers, right?

7    A.   Yes.

8    Q.   And one of the things about being a firefighter

9  that's, you know, important is responding quickly,

10  correct?

11    A.   Yes.

12    Q.   You know, a fire department is judged in terms

13  of its effectiveness, on its ability to respond quickly to

14  a fire or to an emergency situation, correct?

15    A.   Yes.

16    Q.   And to provide the appropriate care or

17  responsibilities that they're supposed to be doing there,

18  correct?

19    A.   Yes.

20    Q.   Okay.  What about as a paramedic?  You know,

21  what types of responsibilities or duties were you

22  responsible for as a paramedic for the City of Moraine?

23    A.   As a paramedic we were required to provide

24  medical care per our standing orders and State standards.

25    Q.   Okay.  And, again, some of these activities that

David Brian Lee - July 17, 2014

28

1   you would do as a paramedic were physically demanding?

2        A.    Some of them.

3        Q.    Some of them were.  If you're responding, let's

4   say, to a motor vehicle accident and you have to lift

5   people that may be injured from the street to a cot or

6   something like that, correct?

7        A.    Yes.

8        Q.    Did you ever have to use the jaws of life to

9   ever free anybody from a vehicle?

10       A.    Yes.

11       Q.    That's a pretty heavy piece of equipment, right?

12       A.    No.

13       Q.    No?  All right.  Not in your opinion?

14       A.    Not in my opinion.

15       Q.    All right.  And would you receive, you know,

16   training from the fire department in regards to these

17   types of responsibilities either as a firefighter or

18   paramedic?

19       A.    Yes.

20       Q.    Did you ever have to use what some people refer

21   to as the burn tower or the burn station?

22       A.    Yes.

23       Q.    Would you have to climb the steps, you know, up

24   and down that thing?

25       A.    Yes.

David Brian Lee - July 17, 2014

29

1    Q.   How many -- how many different stories is a burn
2  tower, the ones that you've trained on with the City of
3  Moraine?
4    A.   I think it's four to five.
5    Q.   And did you guys do the exercise where you had
6  to carry like a coiled hose up and down the steps as part
7  of your training?
8    A.   I don't recall.
9    Q.   All right.  But, you know, the purpose of these
10  training sessions is, I assume, to teach you as the
11  firefighters and paramedics, you know, the proper methods
12  and techniques for performing certain aspects of your job,
13  correct?
14         MR. WEBBER:  Objection.
15         Answer if you know.
16         THE WITNESS:  Can you repeat the question?  I'm
17  sorry.
18         MR. SCHIERLOH:  Sure.
19  BY MR. SCHIERLOH:
20    Q.   When you received training from the City the
21  City's trying to help you develop, you know, the proper
22  methods and techniques for performing certain aspects of
23  your job?
24         MR. WEBBER:  Objection.
25  BY MR. SCHIERLOH:

David Brian Lee - July 17, 2014

30

1      Q.   Would that be fair?

2      A.   Yes.

3      Q.   Okay.  And depending on the training, for

4  instance, if it's going up and down steps in the burn

5  tower, it's also to help condition you and help build

6  endurance for performing these types of activities so when

7  you respond to an actual burning building, you know,

8  you're not hoofing it up the steps dead tired; would that

9  also be fair?

10           MR. WEBBER:  Objection.

11           THE WITNESS:  I can't answer that.  I don't --

12           MR. SCHIERLOH:  All right.

13  BY MR. SCHIERLOH:

14      Q.   Would you agree with the statement, Mr. Lee,

15  that the City of Moraine has an inherent invested interest

16  in the health and well-being of its firefighters?

17      A.   No.

18      Q.   You don't agree with that statement?

19      A.   No.

20      Q.   Why?

21      A.   Because I -- I don't see why it's the City's

22  responsibility.  The City has no responsibility to worry

23  about the health and safety -- or the health of an

24  employee.

25      Q.   I want just to refer to firefighters at this

David Brian Lee - July 17, 2014

31

1   point.  Okay?

2        A.    Okay.

3        Q.    Do you believe that the City of Moraine has an

4   interest in the health and well-being of the firefighters

5   employed by its fire division?

6        A.    No.

7        Q.    You don't see a reason for the City of Moraine

8   to be concerned about the Health And Wellness of its

9   firefighters?

10       A.    Repeat your question, please.

11       Q.    Sure.

12             Would you agree that the City -- I'll change the

13  question.  Okay?

14       A.    Okay.

15       Q.    Would you agree that the City has a legitimate

16  concern in developing a program designed to gauge or

17  assure the health and wellness of its firefighters?

18       A.    No.

19       Q.    Why is that, sir?

20       A.    I don't believe that, again, that the City is

21  responsible for the health of its employees.

22       Q.    Who is responsible; the individual employee?

23       A.    The individual employee.  The individual

24  employee.

25       Q.    Would you agree then -- well, would you agree

David Brian Lee - July 17, 2014

32

1    that the City has a concern that the firefighters that it

2    employs have the ability to safely and adequately perform

3    their responsibilities?

4         A.   Yes.

5         Q.   Okay.  And would you agree that an individual

6    who -- strike that.

7              Would you agree that the health of the

8    individual, the firefighter, plays a role in determining

9    whether or not that individual, that particular

10   firefighter, can adequately and safely perform their

11   responsibilities as a firefighter?

12        A.   No.

13        Q.   Mr. Lee, would you agree that all individuals

14   develop certain physiological changes as we age?

15        A.   Yes.

16        Q.   Things get hard, right, as we get older?

17             MR. WEBBER:  Objection.

18   BY MR. SCHIERLOH:

19        Q.   You can't run as far, can't lift things as heavy

20   as we used to; would you agree with that?

21        A.   No.

22        Q.   But you would agree that the aging process does

23   affect the overall health and wellness of an individual?

24        A.   No.

25        Q.   You don't believe that statement or you don't

David Brian Lee - July 17, 2014

33

1    agree with that statement?

2         A.    No.

3         Q.    So if a doctor tells you that, you know, you

4    should be getting a colonoscopy past fifty years of age

5    you don't believe there's a correlation between the age of

6    an individual and the health risks that could be present

7    past forty, fifty years of age?

8         A.    No.

9         Q.    Mr. Lee, have you ever seen any literature or

10   materials that discuss certain risk factors that are more

11   prominent with firefighters beyond or advancing beyond age

12   forty?

13        A.    Yes.

14        Q.    Okay.  What have you read?

15        A.    Basically what the City provided.

16        Q.    Okay.

17        A.    So I don't recall what the document was.

18        Q.    Did you read those materials though?

19        A.    I believe so.

20        Q.    And did you see specifically the materials that

21   referenced certain factors, cardiopulmonary risks, stroke

22   risks, heart attacks, cancer risks, that are more

23   prevalent in firefighters over age forty?

24        A.    Yes.

25        Q.    Okay.  Mr. Lee, will you please refer to Exhibit

David Brian Lee - July 17, 2014

34

1   B, please, which is --

2       A.   Okay.

3       Q.   And please turn to the last page of that

4   document.

5       A.   Okay.

6       Q.   Your signature is there, correct?  This is Page

7   36, Bates numbered Lee 0085.

8       A.   Yes.

9       Q.   And I'm associating your signature and name

10  there under the Moraine Professional Firefighters

11  Association, Local IAFF 2981, that column there, correct?

12      A.   Yes.

13      Q.   I'm making the assumption, therefore, that you

14  were part of that group of individuals that was

15  negotiating this agreement on behalf of the Union; is that

16  fair?

17      A.   No.

18      Q.   That's not fair.  Okay.

19           What was -- what is the reason for your

20  signature appearing on this document, sir?

21      A.   I was a member of the trustees.

22      Q.   So you did not in any way play a role in the

23  negotiation with the City of this Collective Bargaining

24  Agreement?

25      A.   No.

David Brian Lee - July 17, 2014

35

1     Q.    None whatsoever?

2     A.    No.

3     Q.    Never had any meetings with individuals in the

4  City to discuss the contents of this agreement or the

5  terms of this agreement?

6     A.    No, I never met with the City.

7     Q.    Never met with the City, never discussed the

8  terms of this agreement, the negotiation of the terms of

9  this agreement, with any of the other individuals there

10 listed in the column for the Union, correct?

11    A.    Can you repeat your question?

12    Q.    Sure.

13          You never discussed the negotiation or the terms

14 that are contained within this agreement with any of the

15 individuals there listed in the column for the Union?

16    A.    Yes.

17    Q.    Okay.  Who did you speak with?

18    A.    I believe Michael Harris.

19    Q.    Okay.

20    A.    And I don't recall the -- any other specific

21 conversations.

22    Q.    Do you recall if any of the conversations that

23 you had with Michael Harris had to do with the revisions

24 to Article 10, Section 5 of the CVA on Page 4 dealing with

25 the health and wellness physicals to be provided by the

David Brian Lee - July 17, 2014

36

1   City?

2        A.   Can you repeat that, please?

3        Q.   Sure.

4             In any of your discussions with Michael Harris

5   with respect to the negotiations of the terms of this

6   agreement --

7        A.   Uh-huh.

8        Q.   -- did any of those discussions have anything to

9   do with Article 10, Section 5 on Page 14 with respect to

10  the health and wellness physicals to be provided by the

11  City?

12       A.   Yes.

13       Q.   Okay.  Can you tell me what you discussed with

14  Mr. Harris?

15       A.   I don't -- it wasn't a discussion with

16  Mr. Harris.  It was a discussion in a Union meeting with

17  the Union.

18       Q.   Okay.  Did it take place prior to June 1, 2011,

19  this discussion?

20       A.   Yes.

21       Q.   Okay.  Tell me what was -- well, first of all,

22  tell me who was involved in this meeting.

23       A.   I can't recall everybody that was at the

24  meeting.

25       Q.   Tell me who you can recall.

David Brian Lee - July 17, 2014

37

1          A.    I believe there was Mike Harris, Chuck Gambill,

2     Mark Erby, myself, and that's all I can recall off the top

3     of my head.

4          Q.    Okay.  Was this a meeting specifically with

5     members of the Union that were negotiating this agreement

6     or were individuals that were representing the City a part

7     of this meeting as well?

8          A.    This was the Union only.

9          Q.    Okay.  This was strictly a Union meeting?

10         A.    Correct.

11         Q.    And am I correct in stating that the purpose of

12    this meeting was to discuss the terms, or the negotiation

13    the terms, of this Collective Bargaining Agreement?

14         A.    Yes.

15         Q.    And specifically that night there was a

16    discussion about the revisions to Article 10, Section 5

17    dealing with the Health And Wellness Physicals, correct?

18         A.    There was a discussion about Health And

19    Wellness.  Whether it was specifically this I can't tell

20    you now.

21         Q.    Okay.  Well, then, tell me, sir, what was

22    discussed that evening about the Health And Wellness

23    physicals?

24         A.    There was either a PowerPoint or a Word document

25    that was placed on the screen by the projector that run up

David Brian Lee - July 17, 2014

38

1    a document discussing Health And Wellness, and there was a
2    discussion about that.
3         Q.   Okay.  Was the document that was displayed in
4    PowerPoint or a Word document, was this document, what is
5    what's referred to here as Exhibit A that's been
6    introduced to you, the Standard Operating Guideline
7    100.5.13?
8         A.   I don't know.
9         Q.   Do you recall if during the course of that
10   discussion any individual that night during that meeting
11   with the Union talked about the changes that were going to
12   be implemented to the Health And Wellness Physical
13   guideline of the City of Moraine Fire Division?
14        A.   Yes.
15        Q.   Do you recall exactly what was being discussed
16   about the proposed revisions?
17        A.   Not specifically.
18        Q.   Okay.  Do you remember if anybody went through
19   the proposed revisions and discussed exactly what the
20   City's policy on Health And Wellness physicals was going
21   to entail?
22        A.   I don't recall how it was presented to us.
23        Q.   Okay.  The Health And Wellness Physical
24   guideline as revised on April 1, 2011 requires that
25   individuals, firefighters, paramedics, anybody employed by

David Brian Lee - July 17, 2014

39

1   the fire department over the age of forty engage in a full

2   medical exam, correct, as stated in that document?

3        A.   What are you referring to, what section?

4        Q.   This section here deals with the medical

5   exams --

6        A.   Right.

7        Q.   -- to be provided for individuals over the age

8   of forty.

9        A.   Right.

10       Q.   I mean that's the crux of your lawsuit, right?

11       A.   Right.

12       Q.   Okay.

13       A.   It states a full physical is required.

14       Q.   Right.  And as a part of that you also have to

15   complete a questionnaire, correct?

16       A.   Yes.

17       Q.   And you have to submit that questionnaire to the

18   City's medical physician, Dr. Lovett?

19       A.   Yes.

20       Q.   Individuals under forty, pursuant to the

21   operating guideline, only have to submit the

22   questionnaire, correct?

23       A.   Yes.

24       Q.   And if the physician deems that further testing

25   is needed that individual who submitted the questionnaire

David Brian Lee - July 17, 2014

40

1    will have to undergo further testing, correct?

2         A.    As far as I know.

3         Q.    And it's conceivable, therefore, that an

4    individual under forty, depending on Dr. Lovett's

5    determination, or whoever is the physician for the City,

6    could require an individual under forty to perform a full

7    medical examination as outlined in that guideline if

8    certain health risks are -- are determined by reviewing

9    the questionnaire, correct?

10        A.    I can't answer that.

11        Q.    Okay.  Do you recall if the specifics of the

12   guideline, 100.5.13, were discussed during that meeting

13   that you engaged in with different members of the Union

14   about the Collective Bargaining Agreement and the

15   negotiation of its terms?

16        A.    I don't recall what specifics were discussed.

17        Q.    Okay.  Mr. Lee, do you have any understanding or

18   any knowledge of the individuals who were consulted by the

19   City in developing the guideline that's before you in

20   Defendant's Exhibit A?

21        A.    I don't know who was specifically negotiating

22   this.

23        Q.    Okay.  Do you have any knowledge or

24   understanding of any materials or literature that the City

25   reviewed in developing the guideline that's before you in

David Brian Lee - July 17, 2014

41

1    Defendant's Exhibit A?

2         A.    Yes.

3         Q.    Okay.  What is your understanding of the

4    materials or literature that the City reviewed in

5    developing the Health And Wellness Physical guideline?

6         A.    My understanding is, is the City has provided

7    during the discovery process what they used.  That's my

8    only understanding.

9         Q.    As well as in the EEOC proceedings as well,

10   correct?

11        A.    (No response.)

12        Q.    The materials that the City submitted in

13   response to your EEOC dispute?

14        A.    I assume so.

15        Q.    Okay.  Dr. Lovett's affidavit, correct?

16        A.    (No response.)

17        Q.    Is your understanding that the City referred to

18   Dr. Lovett's expertise as stated in his affidavit in

19   developing the Standard Operating Guideline 100.5.13, if

20   you know?

21        A.    I don't know.

22        Q.    All right.

23             (Marked Defendant's Exhibit C.)

24   BY MR. SCHIERLOH:

25        Q.    Exhibit C.  Mr. Lee, I'm providing you a portion

1   of NFPA 1582.  First of all, have you ever seen or

2   reviewed this document before?

3        A.   I have seen this.

4        Q.   You have seen this?

5        A.   Yes.

6        Q.   Are you familiar with what the National Fire

7   Protection Association is?

8        A.   Yes.

9        Q.   What is it?  Can you just describe for me what

10  the National Fire Protection Association is?

11       A.   It's a group of people that set standards.

12       Q.   Okay.

13       A.   Voluntary standards for the fire service.

14       Q.   And it's not just people; it's people employed

15  as firefighters, chiefs, people associated with the

16  firefighting trade; is that fair?

17       A.   Yes.

18       Q.   Okay.  And they develop these standards -- is it

19  your understanding they develop these standards to provide

20  essentially an assistance tool for the local jurisdictions

21  in helping devise their own policies and guidelines?

22  Would that be fair?

23       A.   Yes.

24       Q.   Is it your understanding that the City referred

25  to NFPA 1582 in developing its guidelines set forth in the

David Brian Lee - July 17, 2014

43

1    Health And Wellness Physical Section, 100.5.13?

2         A.    I don't know.

3         Q.    You don't know.

4              Mr. Lee, when is the first time that you became

5    aware of the specific requirements of the City's Health

6    And Wellness Physical guideline?

7         A.    You'll have to be more specific.

8         Q.    Certainly.

9              When did you first become aware of the

10   examination requirements for individuals over the age of

11   forty as set forth in the City's guidelines for Health And

12   Wellness physicals?

13        A.    Again, you'll have to be more specific on what

14   guideline you're talking about.

15        Q.    Okay.  Well, let's look at Exhibit A.

16        A.    Okay.

17        Q.    When's the first time that you ever sat down,

18   that you can recall, that you ever sat down and looked at

19   this document, became familiar with what it requires?

20        A.    I don't recall the exact date I seen this.

21        Q.    Do you recall generally?

22        A.    Generally at the end of 2011.

23        Q.    So prior to 2011 it's your testimony that you

24   never saw Exhibit A here prior to that date, prior to that

25   month?

David Brian Lee - July 17, 2014

44

1          A.    Correct.

2          Q.    Even though that you may not have actually seen

3    the physical document did you ever become aware of the

4    requirements of the City's Health And Wellness Physical

5    guidelines prior to December 2011?

6          A.    Yes.

7          Q.    Okay.  Do you recall when you became aware of

8    the requirements of the City's Health And Wellness

9    Physical guidelines?

10         A.    Not the exact date.

11         Q.    Was it before November 2011?

12         A.    I don't recall.

13         Q.    Okay.  Do you recall in November 2011 when the

14   City advised you of your examination that you had to

15   perform with respect to the guidelines set forth in

16   Section 100.5.13?

17              MR. WEBBER:  Objection.

18              Answer if you know.

19              THE WITNESS:  You'll have to repeat the question

20   for me.

21   BY MR. SCHIERLOH:

22         Q.    In November of 2011 do you recall the City

23   advising you that you had to get a medical examination

24   pursuant to the City's guidelines in 100.5.13?

25         A.    I don't recall whether they specified this.  We

David Brian Lee - July 17, 2014

45

1    do have an e-mail that said that we had to perform the

2    physical but I don't recall whether for this specifically.

3         Q.   Okay.

4              (Marked Defendant's Exhibit D.)

5    BY MR. SCHIERLOH:

6         Q.   I'm going to show you what I've marked as

7    Exhibit D.

8              MR. WEBBER:  Sorry.

9    BY MR. SCHIERLOH:

10        Q.   Have you seen this document before?

11        A.   Yes.  Okay.

12        Q.   Is this the e-mail you're referring to?

13        A.   No.

14        Q.   There was one prior to this, correct?

15        A.   Correct.

16        Q.   What did the first e-mail that you received

17   state to the extent you can recall?

18        A.   It -- the first e-mail I remember had to do with

19   blood draws.

20        Q.   Okay.

21        A.   But I don't recall the -- or maybe the

22   questionnaire.  I don't remember.

23        Q.   Had you ever had to fill out a questionnaire

24   prior, in previous years?

25        A.   Yes.

David Brian Lee - July 17, 2014

46

1      Q.   And then you received this e-mail on
2  November 23rd, correct?
3      A.   Can you repeat the question, please?
4      Q.   I'm sorry.
5           MR. SCHIERLOH:  I think I gave out an extra
6  copy.
7           MS. LENTZ:  Do you need that?
8           MR. SCHIERLOH:  This is the one I'm referring
9  to, Mr. Lee.  I'm sorry.
10  BY THE WITNESS:
11     Q.   On November 23rd you received this e-mail,
12  correct?
13     A.   I don't know when I received it.
14     Q.   Well, your name's on there, and at least it was
15  sent on November 23rd, correct?
16     A.   Correct.  It was sent on November 23rd.
17     Q.   And do you recall this e-mail, sir?
18     A.   Yes.
19     Q.   It advised you that you had to participate in a
20  blood draw, correct?
21     A.   Yes.
22     Q.   Did you ultimately participate in that blood
23  draw?
24     A.   No.
25     Q.   Why not?

David Brian Lee - July 17, 2014

47

1          A.    Because I didn't -- I'm not comfortable with

2    needles and I wasn't comfortable with the policy as

3    written.

4          Q.    So what policy are you referring to as written?

5          A.    The Health And Wellness.

6          Q.    So at least on November 23, 2011 you were aware

7    of the Health And Wellness policy as revised in 100.5.13,

8    correct?

9          A.    Yes.

10          Q.    So you actually learned about it prior to

11    December of 2011 then, correct?

12          A.    Yes.

13          Q.    Okay.  So you learned about the policy, the one

14    that we talked about where you had to get a full medical

15    examination for individuals over forty years, correct?

16          A.    Correct.

17          Q.    You disagreed with that, you didn't like

18    needles, and because of those reasons you didn't

19    participate in the blood draw, correct?

20          A.    Correct.

21          Q.    Okay.  You were scheduled for a full medical

22    examination on December 7, 2011, correct?

23          A.    I can't answer that.

24          Q.    The first time that you were scheduled for an

25    examination by Dr. Lovett did you appear?

David Brian Lee - July 17, 2014

48

1     A.    No.

2     Q.    Why not?

3     A.    I was on vacation.

4     Q.    All right.  You were advised of the fact that

5  there was a scheduled examination for you and that it was

6  missed due to vacation or whatever reason by Chief Cooper,

7  correct?

8     A.    No.

9     Q.    Mr. Lee, I'll show you what I've marked here as

10  Defendant's Exhibit E.

11           (Marked Defendant's Exhibit E.)

12           THE WITNESS:  Okay.

13  BY MR. SCHIERLOH:

14     Q.    This is the one that I mistakenly showed you

15  earlier.  Now, this is in December of 28, 2011, correct?

16     A.    Yes.

17     Q.    Do you recall receiving this e-mail?

18     A.    Yes.

19     Q.    And this e-mail advises you that pursuant to the

20  City's guidelines you have to go get a medical

21  examination, correct?

22     A.    Yes.

23     Q.    Essentially?  And your response is I'll give

24  them a call?

25     A.    Yes.

David Brian Lee - July 17, 2014

49

1      Q.   You didn't respond to Deputy Cooper objecting to
2   the guidelines because you felt that they were wrong or
3   unlawful in this e-mail, did you?
4      A.   No.
5      Q.   Okay.  You just said that you would give them a
6   call?
7      A.   Yes.
8      Q.   And did you, in fact, give them a call and
9   schedule an examination with Dr. Lovett?
10      A.   I -- I don't recall.
11      Q.   Okay.  You don't recall calling Dr. Lovett and
12   scheduling an examination for June 30, 2012?
13      A.   Yes, I scheduled an appointment.
14      Q.   Okay.  At any time between, let's say,
15   December 28th when you responded to Deputy Cooper and
16   January 30th, 2012, the scheduled date for your
17   examination with Dr. Lovett, did you complain to any
18   member of the Union or the City about your criticisms of
19   the guideline the City adopted for Health And Wellness
20   physicals?
21      A.   No.
22      Q.   What avenues would have been available to you
23   during that time if you wanted to object to the policy?
24   What could you have done?
25           MR. WEBBER:  Objection.

David Brian Lee - July 17, 2014

50

1          Go ahead and answer.

2          THE WITNESS:  What is it?  Would you repeat

3    that?

4    BY MR. SCHIERLOH:

5          Q.   For instance, could you have complained with the

6    Union and filed a grievance, and to the Union, you know,

7    if you object to the guideline?

8          A.   Yes.

9          Q.   It's my understanding that certain committees

10   that were established, there was a Labor Management

11   Committee that you could go to about the operating

12   guideline, correct?

13         A.   Yes.

14         Q.   There was a Health And Safety Committee too that

15   was established pursuant to the Collective Bargaining

16   Agreement that you could have complained to about the

17   guideline, correct?

18         A.   Yes.

19         Q.   You could have complained to your superiors?

20         A.   Yes.

21         Q.   You could have complained to the administration,

22   to the city manager, correct?

23         A.   Yes.

24         Q.   But you didn't complain to any of those

25   different individuals or groups, did you, --

David Brian Lee - July 17, 2014

51

1      A.    No.

2      Q.    -- between December 28th and January 30, 2012?

3      A.    No.

4      Q.    And you didn't file a Union complaint or

5 grievance between December 28, 2011 and January 30, 2012

6 with respect to the Health And Wellness Guideline?

7      A.    No.

8      Q.    Now, as part of the examination you were

9 required to complete a questionnaire, correct?

10      A.    Yes.

11            (Marked Defendant's Exhibit F.)

12 BY MR. SCHIERLOH:

13      Q.    Mr. Lee, this is Defendant's Exhibit F.  Will

14 you please look at that document, sir.

15            MS. MECHAK:   Thank you.

16 BY MR. SCHIERLOH:

17      Q.    Have you seen this document before, sir?

18      A.    Yes.

19      Q.    Does this appear to be a copy of the

20 questionnaire that you were sent in November of 2011 that

21 you were required to complete as part of your Health And

22 Wellness examination for the City?

23      A.    Yeah, it appears to be a copy.

24      Q.    And in November of 2011 or thereafter did you

25 actually complete this document and send it to

David Brian Lee - July 17, 2014

52

1    Dr. Lovett's office?

2         A.   Yes, I did.

3         Q.   Okay.  There was some issue that the document

4    couldn't actually be viewed because it was encrypted or

5    blocked in some fashion.  Do you remember that?

6         A.   Yes.

7         Q.   Okay.  Did you do anything to the document

8    itself when you submitted it to Dr. Lovett that would have

9    prevented Dr. Lovett from viewing the information that

10   would have been contained in the questionnaire that you

11   submitted?

12        A.   No.

13        Q.   Do you have any understanding as to why

14   Dr. Lovett couldn't view the information --

15        A.   No.

16        Q.   -- that was submitted as part of your

17   questionnaire?

18             MR. WEBBER:  You might wait for him to finish

19   the question before you answer.

20             THE WITNESS:  No.

21   BY MR. SCHIERLOH:

22        Q.   Do you have any understanding as to why

23   Dr. Lovett couldn't review the information that you

24   submitted as part of your questionnaire?

25        A.   No.

David Brian Lee - July 17, 2014

53

1      Q.    What is your understanding as to who created
2  this questionnaire, Mr. Lee?
3      A.    My understanding, it was created by Dr. Lovett.
4      Q.    Dr. Lovett.  Okay.
5            And what's your understanding as to who would
6  actually view the information that is submitted as part of
7  that questionnaire?
8      A.    A member of Dr. Lovett's offices.
9      Q.    Is it your understanding that the City
10 administration, the administration of the fire department,
11 never sees any of the information that's contained in the
12 questionnaire that an individual would submit as part of
13 its standard operating guideline Health And Wellness
14 Physicals?
15     A.    I can't answer as to what the City sees.
16     Q.    Okay.  Essentially you have no knowledge about
17 whether the City actually views any of the information
18 contained in the questionnaire that is submitted by an
19 employee?
20     A.    I have no knowledge of what they can view.
21     Q.    Okay.  Thank you.
22           Do you know if Dr. Lovett was ultimately ever
23 able to view the information that was submitted in the
24 questionnaire provided by you in November of 2011 or
25 thereafter?

David Brian Lee - July 17, 2014

54

1      A.   I can't answer that question.

2      Q.   He never responded back to you in any fashion

3  saying okay, I got it, we were able to fix the problem and

4  we can read it okay?

5      A.   No.

6      Q.   You never received any confirmation from

7  Dr. Lovett?

8      A.   No.

9      Q.   No.  But do you recall them contacting either

10  the City or you and saying hey, we can't review the

11  information that was provided as the part of your

12  questionnaire?

13      A.   Yes.  I provided a link, though.

14      Q.   Did you have to do anything thereafter to try to

15  relieve or absolve any problems that Dr. Lovett was having

16  with your questionnaire and not being able to open it?

17      A.   No.

18      Q.   You didn't resubmit it or anything like that?

19      A.   I took a physical print copy with me when I went

20  to my physical.

21      Q.   So you took a hard copy that you filled out to

22  the physical --

23      A.   Correct.

24      Q.   -- on January 30, 2012?

25      A.   Yes.

David Brian Lee - July 17, 2014

55

1      Q.    Okay.  A physical that was completed in its

2  entirety -- or excuse me -- a questionnaire that was

3  provided in its entirety?

4      A.    Yes.

5      Q.    And you provided that to Dr. Lovett or a member

6  of his staff?

7      A.    Yes.

8      Q.    You did not provide a copy to the City, of

9  course, or any member of the City --

10     A.    No.

11     Q.    -- of your questionnaire?

12     A.    No.

13     Q.    Between December 28, 2011 and January 30, 2012

14 do you recall having any additional discussions with any

15 member of the City, Chief Trick, Deputy Chief Cooper, any

16 of your superiors, about your health examination with

17 Dr. Lovett or any criticisms you had of the guidelines of

18 100.5.13?

19     A.    No.

20     Q.    Okay.  Tell me about what happened when you

21 responded to your examination on January 30, 2012.

22     A.    When I went down to my examination I provided

23 them with a copy of the questionnaire, the PA, then was

24 taken back to their trailer.  When she came out to state

25 that I had to do the blood draw I made my objections to

David Brian Lee - July 17, 2014

56

1   her and told her that I would only complete the part of
2   the physical that was required under forty, and she stated
3   she would have to go talk to Lovett, or whatever.
4        Q.   Okay.
5        A.   Or I don't know who in the office she spoke
6   with.
7             Then she came back and stated that I had to
8   complete the full physical because that's the contract
9   that they had with the City, and when I again objected she
10  said that they would not be able to provide a fitness
11  for --
12       Q.   Fit for duty, the card?
13       A.   Yeah, unless I completed the full physical.
14            And at that point I basically told her I cannot
15  complete the physical.
16       Q.   So you didn't?
17       A.   Then left.
18       Q.   You didn't undergo any portion of the test that
19  was typically administered by Dr. Lovett on January 3,
20  2012?
21       A.   I believe they did the eye test and the
22  spirometer.
23       Q.   Okay.  And other than those two individual tests
24  you didn't engage in any other aspect of the testing that
25  would have been performed by Dr. Lovett?

David Brian Lee - July 17, 2014

57

1       A.   Correct.

2       Q.   And then did you leave Dr. Lovett's trailer or

3   office at that time?

4       A.   Yes.

5       Q.   Where did you go next?

6       A.   Back to Station 29.

7       Q.   Who did you speak to when you returned?

8       A.   Lieutenant Sinewe, S-I-N-E-W-E.

9       Q.   What did you tell Lieutenant Sinewe at that

10  time?

11      A.   I believe I told him I needed to file a

12  complaint but I don't remember the exact wording.

13      Q.   File a complaint with the City?

14      A.   About -- yes.

15      Q.   Okay.  About the medical examination?

16      A.   Correct.

17      Q.   Okay.  Did you speak with Deputy Chief Cooper at

18  that time?

19      A.   Yes.

20      Q.   Tell me about what you discussed with Deputy

21  Chief Cooper.

22      A.   Basically we discussed the health and wellness

23  tests, and I told him I felt it was illegal.

24           And he basically told me that -- to put it in

25  writing, and that's what I did.

David Brian Lee - July 17, 2014

58

1      Q.   That's what you did.  Okay.

2           What did you explain to Deputy Chief Cooper on

3  January 30, 2012 about what you believed to be unlawful

4  about the guideline?

5      A.   That it was discriminatory against those over

6  forty.

7      Q.   And did you also tell Deputy Chief Cooper at

8  that time that you filed a complaint with the EEOC?

9      A.   I told him I talked with the EEOC, yes.

10     Q.   Was that true?

11     A.   Yes.

12     Q.   When did you first speak with the EEOC?

13     A.   I don't remember the exact date that I went down

14  and talked with them.

15     Q.   Okay.  Was it in 2012?  It was obviously prior

16  to your examination on January 30.

17     A.   Right.  I believe it was before 2012.

18     Q.   Okay.  So December of 2011?

19     A.   Possibly.

20     Q.   Okay.  Was it following your response to Deputy

21  Chief Cooper's e-mail of December 28, 2011 in Defendant's

22  Exhibit E that you met with the EEOC?

23     A.   You're going to have to repeat that.  I'm sorry.

24     Q.   Did you meet with the EEOC after communicating

25  with Deputy Chief Cooper on December 28, 2011, if you

David Brian Lee - July 17, 2014

59

1   know?

2       A.   Yeah, I don't recall the exact date.  I wasn't

3   there.

4       Q.   Okay.  That's fine.

5           MR. WEBBER:  For the record, Josh, you were

6   showing him exhibit, is that --

7           MR. SCHIERLOH:  E.

8           MR. WEBBER:  E.  Thank you.  I just wanted to

9   make the record clear.  Yeah.

10  BY MR. SCHIERLOH:

11      Q.   When you met with the EEOC at some time in

12  December of 2011 what did you tell them at that time?

13      A.   Basically I went down and took them a copy of

14  the policy and the questionnaire, and told them I had some

15  concerns with the policy, and that I would like them to

16  look at it and give me some advice on what to do.

17      Q.   And did they ever respond to you at some point?

18      A.   I met with the investigator.

19      Q.   Okay.

20      A.   So --

21      Q.   And what did he tell you?

22      A.   He basically told me that he felt that this was

23  a discriminatory policy and that they were in violation of

24  the GINA law, and recommended I go ahead and file a

25  complaint with them.

David Brian Lee - July 17, 2014

60

1      Q.   Okay.  And when you met with the investigator
2   was this the same day you went to speak with the EEOC or
3   was this a subsequent meeting?
4      A.   It was -- it was all at the same time.
5      Q.   All the same day.
6      A.   Basically you met with him right there.
7      Q.   So you went down, met with an investigator,
8   provided him with the documents that you described?
9      A.   Correct.
10      Q.   He reviewed them and he gave you an opinion, or
11   she gave you an opinion as to what they believed was
12   unlawful about the City's policies?
13      A.   Correct.
14      Q.   Do you recall the name of this individual, the
15   investigator?
16      A.   James McKensey.
17      Q.   James McKensey.  Okay.
18           Was that the only time you met with Mr. McKensey
19   prior to January 30, 2012?
20      A.   Yes.
21      Q.   All right.  So on January 30, 2012 you went for
22   the medical examination, you only completed a portion of
23   it, you went back to the department, reported your
24   concerns to Lieutenant Sinewe, you spoke with Deputy Chief
25   Cooper, and then you made a formal written complaint to

David Brian Lee - July 17, 2014

61

1    Deputy Chief Cooper, correct?

2        A.   You'll have to slow down.

3        Q.   Well, I'm just kind of discussing what you've

4    already testified to.

5        A.   Right.  Well, again, you'll have to repeat it

6    because I missed parts of it.

7        Q.   Okay.  You met with the EEOC investigator, okay,

8    sometime in December of 2011?

9        A.   Around December.

10       Q.   Okay.  You had your examination scheduled for

11   January 30, 2012?

12       A.   Correct.

13       Q.   Okay.  You went for your examination, you

14   indicated to Dr. Lovett or a member of his staff that you

15   could only complete certain portions of the test?

16       A.   Yes.

17       Q.   They said that was unacceptable, and you left?

18       A.   Correct.

19       Q.   You then went back to the department that same

20   day, reported your concerns to Lieutenant Sinewe?

21       A.   Yes.

22       Q.   And you ultimately spoke with Deputy Chief

23   Cooper?

24       A.   Yes.

25       Q.   And told him about your complaint with the City

David Brian Lee - July 17, 2014

62

1  guidelines, correct?

2      A.   Yes.

3      Q.   Deputy Chief Cooper told you to put it in

4  writing, which you did?

5      A.   Yes.

6      Q.   And that all occurred on January 30, 2012, your

7  meeting with Deputy Chief Cooper and the submission of the

8  written complaint?

9      A.   Yes.

10     Q.   Between December, sometime in December when you

11 met with the EEOC investigator, and January 30th, you

12 had no other meetings with any members of the EEOC and no

13 other discussions with any member of the City regarding

14 Guideline 100.5.13; is that correct?

15     A.   Not that I recall.

16     Q.   Okay.  Thank you.

17          What was the City's response to your written

18 complaint?

19     A.   I'm not sure I ever got a response to it.

20     Q.   Okay.  What was the next discussion you had with

21 an individual, a superior of yours at the City, with

22 respect to your refusal to submit to the examination per

23 the Guideline 100.5.13?

24     A.   If I recall correctly, the next step was I met

25 with Chief Trick, and Lieutenant Sinewe I believe was

David Brian Lee - July 17, 2014

63

1   present.

2        Q.   Okay.  And what was the purpose of that meeting

3   as best you can recall?

4        A.   The purpose of that meeting was -- well, I can't

5   speak for what their purpose for that meeting was.

6        Q.   Okay.

7        A.   So --

8        Q.   Tell me about what happened at the meeting at

9   that time.  What was discussed?

10       A.   Basically what was discussed was he, Chief

11  Trick, asked me what my concerns were about it.

12       Q.   Okay.

13       A.   When I started getting into the legalities of it

14  and that I believed it's a discriminatory policy over

15  forty, I was told we're not going to discuss that part of

16  it.

17       Q.   Okay.

18       A.   And then, again, I don't recall what the rest of

19  the specific conversation was.

20       Q.   As part of that discussion that day with Chief

21  Trick did you advise him that you had contacted the EEOC?

22       A.   I believe so.

23       Q.   Okay.  And on that day were you issued a direct

24  order to complete the health examination?

25       A.   No.

David Brian Lee - July 17, 2014

64

1     Q.  On a subsequent date were you given a direct

2  order, a written order, to complete the health

3  examination?

4     A.  Yes.

5     Q.  Okay.

6        (Marked Defendant's Exhibit G.)

7  BY MR. SCHIERLOH:

8     Q.  This is Exhibit G.  Mr. Lee, have you seen this

9  document before?

10     A.  Yes.

11     Q.  Okay.  And that's your signature at the bottom

12  that you've received and understood this?

13     A.  Yes.

14     Q.  All right.  And was it received by you on

15  February 8, 2012?

16     A.  I believe so.

17     Q.  Do you recall how you received this document?

18     A.  Yes.

19     Q.  How did you receive it, sir?

20     A.  It was presented by Lieutenant Sinewe.

21     Q.  It was hand delivered to you?

22     A.  Correct.

23     Q.  At the department?

24     A.  Yes.

25     Q.  Okay.  You referenced a discussion that you had

David Brian Lee - July 17, 2014

65

1  with Chief Trick about the Health And Wellness Physical

2  guideline and your complaint about it being unlawful.  Do

3  you recall when that discussion occurred prior to

4  receiving this directed order?

5       A.   I don't recall the exact date.

6       Q.   Is it possible it was within a few days of

7  receiving this, your discussion with Chief Trick?

8       A.   Of receiving this?

9       Q.   Yes.

10      A.   This document?

11      Q.   Exhibit G.

12      A.   I believe it was before.

13      Q.   Do you recall how much time elapsed from your

14  discussion with Chief Trick and when you received this

15  document?

16      A.   I don't recall exactly but I would say less than

17  a week.

18      Q.   Okay.  And according to this order you were

19  given thirty days to complete the health examination with

20  Dr. Lovett, correct?

21      A.   According to the order, yes.

22      Q.   And you did not comply with this directive, did

23  you?

24      A.   No.

25      Q.   Why not?

David Brian Lee - July 17, 2014

66

1        A.    Because I felt the EEOC was handling the

2    complaint and that it would be dealt with in that fashion.

3        Q.    Do you know, sir, following receipt of this

4    document, this directed order, if anyone from the EEOC

5    contacted Chief Trick or any member of the City?

6        A.    I don't know.

7        Q.    Do you know if prior to receiving this document,

8    this directed order, on February 8, 2012, if any member or

9    if the investigator at the EEOC contacted any individual

10   at the Moraine Fire Department or the city manager in

11   any way?

12       A.    I don't know.

13       Q.    As a result of failing to comply with the

14   directed order you were placed on unpaid administrative

15   leave, correct?

16       A.    Yes.

17       Q.    You were provided notice of that?

18       A.    Yes.

19       Q.    And you were given a hearing date, correct?

20       A.    Yes.

21            (Marked Defendant's Exhibit H.)

22   BY MR. SCHIERLOH:

23       Q.    Exhibit H, Mr. Lee, do you recall receiving this

24   document?

25       A.    It appears to be the document that I received.

**David Brian Lee - July 17, 2014**

67

1      Q.   Okay.  Do you recall how you received this

2  document?

3      A.   Yes.

4      Q.   How did you receive it?

5      A.   I received it from David Hicks.

6      Q.   David Hicks.  Okay.  Did he hand deliver it to

7  you?

8      A.   Yes.

9      Q.   How was that accomplished?

10      A.   In a meeting that was held.

11      Q.   So you had a meeting with Dave Hicks and he hand

12  delivered this notice to you during the course of that

13  meeting?

14      A.   Yes.

15      Q.   Or at the conclusion of that meeting?

16      A.   At some point during that meeting.

17      Q.   At some point.  Okay.

18           What was discussed with Dave Hicks during the

19  course of that meeting, sir?

20      A.   Again, he went over this.

21           Again, I made my objections and told them the

22  policy was discriminatory.  I told him I was in contact

23  with the EEOC and that I believed the EEOC would be

24  handling things, and that's pretty much the discussion.

25      Q.   Is it fair to assume that the meeting with Dave

David Brian Lee - July 17, 2014

68

1    Hicks occurred on March 9, 2012?

2         A.    Yes.

3         Q.    Okay.  And prior to March ninth and up to March

4    9, 2012 are you aware if the investigator from the EEOC

5    had contacted David Hicks or any member or administrator

6    of the City?

7         A.    I believe during this meeting that David Hicks

8    stated that they had been in contact with the EEOC.

9         Q.    David Hicks stated to you that he had been in

10   contact with a member of the EEOC?

11        A.    Yes, he stated that they were working with the

12   EEOC.

13        Q.    That the City was working with the EEOC?

14        A.    I don't recall the exact terminology but he

15   implied that, yes, they were.

16        Q.    And this would obviously have been in reference

17   to the complaint that you made?

18        A.    Correct.

19        Q.    Okay.  You had a hearing on March 13th,

20   correct, in regards to the notice of being placed on

21   administrative leave for insubordination?

22        A.    I don't recall the exact date.

23              (Marked Defendant's Exhibit I.)

24   BY MR. SCHIERLOH:

25        Q.    I'll hand you Exhibit I.  Have you ever seen

David Brian Lee - July 17, 2014

69

1    this document before, sir?

2          A.    Yes.

3          Q.    Okay.  Obviously this document indicates that

4    you had a hearing on March 13th of 2012 at 9:00 a.m.; is

5    that correct?

6          A.    Yes.

7          Q.    And this was presided over by the former Chief

8    Tom Schenck?

9          A.    Yes.

10         Q.    And at that time you were provided an

11   opportunity to voice your concerns and present any

12   evidence to him about what you thought was improper or

13   unlawful about the Standard Operating Guideline 100.5.13?

14         A.    Yes.

15         Q.    Okay.  If you turn to Page 2 of this document,

16   you indicated in there, in the last sentence of what

17   appears to be the third paragraph down, it says that you

18   indicated to Former Chief Schenck that you did not read

19   the pertinent Standard Operating Standard until

20   December of 2011 and January of 2012.  Do you see that?

21         A.    Where it says Firefighter Lee said that he did

22   not read the pertinent SOG until the 2011, 2012 time

23   frame?

24         Q.    December 2011, January 2012.

25         A.    Yes, sir.

David Brian Lee - July 17, 2014

70

1      Q.   That would be incorrect in light of today's

2 testimony where you said you were aware of the Standard

3 Operating Guideline in November of 2011, correct?

4            MR. WEBBER:  Objection.

5            THE WITNESS:  I don't know the exact date.  I'm

6 just --

7 BY MR. SCHIERLOH:

8      Q.   Okay.  And as a result of the hearing obviously

9 Tom Schenck, former Chief Tom Schenck, advised the City

10 that discipline was warranted in this case, correct?

11     A.   Correct.

12     Q.   And ultimately you were terminated by the City

13 for insubordination?

14     A.   Correct.

15           (Marked Defendant's Exhibit J.)

16           MR. WEBBER:  Thank you.

17 BY MR. SCHIERLOH:

18     Q.   This is the Notice of Termination dated March 28

19 of 2012, Exhibit J.  You received this document, correct,

20 sir?

21     A.   Yes.

22     Q.   Okay.  Do you recall how you received this

23 document?

24     A.   Yes.

25     Q.   How did you receive it?

David Brian Lee - July 17, 2014

71

1        A.    It was taped to my front door.

2        Q.    At the time the City served it on you by placing

3    notice on the front door of your home?

4        A.    Correct.

5        Q.    Now, is it your understanding that the City of

6    Moraine is a paramilitary organization?

7        A.    Yes.

8        Q.    What does that mean?  Can you explain that to

9    me?

10        A.    That means that they operate in a chain of

11    command.

12        Q.    And chain of command, therefore, in such an

13    organization is very important; you have to follow

14    command, correct?

15        A.    Yes.

16        Q.    All right.

17              (Marked Defendant's Exhibit K.)

18    BY MR. SCHIERLOH:

19        Q.    Defendant's Exhibit K, have you seen this

20    portion of the Moraine Fire Department Rules And

21    Regulations Report describing the organization as a

22    paramilitary type organization, sir?

23        A.    I don't believe I've ever seen this document.

24        Q.    But you'll agree with me in there it says that

25    under Subsection 1 the fire division functions as a

David Brian Lee - July 17, 2014

72

1    paramilitary organization and thus the chain of command is

2    paramount at all times, correct?

3         A.    That's what it states.

4         Q.    And in this particular situation you were

5    charged with insubordination for failing to comply with

6    the directive given to you by Chief Trick on February 8,

7    2012, correct?

8         A.    Yes.

9               (Marked Defendant's Exhibit L.)

10   BY MR. SCHIERLOH:

11        Q.    Exhibit L.  Section 7 here of Exhibit L was

12   given to me by you and your attorney, obviously, and it

13   was removed from the City's personnel manual policy -- or

14   Personnel Policy Manual.

15              MS. LENTZ:  Isn't this Exhibit K?

16              MR. SCHIERLOH:  No.  K was the rules and

17   regulations.

18              MS. LENTZ:  Oh, I see.  Sorry.

19   BY MR. SCHIERLOH:

20        Q.    Have you seen this portion of the policy manual

21   before, Mr. Lee?

22        A.    Yes.

23        Q.    And if we turn to Page 91, under Subsection Q it

24   has a designation there for Group III offenses, correct?

25        A.    Yes.

David Brian Lee - July 17, 2014

73

1        Q.    Okay.  And if we turn to the following page

2   under Number 13 insubordination obviously is included

3   within Group III offenses, correct?

4        A.    Yes.

5        Q.    And if you look down to the paragraph enumerated

6   with R, for a first offense of Group III disciplinary

7   offenses the discipline area action can be a ten day

8   suspension to termination.  Do you see that?

9        A.    Yes.

10       Q.    Okay.  Now, you filed a grievance for both your

11  unpaid administrative leave as well as your termination,

12  correct?

13       A.    Yes.

14       Q.    All right.  I believe your grievance for the

15  unpaid administrative leave was filed March 15, 2012 and

16  the grievance for your termination was filed April 12 --

17  excuse me -- April 2, 2012.  Does that sound --

18       A.    Do you have the documents so I can refer to

19  them?

20       Q.    Well, does that sound somewhat accurate to you,

21  if you know?

22       A.    It sound fairly accurate.

23       Q.    Okay.  Your grievances were ultimately denied by

24  the City, correct?

25       A.    Yes.

David Brian Lee - July 17, 2014

74

1    Q.    And you approached the Union about participating

2    on your behalf?

3    A.    Yes.

4    Q.    Taking the grievance further, potentially

5    arbitrating, correct?

6    A.    Yes.

7    Q.    What was the Union's response to you --

8    A.    They denied.

9    Q.    -- in response to your question?

10   A.    I'm sorry.

11   Q.    That's okay.  What did they tell you?

12   A.    They told me basically they felt it would be too

13   costly to take it to arbitration.

14   Q.    Did they indicate to you or to any member of the

15   group that you met with from the Union indicate to you

16   that they agreed with the policy set forth in Section

17   100.5.13, the Health And Wellness Physical Guideline?

18   A.    Yes.

19   Q.    And did they indicate to you they did not want

20   to arbitrate on your behalf because they didn't want to

21   appear as if they were adopting your views that the policy

22   itself was unlawful?

23   A.    Yes.

24   Q.    During the process of contesting the guideline

25   with the City following January 30, 2012, the City

David Brian Lee - July 17, 2014

75

1    indicate to you that you could get your own private doctor

2    to have the examination done, correct?

3        A.    Yes.

4        Q.    Did you not feel that this was a suitable remedy

5    or substitute for not having to go through Dr. Lovett?

6        A.    Can you restate your question?

7        Q.    Sure.  You were allowed to go see a private

8    doctor to get the examination done, correct?

9        A.    Yes.

10       Q.    The City offered you that opportunity?

11       A.    Yes.

12       Q.    Was that not a suitable accommodation for you in

13   order to meet the City's requirement of 100.5.13?

14       A.    No.

15       Q.    Why not?

16       A.    Because I didn't get the impression that they

17   were willing to pay for it, what it would cost.

18       Q.    You wanted the City to reimburse you for the

19   cost of the examination by your private doctor?

20       A.    Yes.

21       Q.    And if they had would you have been -- would the

22   health examination process have been available to you?

23       A.    No.

24       Q.    Okay.  Why not?

25       A.    Because it's discrimination.

David Brian Lee - July 17, 2014

76

1      Q.   So even though you could get your own doctor and

2   if the City was willing to reimburse you the cost of the

3   examination you still felt it was discriminatory?

4      A.   Yes.

5      Q.   Okay.  Mr. Lee, as we discussed, you're

6   currently employed with JEMS, correct?

7      A.   Yes.

8      Q.   What is your annual salary that you're making

9   with JEMS?

10      A.   I make 14.50 an hour, so you'll have to do the

11   math.

12      Q.   Do you recall how much you made in 2012?

13      A.   (No response.)

14      Q.   What was on your W-2?

15      A.   I don't have those numbers.  I've provided that

16   to you.

17      Q.   So you don't recall what you made in 2012?

18      A.   No.

19      Q.   Do you recall what your salary was with the City

20   in 2011?

21      A.   I don't.  I don't know, no.

22      Q.   Can you explain to me the difference between the

23   benefits that you've received as part of your employment

24   with the City and any benefits you receive or don't

25   receive as part of your employment with JEMS?

David Brian Lee - July 17, 2014

77

1       A.    Benefits with the City were I received uniform

2   allowance, paid vacation, paid sick time, Police And Fire,

3   which is a retirement system, and that's what I recall

4   right now, so --

5       Q.    Go ahead.  I'm sorry.

6       A.    And with JEMS the only thing we get is PERS.

7       Q.    So PERS, you're receiving PERS now with JEMS?

8       A.    Yes.

9       Q.    Obviously that's different than Police And Fire.

10      A.    Correct.

11      Q.    How many years did you have in the Police And

12  Fire?

13      A.    Roughly fifteen or sixteen, right in that road.

14  Sixteen maybe.

15      Q.    How many years did it take for you to become a

16  vested member of Police And Fire; do you recall?

17      A.    I don't know specifically.  I've heard ten

18  years.

19      Q.    Ten years.  Do you recall was there an age you

20  could retire with full benefits with Police And Fire?

21      A.    Forty-eight.

22      Q.    Forty-eight.  And what's the status of your --

23  the amount that you've accrued with Police And Fire right

24  now?  Is it just sitting stagnant?

25      A.    Yeah.

David Brian Lee - July 17, 2014

78

1     Q.   So there's no rollover into PERS from Police And
2     Fire?
3     A.   I don't know.
4     Q.   And even if you did, you didn't do that,
5     correct?
6     A.   Correct.
7     Q.   All right.  So now you're collecting PERS, and
8     you have about two years into PERS I take it, two or
9     three?
10    A.   Yes, just roughly.
11    Q.   You don't get paid vacation at JEMS?
12    A.   No.
13    Q.   You don't get paid sick time at JEMS?
14    A.   No.
15    Q.   You don't get a uniform allowance at JEMS?
16    A.   No.
17    Q.   Okay.  How much money have you paid for
18    different uniforms that you're required to wear through
19    your employment at JEMS; do you know?
20    A.   They provided a couple of pairs of pants and a
21    couple of shirts, and then we bought t-shirts and a hat,
22    so maybe -- I couldn't tell you exact number.
23    Q.   Okay.
24    A.   I mean --
25    Q.   Less than a hundred dollars?  I mean is it a

David Brian Lee - July 17, 2014

79

```
 1    pretty nominal amount?
 2         A.   Yeah, it should be less than a hundred.
 3         Q.   All right.  You had medical benefits with the
 4    City, correct?
 5         A.   Correct.
 6         Q.   You do not have medical benefits with JEMS?
 7         A.   Correct.
 8         Q.   Do you have medical insurance at the current
 9    time?
10         A.   Yes.
11         Q.   How are you insured?
12         A.   Through my wife.
13         Q.   Does your wife work somewhere?
14         A.   Yes.
15         Q.   Where does she work?
16         A.   Miami Valley Hospital.
17         Q.   Is the coverage that you receive on your wife's
18    plan through Miami Valley Hospital comparable to the
19    coverage you were receiving from the City for medical
20    benefits?
21         A.   No, I don't believe they're the same.
22         Q.   Who was the insurance through at the City; do
23    you recall?
24              CHIEF TRICK:  Anthem.
25              THE WITNESS:  Is that who we were with?
```

David Brian Lee - July 17, 2014

80

1           CHIEF TRICK:  Uh-huh.

2    BY MR. SCHIERLOH:

3        Q.   Who is your wife's insurance through at Miami

4    Valley?

5        A.   Well, you know, that's an interesting question,

6    because Miami Valley Hospital does their Premier, so this

7    year they've done their own insurance to where you have to

8    use their doctors, so I don't really know.

9        Q.   Okay.

10       A.   It's a --

11       Q.   Is it -- is the plan itself the same?  For

12   instance, the high deductible, health spending account

13   plan, or is it different in terms of format?

14       A.   They completely different.

15       Q.   Okay.  Explain to me what's different about the

16   two types of health care.

17       A.   There's a high deductible health plan, and the

18   one that we were on with Moraine I don't believe it was.

19       Q.   Did you have a standard like 90/10 plan,

20   something like that?

21       A.   Yes, something like that.

22       Q.   Okay.  Other than the wages that you've

23   described in your discovery, approximately $100,000, and

24   that just, I assume, is the difference between what you

25   were making with the City and now what you're making with

David Brian Lee - July 17, 2014

81

1    JEMS, and the difference in benefits that you receive

2    between the City and JEMS, are there any other

3    out-of-pocket or financial damages that you've incurred as

4    a result of being terminated from the position with the

5    City?

6         A.   I don't know if I can answer that.  I don't know

7    what the -- can you give me an example of what financial

8    damages you would be talking about?

9         Q.   Okay.  For instance, you had dental and vision?

10        A.   Correct.

11        Q.   Do you have dental and vision through your

12   insurance now, through your wife's insurance?

13        A.   Yes.

14        Q.   Okay.  Are there any other types of expenses

15   that you've had to incur that you're paying for now that

16   you didn't have to pay before when you had your employment

17   with the City?

18        A.   Umm --

19        Q.   We've talked about uniform allowance.

20        A.   Right.  I believe there would be a difference in

21   we have to pay for the insurance now.

22        Q.   Okay.

23        A.   I don't remember what the City -- I don't

24   remember if we had to pay anything for the City or not.

25        Q.   Okay.  So there would be a difference between

David Brian Lee - July 17, 2014

82

1    your contribution toward the premium --

2         A.    Correct.

3         Q.    -- for your insurance?

4         A.    Correct.

5         Q.    Do you know what that difference is in terms of

6    what you're paying now --

7         A.    Not offhand.

8         Q.    -- and what you used to pay?

9         A.    Not offhand.

10        Q.    Can you get that information and get it to your

11   attorney?

12        A.    Yes.

13        Q.    So my question is, anything else that you've

14   incurred other than what we've talked about here?

15        A.    Not that I can recall at this time.

16        Q.    I believe you're making a claim or you've at

17   least alleged that you've suffered some type of emotional

18   distress from all of this?

19        A.    Correct.

20        Q.    Have you sought any treatment with any

21   physicians or health care professionals for such distress

22   or emotional discomfort?

23        A.    No.

24        Q.    Mr. Lee, I guess for some reason I was under the

25   impression that you had some kind of side business or

David Brian Lee - July 17, 2014

83

1   private business that you had with computers that you were

2   making money or other sources of income.

3       A.    No.

4       Q.    That's not true?

5       A.    No.

6       Q.    You've never had any type of private business or

7   did computer work for people for money?

8       A.    No.

9           MR. WEBBER:  Other than what he's already

10  testified to?

11          MR. SCHIERLOH:  Certainly.

12  BY MR. SCHIERLOH:

13      Q.    I just thought there was something you were

14  doing in addition on the side?

15      A.    No.

16      Q.    Okay.  Mr. Lee, during the course of your

17  employment with the City of Moraine prior to 2011 did you

18  ever receive any discipline for any infractions during the

19  course of your employment?

20      A.    Yes.

21      Q.    Okay.

22          MR. SCHIERLOH:  Where am I; M?

23          THE REPORTER:  M.

24          (Marked Defendant's Exhibit M.)

25          MR. WEBBER:  Josh, are you going to be asking

David Brian Lee - July 17, 2014

84

1   him about all sorts of prior discipline?

2          MR. SCHIERLOH:  I am.

3          MR. WEBBER:  And incidents in his employment?

4          MR. SCHIERLOH:  Yes.

5          MR. WEBBER:  Can I have just a continuing

6   objection to the relevance of all of this?

7          MR. SCHIERLOH:  Certainly.

8   BY MR. SCHIERLOH:

9      Q.   I have marked this as Exhibit M, Defendant's

10  Exhibit M, and I'm going to show it to you.  Take a look

11  at it.

12     A.   Okay.

13     Q.   Do you recall receiving this discipline, this

14  Record of Written Reprimand I should say?

15     A.   Yes.

16     Q.   That's your signature on it, of course?

17     A.   Yes.

18     Q.   It says you were cited for a number of

19  violations:  Incompetency, Neglect of Duty, and

20  Insubordination.  The description states that you failed

21  to follow an order to recertify on May 5, 2008, the

22  process was explained to you, and your response was you

23  did on May 11.  What were you supposed to recertify for

24  that you were cited for, Mr. Lee?

25     A.   Their claim is to recertify I believe it was the

David Brian Lee - July 17, 2014

85

1    firefighter's certification.

2        Q.   Firefighter's certification.  And you were given

3    an order to do that on May 5, 2012?

4        A.   No.

5        Q.   So you dispute that you were given an order to

6    recertify by May fifth?

7        A.   Yes.

8        Q.   But you acknowledge that you received a copy of

9    this reprimand and, of course, it was placed in your

10   personnel file.

11           (Marked Defendant's Exhibit N.)

12   BY MR. SCHIERLOH:

13       Q.   I'll show you N, Defendant's Exhibit N.

14   Mr. Lee, this was again what I refer to as the report and

15   recommendation, or a memorandum, created by the police --

16   former police Chief Tom Schenck detailing a hearing for

17   certain discipline that you received.  This was part of an

18   ongoing investigation in the fire department that dealt

19   with you allegedly harassing some female members.  Do you

20   recall at least what -- that these events refer to in this

21   memorandum?

22       A.   Yes.

23       Q.   Do you recall receiving this memorandum

24   following your hearing on February 15, 2006?  Excuse me.

25       A.   Yeah, the hearing didn't occur that day so --

David Brian Lee - July 17, 2014

86

1        Q.    It looks like March 6, 2006.  I'm sorry,
2    March 2, 2006.
3        A.    So what's your question?
4        Q.    Do you recall receiving this document following
5    the hearing?
6        A.    Yes.
7        Q.    Okay.  And, again, it refers to a number of
8    incidents involving you using derogatory terms against
9    female employees in the fire department?
10       A.    Yes.
11       Q.    Referring to them as, I think, a bitch,
12   Miss Ledford?  Did you --
13       A.    Can you repeat that?
14       Q.    The memorandum indicates that you referred to
15   Miss Ledford, another firefighter, as a bitch.
16       A.    That's what the memorandum says, yes.
17       Q.    And did you ultimately receive certain
18   discipline for this violation?
19       A.    Yes.
20       Q.    Okay.  What did you receive; do you recall?
21       A.    I don't recall what the exact is.
22       Q.    You don't recall what discipline you received?
23       A.    It was a suspension.
24       Q.    Was it like twenty-four hours?
25       A.    I believe so.

David Brian Lee - July 17, 2014

87

1            (Marked Defendant's Exhibit O.)

2   BY MR. SCHIERLOH:

3        Q.   I'll show you Defendant's Exhibit O.  This is

4   the Record of Suspension for the incident referred to in

5   the earlier memorandum of harassment, and it details a

6   number of other incidents as well, correct, if you refer

7   to the second page?

8        A.   It appears to be.

9            (Marked Defendant's Exhibit P.)

10  BY MR. SCHIERLOH:

11       Q.   I'll show you Exhibit P.  This is another

12  recovered suspension.  Do you recall receiving this,

13  Mr. Lee?

14       A.   Yes.

15       Q.   Now, that refers to dishonesty, correct?

16       A.   Yes.

17       Q.   Okay.

18       A.   That's what that says.

19       Q.   It's my understanding that you were required to

20  complete certain equipment check documentation --

21       A.   Yes.

22       Q.   -- as part of your responsibilities with the

23  fire department, correct?

24       A.   Yes.

25       Q.   It's my understanding that you were filling

David Brian Lee - July 17, 2014

88

1    these documents out in advance and then turning them in

2    without doing the equipment checks?

3        A.    That's incorrect.

4        Q.    That's incorrect.  Okay.

5              Sir, tell me what was going on at this time and

6    what do you dispute with the City's accusations which led

7    to your suspension?

8        A.    It's been so long ago I don't recall all the

9    details of it so I can't get into all that, so --

10       Q.    You don't recall filling out the equipment check

11   sheets in advance and submitting them as part of your

12   regular duties?

13       A.    No, I do not.

14       Q.    Okay.

15             (Marked Defendant's Exhibit Q.)

16   BY MR. SCHIERLOH:

17       Q.    Exhibit Q, this is another written reprimand

18   that you received, Mr. Lee, correct?

19       A.    Uh-huh.

20             MR. WEBBER:  Yes?

21             THE WITNESS:  Well, yes.  Sorry.

22   BY MR. SCHIERLOH:

23       Q.    Again it details a violation of insubordination,

24   and this particular incident you were supposed to do

25   certain inspections within the City, correct?

David Brian Lee - July 17, 2014

89

1        A.    Yes.

2        Q.    And you failed to do those?

3        A.    Yes.

4        Q.    And what was the basis for not performing the

5   safety inspections?

6        A.    Because I was not a safety -- Fire Safety

7   Inspector for the City of Moraine.  That is a separate job

8   title within the Moraine Fire Department.

9        Q.    Were you certified to perform the type of

10  inspections that the City was asking you to do?

11       A.    I maintained a fire safety inspection card, yes.

12       Q.    And so you refused to do them because it was

13  your impression that this was a separate position within

14  the City?

15       A.    It is a separate position within the City.

16       Q.    But that was your position, wasn't it?

17       A.    I'm sorry?

18       Q.    But that was your position?

19       A.    Correct.

20            MR. SCHIERLOH:  Can we just have one minute,

21  take a break?

22            THE WITNESS:  Sure.

23            (A brief recess was taken.)

24  BY MR. SCHIERLOH:

25       Q.    Mr. Lee, I only have a few more questions for

David Brian Lee - July 17, 2014

90

1    you and then I'll pass to Miss Mechak.

2              MR. SCHIERLOH:  Am I pronouncing that correctly?

3              MS. MECHAK:  Yes.

4    BY MR. SCHIERLOH:

5         Q.    Then I may have a few follow-up questions after

6    her.

7              One thing I wanted to ask you about, in 2011 did

8    you file a workers' comp claim due to arthritis with the

9    City, workers' comp?

10        A.    No.

11        Q.    You did not file a workers' comp claim in 2011?

12        A.    In 2011?

13        Q.    In 2011 or any other time.

14        A.    Yes, there was a worker comp claim filed.

15        Q.    And what was the claim that you were seeking

16   benefits for?  Was it arthritis?

17        A.    No.

18        Q.    What was it for?

19        A.    It was for a meniscus tear.

20        Q.    Was the claim allowed?

21        A.    Yes.

22        Q.    And did you receive certain benefits from that,

23   from the claim, workers' comp?

24        A.    Yes.

25        Q.    Are you still receiving benefits from workers'

David Brian Lee - July 17, 2014

91

1    comp?

2        A.    No.

3        Q.    When did that end?

4        A.    I couldn't tell you the exact date.

5        Q.    Okay.

6        A.    So --

7        Q.    Did it end prior to your employment ending with

8    the City of Moraine?

9        A.    Yes.

10       Q.    So prior to March 28th of 2012 your workers'

11   comp benefits stopped?

12       A.    Yes.

13       Q.    And that was the only claim that you made for

14   workers' comp with the City of Moraine?

15       A.    No, there was others.

16       Q.    But in 2011 that was the only one that you made?

17       A.    As far as I can recall today.

18            MR. SCHIERLOH:  Okay.  I will pass to

19   Miss Mechak for the hard questions.

20            THE WITNESS:  Okay.

21            MR. WEBBER:  Before we do that, for the sake of

22   our court reporter, with the air conditioner, would you

23   guys mind switching places?

24            MS. MECHAK:  Can we try it from here since I'm

25   all set up, and then if she can't hear me then we'll

David Brian Lee - July 17, 2014

92

1   switch?

2           MR. WEBBER:  That's okay.

3           MS. MECHAK:  Is that okay?

4           THE REPORTER:  Sure.  If I have a problem I'll

5   let you know.

6           MS. MECHAK:  People usually complain I talk too

7   fast, not too quietly, so --

8                         - - -

9                   CROSS EXAMINATION

10  BY MS. MECHAK:

11      Q.   Good morning, Mr. Lee.  My name is Megan Mechak,

12  and I am the Union's attorney in the action that you filed

13  against it and the City, and I just have a few questions

14  for you.

15      A.   Okay.

16      Q.   I'm going to jump around because I don't want to

17  make you reanswer questions that you've already answered.

18      A.   Okay.

19      Q.   So if you need me to explain my questions please

20  let me know.

21      A.   Okay.

22      Q.   If you don't understand a question that I've

23  asked will you please let me know?

24      A.   Yes.

25      Q.   And I know we just took a break.  Do you need

David Brian Lee - July 17, 2014

93

1    another one before we get started?

2         A.    No.  I'm good.

3         Q.    If you need a break just let me know, we'll take

4    one.

5         A.    Okay.

6         Q.    You testified earlier that you graduated from

7    high school in 1986; is that right?

8         A.    Yes.

9         Q.    And that you started with the Butler Township

10   Fire Department in about 1992; is that right?

11        A.    I believe it's '93.

12        Q.    Okay.  What did you do, if anything, for

13   employment between your graduation from high school and

14   the start of your employment with Butler Township?

15        A.    I worked at McDonald's and two or three grocery

16   stores, I believe.

17        Q.    And did you leave all of those other positions

18   voluntarily?

19        A.    Yes.

20        Q.    Were you disciplined at any of those positions?

21        A.    No.

22        Q.    Okay.  And I think you testified that the

23   position at Butler Township was part time; is that right?

24        A.    Yes.

25        Q.    How many hours a week or a month was that, if

David Brian Lee - July 17, 2014

94

1    you recall?

2         A.   I can't recall.

3         Q.   Okay.  And were you disciplined when you were

4    employed by Butler Township at all?

5         A.   Yes.

6         Q.   And how many times would you say you were

7    disciplined by Butler Township?

8         A.   I don't recall.

9         Q.   Do you recall the types of discipline that you

10   received?

11             MR. WEBBER:  Objection.

12             THE WITNESS:  Yes.

13             MR. WEBBER:  May I have a continuing objection

14   to the relevance of this?

15             MS. MECHAK:  Go ahead and answer.

16             THE WITNESS:  Can you repeat the question?

17             MS. MECHAK:  Sure.

18   BY MS. MECHAK:

19        Q.   Do you recall the types of discipline that you

20   received?

21        A.   You're going -- I mean are you talking -- I

22   remember I pulled a shoreline one time and, therefore, I

23   wasn't allowed to drive.

24             So I ran over a curb one time with a truck.

25   Again, I don't know what the discipline was for those.

David Brian Lee - July 17, 2014

95

1    That's been years ago.

2         Q.   Were you ever disciplined for insubordination at

3    Butler Township?

4         A.   No.

5         Q.   Were you ever disciplined for dishonesty at

6    Butler Township?

7         A.   No.

8         Q.   You mentioned one workers' compensation claim

9    you had recently, and you said there were others?

10        A.   Yes.

11        Q.   About how many workers' compensation claims did

12   you file while you were employed with the City of Moraine?

13             MR. WEBBER:   Objection, relevance.

14             Go ahead and answer.

15             THE WITNESS:  I don't recall.

16   BY MS. MECHAK:

17        Q.   Was it in total more than five?

18        A.   I don't believe so.

19        Q.   And you testified about working for Sinclair

20   Community College during your National Registry Testing.

21        A.   Yes.

22        Q.   When did you start that position?

23        A.   I want to say somewhere around '94 maybe.

24        Q.   And I think it -- were you paid on a per day or

25   per class basis or per test basis?

David Brian Lee - July 17, 2014

96

1      A.   Yes, it's basically a per test.

2      Q.   Okay.  And how often, let's start in 1994, how

3  many tests did you typically work, if you recall?

4      A.   I don't recall.  Typically they did two tests a

5  year but I may not have worked all of them depending on

6  scheduling.

7      Q.   And you said you hadn't done that for about a

8  year; is that right?

9      A.   Yes.  I don't recall the last time I did it,

10  so --

11      Q.   And why did you stop doing it?

12      A.   They just haven't met my schedule.  They

13  schedule them on a day when -- they set their day and I

14  may have to be working or have other plans.

15      Q.   All right.  Other than working for the National

16  Registry or --

17      A.   And just to go back on the question, I still do.

18  If they have another one I still can do that.

19      Q.   You just haven't been able to coordinate that?

20      A.   Yes, just haven't been able to fill when I was

21  able to do it.

22      Q.   Other than the National Registry testing and the

23  Sugar Creek Township work that you testified about

24  earlier, did you have any sources of income while you were

25  employed by the City of Moraine?

David Brian Lee - July 17, 2014

97

1        A.    I don't -- I don't believe so.

2        Q.    You testified that you were involved in a

3    bankruptcy?

4        A.    Yes.

5        Q.    Do you recall when that was filed?

6        A.    I don't recall the exact date.

7        Q.    Do you recall the year?

8        A.    Not offhand.

9        Q.    Was it while you were employed by the City of

10   Moraine?

11       A.    No.

12       Q.    Was it before that?

13       A.    Yes.

14       Q.    And did you receive a discharge?

15       A.    Yes.

16       Q.    And what jurisdiction was that bankruptcy filed

17   in, if you recall?

18       A.    It would be Ohio, I believe.

19       Q.    Okay.  If you would pull out -- I want to ask

20   you some questions about the exhibits that you've already

21   testified about.

22       A.    Okay.

23       Q.    So if you could just grab that stack.

24       A.    Okay.

25       Q.    Let's talk about Exhibit A, which is the SOG.

David Brian Lee - July 17, 2014

98

1        A.    Okay.  I'm looking.  There it is.  Okay.

2        Q.    Now, the SOG 100.5.13 is not an attachment to

3    the Collective Bargaining Agreement; is that right?

4        A.    As far as I know it's not.

5        Q.    Okay.  And you signed the Collective Bargaining

6    Agreement, correct?

7        A.    Yes.

8        Q.    And presumably before you signed it you read it,

9    correct?

10       A.    I would assume so.  I don't recall.

11       Q.    Okay.  So the SOG is not attached to the CBA as

12   far as you know, correct?

13       A.    Correct.

14       Q.    And the content of the SOG that is Exhibit A is

15   not included anywhere in the 2011 to 2014 CBA, correct?

16       A.    Correct.

17       Q.    Okay.  And you were asked some questions earlier

18   about the Public Safety Health & Wellness Questionnaire,

19   which is Exhibit F.

20       A.    Okay.

21       Q.    That is not attached to the CBA, correct?

22       A.    Correct.

23       Q.    Okay.  And that document is not -- was not

24   attached to the SOG that you saw, correct?

25       A.    Was it -- you're referring to Exhibit --

David Brian Lee - July 17, 2014

99

1    Q.    Exhibit A.

2    A.    A?

3    Q.    Uh-huh.

4    A.    No.  It was not attached to it.

5    Q.    Okay.  And the SOG itself indicates under

6    Responsibility, if you want to take a look at it, that all

7    members of the Moraine Fire Department have the

8    responsibility to learn and follow this guideline,

9    correct?

10    A.    Correct.

11    Q.    Okay.  And typically when a guideline or a

12    policy is issued it's placed in a binder at the station;

13    is that right?

14    A.    That's correct.

15    Q.    Okay.  And there's a firefighter whose job it is

16    to do monthly tests or quizes on the various SOGs,

17    correct?

18    A.    At the time I was employed, yes.

19    Q.    Okay.  And as far as -- for the term that you

20    were there, at least as relevant for 2011 and 2012, that

21    was happening, correct?

22    A.    I can't recall specifically now.

23    Q.    Okay.  Now, you talked earlier about various

24    activities that firefighters have to complete, you know,

25    responding to fires, things of that nature.  Do you recall

David Brian Lee - July 17, 2014

100

1    that?

2            A.    Yes.

3            Q.    And when firefighters respond, for example, to a

4    fire emergency they have to do that while they're wearing

5    what's called bunker or turnout gear, correct?

6            A.    Yes.

7            Q.    Okay.  And that typically consists of a coat and

8    pants, helmet and boots, that are fire resistant and are

9    designed to protect the person wearing those items,

10   correct?

11           A.    Yes.

12           Q.    And then typically when firefighters respond to

13   a fire emergency they also wear what's called an SCBA,

14   correct?

15           A.    Yes.

16           Q.    And also have to wear an oxygen tank?

17           A.    No.

18           Q.    When they're responding to emergencies?

19           A.    No.

20           Q.    In a fire they don't wear an oxygen tank?

21           A.    No.

22           Q.    How can you receive oxygen?

23           A.    We receive it through an air bottle that's

24   provided, so it's not oxygen.

25           Q.    And you wear that on your back?

David Brian Lee - July 17, 2014

101

1      A.   Yes.

2      Q.   Okay.

3           MR. WEBBER:  Well, it's got some oxygen in it,

4  right?

5           THE WITNESS:  Yes.  An oxygen bottle is

6  different.

7           MR. WEBBER:  Okay.

8  BY MS. MECHAK:

9      Q.   And what's the size of the air bottle that

10  you're referencing?  How many -- how big is it?

11      A.   Oh, the ones we had were over thirty minutes.

12      Q.   Okay.  And so how heavy was that?  Was there a

13  weight to it?

14      A.   There is a weight but I don't know specifically

15  because it varies.

16      Q.   Okay.  Was it typically when you started and you

17  had thirty minutes of air left more than ten pounds?

18      A.   I would say so.

19      Q.   Okay.  More than fifteen pounds?

20      A.   I would say so.

21      Q.   More than twenty pounds?

22      A.   Probably.

23      Q.   More than twenty-five pounds?

24      A.   That's probably getting right around there.

25      Q.   Okay.

David Brian Lee - July 17, 2014

102

1        A.    I don't know specifically what they weigh.

2        Q.    Okay.  So when you as a firefighter responded to

3   a fire you had your turnout or your bunker gear on,

4   correct?

5        A.    Uh-huh.

6              MR. WEBBER:  You need to say yes or no.

7              THE WITNESS:  Sorry.  Yes.

8   BY MS. MECHAK:

9        Q.    The SCBA?

10       A.    Yes.

11       Q.    And then an air bottle with about twenty-five

12  pounds of additional weight; is that right?

13       A.    Yes.

14       Q.    Now, you testified earlier that to your

15  understanding that the Union negotiated Exhibit A, which

16  is the SOG, with the fire department.  Do you recall that?

17       A.    I believe the Union negotiates something with

18  it.

19       Q.    And what is the basis -- well, what's your

20  understanding of what the Union negotiated with the City?

21       A.    I have no knowledge of what the specifics of the

22  negotiations entailed.

23       Q.    Okay.  And looking at Exhibit A, the SOG, the

24  Union did not sign off on it as approving it, correct?

25       A.    I have no knowledge of that.

David Brian Lee - July 17, 2014

103

1      Q.    Well, take a look at it, with the SOG 100.5.13,

2   and let me know if there's any indicator there that the

3   SOG was approved by the Union?

4      A.    Within the document I'm looking at I see no

5   Union approval.

6      Q.    Okay.

7      A.    Or from any Union member.

8      Q.    And the Union hasn't signed off, or you don't

9   see anything where the Union signed off on it even

10  acknowledging it, correct?

11            MR. SCHIERLOH:  Objection.

12            Go ahead.

13            THE WITNESS:  No, I have not.

14            MS. MECHAK:  Okay.

15  BY MS. MECHAK:

16     Q.    Now, do you still maintain a paramedic license?

17     A.    It's a certification.  Yes, I do.

18     Q.    Okay.  And did you ever lose the certification

19  and have to recertify after your termination with the

20  City?

21     A.    Yes.

22     Q.    Okay.  When did you lose your certification?

23     A.    I renewed it May of this year.

24            MR. WEBBER:  She asked you when you lost it.

25            MS. MECHAK:  Yes.

David Brian Lee - July 17, 2014

104

1   BY MS. MECHAK:

2        Q.   Was there ever a point where you were not

3   certified as a paramedic?

4        A.   Oh, no.  I'm sorry.  No.

5        Q.   And you renewed it just because it was coming

6   due in this year, right?

7        A.   Yes.

8        Q.   You have to renew every two years or something?

9        A.   Every three years.

10       Q.   Every three years.  Okay.

11            And what is your role at JEMS?

12       A.   I am a Lieutenant Paramedic.

13       Q.   And you indicated that your hourly wage is

14   14.30?

15       A.   Yes.

16       Q.   How many hours do you work or are you scheduled

17   to work in a week?

18       A.   It varies.

19       Q.   And what is the --

20       A.   The average is probably about thirty-six.

21       Q.   Okay.

22       A.   By schedule I'm required -- I will work

23   twenty-fours a week.  But there's always extra hours so

24   I've been averaging probably thirty-six or a little bit

25   more.

David Brian Lee - July 17, 2014

105

1    Q.   Okay.  And what is the shift for JEMS?

2    A.   They run two shifts, 5A to 5P and 5P to 5A.

3  Again, just whatever's open.  Currently I'm running 5P to

4  5A.

5    Q.   Okay.  And do you -- is that shift every day or

6  do you work twelve on, forty-eight off of type situation,

7  or how does it work?

8    A.   The way I'm officially scheduled is twelve on,

9  sixty off, so every third day at night, but, again,

10  depending on when there's an opening or we need people to

11  fill schedules I can fill in any time, even partial shifts

12  if necessary.

13    Q.   Were you hired at JEMS as a lieutenant?

14    A.   Yes.

15    Q.   Have you ever been disciplined at JEMS?

16    A.   No.

17    Q.   Now, prior to -- well, I wanted to ask some

18  questions about when the physical, the Health And Wellness

19  physical, which I'm going to turn to that now.  Okay?

20    A.   Okay.

21    Q.   You indicated that you did not participate in

22  the blood draw that was scheduled for you in 2011; is that

23  right?

24    A.   Yes.

25    Q.   Prior to your refusal to participate in that

David Brian Lee - July 17, 2014

106

1  blood draw did you tell the Union that you were not going

2  to participate?

3       A.   No.

4       Q.   Okay.  And when you refused to participate did

5  you discuss your refusal to participate with anyone in the

6  Union at that time?

7       A.   No.

8       Q.   So you didn't explain to anyone in the Union why

9  you were refusing to participate?

10      A.   No.

11      Q.   And when you were ordered to complete the

12 physical on December 27th, the e-mail that you received

13 from Deputy Chief Cooper, did you notify the Union that

14 you would not be participating in the physical?

15      A.   No.

16      Q.   Okay.  Now, you said that before the January 30,

17 2012 physical appointment you did fill out questionnaire

18 that -- or a questionnaire similar to the one that's been

19 included as Exhibit F; is that right?

20      A.   Correct.

21      Q.   Okay.  Did you provide a copy of that completed

22 questionnaire to the Union?

23      A.   No.

24      Q.   Okay.  And do you have any knowledge that the

25 Union received a completed copy of that questionnaire from

David Brian Lee - July 17, 2014

107

1   any source?

2        A.   I have no knowledge of that.

3        Q.   Prior to January 30, 2012 did you tell anyone on

4   the Union executive board of your intention not to

5   complete the Health And Wellness physical required of

6   employees over the age of forty years?

7        A.   What date did you say?

8        Q.   The January 30, 2012 appointment date.

9        A.   No.

10        Q.   And I believe that you said you came back from

11   that appointment and you spoke to your -- to the

12   Lieutenant Sinewe?

13        A.   Sinewe.

14        Q.   Sinewe.  I'm sorry.

15        A.   No problem.

16        Q.   Was he your supervisor?

17        A.   Yes.

18        Q.   And that was of the capacity that you spoke to

19   him, correct?

20        A.   Yes.

21        Q.   And then I think you testified that you spoke to

22   Deputy Chief Cooper and at that point you explained to him

23   your belief that the policy was discriminatory; is that

24   right?

25        A.   Yes.

David Brian Lee - July 17, 2014

108

1      Q.   Did you have Union representation during that
2  meeting?

3      A.   No.

4      Q.   Okay.  Prior to that meeting did you notify
5  anyone in the Union of your opinion that the SOG was
6  discriminatory?

7      A.   No.

8      Q.   And at some point did you make formal written
9  complaint to Deputy Chief Cooper?

10     A.   Yes.

11     Q.   Do you recall when you did that?

12     A.   The same day.

13     Q.   Did you at the time when you provided the
14  complaint to Deputy Chief Cooper provide a copy to anyone
15  from the Union?

16     A.   I don't recall.  I don't believe so.

17     Q.   Okay.  And then I think that you said there was
18  a meeting that you had with Chief Trick and Lieutenant
19  Sinewe?

20     A.   Sinewe.

21     Q.   Is that right?

22     A.   Yes.

23     Q.   Did you have Union representation during that
24  meeting?

25     A.   No.

David Brian Lee - July 17, 2014

1      Q.   And that was the meeting during which you

2  received the memorandum with the order that you complete

3  the physical within thirty days, correct?

4      A.   No.

5      Q.   It was not?

6      A.   No.

7      Q.   Okay.  When you -- okay.

8           After that meeting did you discuss the

9  conversation that you had had with Chief Trick and

10  Lieutenant Sinewe with anyone in the Union?

11      A.   No.

12      Q.   When you received the February 8, 2012

13  memorandum ordering you to comply within thirty days you

14  received that from Lieutenant Sinewe, correct?

15      A.   Correct.

16      Q.   Okay.  Was there a meeting or did he just hand

17  the paper to you?

18      A.   There was a meeting in his office.

19      Q.   And did you have Union representation during

20  that meeting?

21      A.   No.

22      Q.   Did you show anyone a copy of that, from the

23  Union, a copy of that memorandum after you received it?

24      A.   No.

25      Q.   Did you ever -- and then ultimately you did file

David Brian Lee - July 17, 2014

110

1   a formal complaint with the EEOC, correct?

2        A.   Yes.

3        Q.   Did you name the Union in that complaint?

4        A.   There was -- there was discussion of the Union

5   with the EEOC gentleman but I don't know specifically what

6   was -- who was named or what.

7        Q.   Okay.  Have you ever seen a copy of your EEOC

8   complaint?

9        A.   Yes.

10       Q.   I apologize.  I don't have any of --

11            MR. WEBBER:  I've got copies of them.

12            MS. MECHAK:  You do?

13            MR. WEBBER:  Yes.

14            MS. MECHAK:  That's great.  If we could just go

15   off for a second.

16            (An off-the-record discussion was held.)

17            MR. WEBBER:  Do you mind just calling it

18   Plaintiff's 32?

19            MR. SCHIERLOH:  You can call it whatever you

20   want.

21            MR. WEBBER:  It's already labeled as that.

22            MS. MECHAK:  That's fine.

23            (Marked Plaintiff's Exhibit 32.)

24   BY MS. MECHAK:

25       Q.   All right.  Sir, you should have a copy of a

David Brian Lee - July 17, 2014

111

1   document that purports to be a Charge of Discrimination,

2   and it's been labeled Plaintiff's Exhibit 32.  Is that

3   what you have?

4        A.   Yes.

5        Q.   And this appears to be a Charge of

6   Discrimination that you filed against the City of Moraine

7   Fire Department, correct?

8        A.   Yes.

9        Q.   Okay.  And you've indicated on it that there's

10  discrimination based on age, genetic information, and

11  retaliation, correct?

12       A.   Yes.

13       Q.   Okay.  Is this the only Charge of Discrimination

14  that you have filed in association with the Health And

15  Wellness physical?

16       A.   This is the only one, only formal one I've

17  filled out.

18       Q.   Okay.  This is what the EEOC provided to me, and

19  this does not list IAFF Local 2981 or the Union as a

20  charged party, correct?

21       A.   Again, I don't know what the -- how their form

22  works, so I do not see that listed on here, so if it's

23  that you're implying --

24       Q.   Okay.  Well, there appears to be a box that says

25  Named is the Employer, Labor Organization, Employment

David Brian Lee - July 17, 2014

112

1    Agency, Apprenticeship Committee, or State or Local

2    Government Agency that I belief discriminated against me

3    or others.  Do you see that?

4         A.   Yes.

5         Q.   And underneath of that there are two boxes,

6    correct?

7         A.   Yes.

8         Q.   The first one lists the City of Moraine Fire

9    Department?

10        A.   Correct.

11        Q.   And the second one is blank, correct?

12        A.   Correct.

13        Q.   Okay.  And as far as you know there's no other

14   Charges of Discrimination relating to the incident that

15   we're here talking about, correct?

16        A.   If -- as far as I know.

17        Q.   This is the only one that you filled out and you

18   signed?

19        A.   That I signed, yes.

20        Q.   Okay.  And did your ever file a written

21   complaint against the Union similar to the one that you

22   provided to Deputy Chief Cooper on or about January 30,

23   2012?

24        A.   No.

25        Q.   Now, was the physical that you were ordered to

David Brian Lee - July 17, 2014

113

1    undergo in 2011 -- 2012, the first time you've been

2    ordered to undergo a Health And Wellness physical by the

3    City?

4         A.    Ordered?

5         Q.    Uh-huh.

6         A.    Yes.

7         Q.    Okay.  Had you ever been required to participate

8    in a Health And Wellness physical?

9         A.    We -- we have done health and physical -- Health

10   And Wellness physicals before.

11        Q.    Did you do a Health And Wellness physical in

12   2010?

13        A.    Yes.

14        Q.    And what did that physical entail, if you

15   recall?

16        A.    A questionnaire and -- and I think just like

17   vital signs, EKG, and a stress test.

18        Q.    And you did --

19        A.    There may have been something else but I don't

20   recall exactly what was involved.

21        Q.    And you did participate in that physical,

22   correct?

23        A.    Correct.

24        Q.    Okay.  You didn't refuse to do it in 2010 even

25   though you would have been over the age of forty at that

David Brian Lee - July 17, 2014

114

1   point, correct?

2       A.   Correct.

3       Q.   When was the first time that you notified anyone

4   associated with the Union that you refused to participate

5   in the Health And Wellness physicals?

6       A.   I believe the -- well, if you want to really get

7   down to it, Phil Sinewe would have been notified.

8       Q.   Well, when I asked you, you said you were

9   talking to Phil Sinewe in his capacity as your supervisor.

10      A.   Correct.  But he's also a Union member.

11      Q.   Dose he hold a position of trustee?

12      A.   No.

13      Q.   Did he in 2011 hold a trustee position of the

14  Union?

15      A.   No.

16      Q.   Was he a member of the executive board, by which

17  I mean the secretary/treasurer, those type of positions?

18      A.   No.

19      Q.   So he was just a Union member?

20      A.   Correct.

21      Q.   When was the first time that you notified a

22  member of the Union executive board about your refusal or

23  your planned refusal to participate in the required

24  physicals?

25      A.   I believe the first time they would have found

115

1  out would be at the -- would probably have been the

2  meeting with Dave Hicks.

3      Q.    That would have been on or about March ninth,

4  correct?

5      A.    Correct.

6      Q.    And who participated, if anyone, or who did you

7  notify at that point about your refusal to participate in

8  the physicals?

9      A.    That would have been Josh Wilson.

10      Q.    And Mr. Wilson was a trustee, correct?

11      A.    Yes.

12      Q.    Okay.  When was the first time that you notified

13  someone on the Union's executive board of your planned

14  refusal or your refusal to participate in the Health And

15  Wellness physicals?

16      A.    On what board?

17      Q.    The executive board, the president, the

18  secretary/treasurer, the vice president, folks in those

19  types of positions.

20      A.    Well, Josh Wilson, I guess that would have been

21  the executive board.

22      Q.    Okay.  So you -- but your understanding is that

23  his position was trustee?

24      A.    Trustee.

25      Q.    And you were a trustee as well, correct?

David Brian Lee - July 17, 2014

116

1      A.    On what date?

2      Q.    Well, were you ever a trustee?  Let's start

3   there.

4      A.    Yes.

5      Q.    When?

6      A.    I believe it was 2010, 2011.

7      Q.    Okay.  So at the point where you refused to

8   participate and were notified of the order that you were

9   to complete the physical within thirty days, so the

10   February, March, 2012 time frame, you were no longer a

11   trustee, correct?

12      A.    Yes.  I believe my term ended on

13   December 31st.  Again, I may be wrong on the dates

14   but --

15           MR. WEBBER:  December 31st of 2011?

16           THE WITNESS:  '11, yeah.

17           MR. WEBBER:  Thank you.

18   BY MS. MECHAK:

19      Q.    And back when you received on or about

20   November 23, 2011 the memo -- the e-mail from Mike Erby --

21   Mark Erby indicating that you need to have blood drawn did

22   you notify the Union that you disagreed with the policy?

23      A.    No.

24      Q.    And you indicated that you filed -- you did not

25   file a grievance relating to your belief that the policy

117

1    discriminated -- the SOG discriminated against people over

2    forty, correct?

3         A.    Can you repeat the question?

4         Q.    Sure.  Prior to the time that you were placed on

5    administrative leave --

6         A.    Okay.

7         Q.    -- on or about March of 2012 you did not file

8    any grievance alleging that the SOG discriminated against

9    folks over forty, correct?

10        A.    Correct.

11        Q.    Did you ask the Union whether you could file

12   such a grievance and they denied you that right?

13        A.    No.

14        Q.    In fact, you hadn't even told them that you

15   thought it was illegal, correct?

16        A.    Correct.

17        Q.    And you testified about two grievances that

18   you -- that you filed, one relating to your unpaid

19   suspension, leave, --

20        A.    Right.

21        Q.    -- and the other one relating to your

22   termination?

23        A.    Correct.

24        Q.    Did you draft the grievance relating to your

25   unpaid leave?

David Brian Lee - July 17, 2014

118

1        A.    I believe Mike Harris and myself did that.

2        Q.    Okay.  And when you say you did that what do you

3   mean?

4        A.    Put the grievance together.

5        Q.    And what do you mean put the grievance together?

6   Did you sit down at the computer together and type it up

7   together, or did you type it up and show it to him, or

8   something else?

9        A.    If I recall, he was typing it up and then I was

10  just giving input where I thought, so --

11       Q.    What about the grievance relating to your

12  termination?

13       A.    Let me -- hold on a minute.  Can I look at that?

14  Is it here?

15       Q.    I don't think it's an exhibit.

16       A.    Okay.  I believe that happened in the same

17  situation.

18       Q.    Okay.  So you two sat down?

19       A.    We both sat down at the computer and he typed it

20  up as I put it together.

21       Q.    And what computer did you use to do that?

22       A.    You know, I don't recall.

23       Q.    And did he at any point tell you that you

24  couldn't include something in the grievance that you

25  wanted to?

David Brian Lee - July 17, 2014

                                                              119

1        A.    I don't recall.

2        Q.    What invasive medical testing did the Union

3    require you to undergo because you were over the age of

4    forty?

5        A.    The Union would have required me everything in

6    this agreement that was agreed to, in the --

7        Q.    What are you talking about?

8        A.    In the SOG, Exhibit A.

9        Q.    Okay.  So Exhibit A, the Union required you to

10   undergo the testing that was in there; is that right?  Is

11   that your testimony?

12       A.    As part of the contract I would have to follow

13   the contract that they agreed to.

14       Q.    Well, let's take a look at the contract then.

15   Why don't you turn to Page 14 of Exhibit B.

16       A.    All right.

17       Q.    And turning to the -- to Section 5, Article 10,

18   the first sentence indicates it is understood and agreed

19   that the City can establish a program to monitor employee

20   safety and health, correct?

21       A.    Correct.

22       Q.    Okay.  So this simply gives the City permission

23   to do that, correct?

24       A.    Correct.

25       Q.    Okay.  And the SOG that's referenced in there is

David Brian Lee - July 17, 2014

120

1    not attached, you said earlier, to the CBA that you saw,
2    correct?
3         A.    Correct.
4         Q.    It's not incorporated word for word in the CBA
5    anywhere, correct?
6         A.    Correct.
7         Q.    The SOG that you saw doesn't indicate that it
8    was approved by the Union, correct?
9         A.    Correct.
10        Q.    It's not signed off on by the Union, correct?
11        A.    Correct.
12        Q.    Okay.  And, in fact, the SOG that you have in
13   front of you wasn't signed by Chief Trick until June 6,
14   2011, correct?
15        A.    Correct.
16        Q.    What genetic information did the Union, and
17   specifically the Union, request from you?
18        A.    Nothing that I'm aware of.
19        Q.    Did anyone from IAFF Local 2981 ever request
20   family medical history from you?
21        A.    No.
22        Q.    Other than your contention through SOG 100.5.13
23   did anyone from IAFF Local 2981 ever require you to
24   undergo a medical exam of any kind?
25        A.    I guess your definition -- it depends.  I have

David Brian Lee - July 17, 2014

121

1   to follow the contract so if that's a required, then, yes.

2       Q.   The contract -- you have to follow the contract

3   because you're an employee of the department, correct?

4       A.   Correct.

5       Q.   And so it was the department that ordered you to

6   undergo the physical, correct?

7            MR. SCHIERLOH:  Objection.

8            MS. MECHAK:  Counsel --

9            THE WITNESS:  The department did order me to

10  undergo it.

11  BY MS. MECHAK:

12      Q.   The Union never sent you an order to undergo the

13  physical, correct?

14      A.   Correct.

15      Q.   And the first time that you complained to anyone

16  from the Union that you believed SOG 100.5.13 was illegal

17  was on or about March 9, 2012, correct?

18           MR. WEBBER:  Objection.  You say Union.  Are you

19  referring to the executive committee?

20           MS. MECHAK:  Yes.

21           MR. WEBBER:  Okay.

22           THE WITNESS:  That would be the first time that

23  they were aware of the -- my objection to the SOG.

24  BY MS. MECHAK:

25      Q.   And did you notify the Union that you had filed

1    a Charge of Discrimination prior to March 9, 2012?

2         A.   No.

3         Q.   Okay.  Other than applying for your -- or since

4    you were hired by JEMS have you applied to work anywhere

5    else?

6         A.   Yes.

7         Q.   Okay.  Where have you applied to work?

8         A.   I don't have a list in front of me.

9         Q.   Have you provided that information to your

10   attorney?

11        A.   Yes.

12        Q.   Okay.  Have you been hired by anyone else and

13   declined the positions?

14        A.   No.

15        Q.   What types of jobs have you been applying for?

16        A.   For paramedic.

17        Q.   Have you been rejected for those positions?

18        A.   Yes.

19        Q.   And do you know the bases for any of those

20   rejections?

21        A.   No.

22        Q.   Now, the Union at -- or had a meeting to discuss

23   your request for assistance; is that right?

24        A.   You're talking arbitration?

25        Q.   Yes.

David Brian Lee - July 17, 2014

123

1      A.    Yes.

2      Q.    Okay.  And at that point you had already filed

3  your Charge of Discrimination, correct?

4      A.    Correct.

5      Q.    And retained your own attorney, correct?

6      A.    Correct.

7      Q.    Okay.  So the discussion was more providing

8  financial assistance; is that right?

9      A.    No.  The discussion was to take to arbitration.

10     Q.    Okay.  And you indicated that there were some

11  folks that agreed with you, is that right, that they

12  agreed with the policy -- I'm sorry -- that they agreed

13  with the policy?

14     A.    Yes, there were people who agreed with the

15  policy.

16     Q.    And who agreed with the policy?

17     A.    Again, I don't remember everybody who did.  The

18  most vocal person was Gary Rettig.  There -- there may

19  have been other people but I don't remember offhand.

20     Q.    And, Mr. Rettig, what was -- did he have a

21  position on the executive board or the executive committee

22  of the Union, to your knowledge?

23     A.    He's past president of the Union.

24     Q.    And -- okay.  And you also indicated that there

25  were folks who indicated that they did not want to appear

124

1    that they were adopting your position that the SOG was

2    unlawful; is that right?

3         A.   Right.  There was, yes.

4         Q.   And who said that?

5         A.   I believe that was Gary Rettig also.

6         Q.   Other than Mr. Rettig can you recall anybody who

7    was vocally outspoken against going forward with the

8    arbitration?

9         A.   Well, Lieutenant Phil Sinewe and Trent Ziegert

10   were two, probably the most vocal.  I'm sure everybody

11   spoke so --

12        Q.   What was Lieutenant Sinewe's position within the

13   Union at that point?

14        A.   What was his position?

15        Q.   Uh-huh.

16        A.   He was a Union member.

17        Q.   He wasn't on the executive committee?

18        A.   No.

19        Q.   And he wasn't a trustee, correct?

20        A.   Correct.

21        Q.   And what happened in this meeting was anybody

22   who was in the Union could attend it, correct?

23        A.   Correct.

24        Q.   And the point was to vote, it was a special

25   meeting to vote on whether to go to arbitration, correct?

David Brian Lee - July 17, 2014

125

1     A.   Correct.

2     Q.   That was actually something that the Union

3  opened up to all the membership to vote on, correct?

4     A.   Yes.

5     Q.   And you were given an opportunity to say your

6  peace?

7     A.   Yes.

8     Q.   And folks asked you questions and you answered

9  them?

10    A.   Yes.

11    Q.   And ultimately there was a vote about whether to

12 proceed with arbitration, correct?

13    A.   Yes.

14    Q.   And I believe that the vote was overwhelmingly

15 against proceeding to arbitration on either grievance?

16    A.   Correct.

17    Q.   Do you know whether the Union had ever taken a

18 case to arbitration prior to your requesting that your

19 cases go to arbitration?

20    A.   Yes.

21    Q.   And when did that happen?

22    A.   I don't recall the date.

23    Q.   Okay.  Was it while Mr. Harris was president?

24    A.   No.

25    Q.   Do you recall who the president was?

David Brian Lee - July 17, 2014

126

1       A.    Anthony Phipps.

2       Q.    And what was the subject matter of that

3  arbitration, if you recall?

4       A.    Yeah.  It was the disciplinary action.

5       Q.    Okay.

6       A.    I think you have it in here.

7       Q.    So one of your earlier discipline cases went to

8  arbitration?

9       A.    Correct.

10       Q.    And did the Union prevail?

11       A.    I don't know exactly how you would --

12       Q.    Did you win?

13       A.    Somewhat.

14       Q.    Okay.

15       A.    I guess.  It was a middle ground, I guess.

16       Q.    All right.  And what was the middle ground?

17       A.    Shoot.  I don't have it in front of me.

18  Basically it was that the disciplinary action would come

19  out, that all records of disciplinary action would be

20  removed from my file automatically, and counseling through

21  the EAP, I believe, so --

22            MS. MECHAK:  Sir, subject to any follow-up I

23  might have based on the questions that you get after this,

24  I don't have anything else for you.  Thank you for your

25  time.

David Brian Lee - July 17, 2014

127

1          THE WITNESS:  Thank you.

2          MR. SCHIERLOH:  Just a few questions,

3    follow-ups.

4                    - - -

5               CONTINUED CROSS EXAMINATION

6    BY MR. SCHIERLOH:

7          Q.   I just want to make sure I understand the

8    timeline with respect to any information you provided to

9    your superiors at the fire department about the SOG and

10   your objection to it.

11         A.   Okay.

12         Q.   The first time you informed your superiors at

13   the fire department about your objection to the SOG was on

14   January 30, 2012, correct?

15         A.   Correct.

16         Q.   Okay.  And not any time prior to that had you

17   informed anybody that was above you in terms of rank and

18   file at the fire department that you disagree or objected

19   to the SOG?

20         A.   That's correct.

21         Q.   Okay.  With respect to your claim under G that

22   it's isolated to the questionnaire that you were required

23   to fill out as part of the health examination under the

24   SOG, correct?  I mean other than the questionnaire no

25   other member from the City requested any medical

David Brian Lee - July 17, 2014

128

1  information from you or historical family information,

2  correct?

3      A.   Correct.

4      Q.   Okay.  So when you -- when you're referring to

5  GINA and the request for genetic information, that claim

6  is related to the health questionnaire that you were

7  required to fill out?

8      A.   Right.

9      Q.   Okay.  When we look at the Charge of

10 Discrimination that is Plaintiff's Exhibit 32, that

11 Miss Mechak questioned you about, if we look at -- this is

12 mine -- if we look at Subsection 3 there you state I

13 believe I'm being retaliated against for complaining.

14 Just explain to me in your own words, Mr. Lee, why you

15 think you were retaliated against.

16     A.   Because instead of dealing with the issue and

17 allowing the EEOC process to go forward the City decided

18 to take action against me and ultimately terminated me for

19 filing a complaint.

20     Q.   Well, they terminated you for insubordination,

21 correct?

22     A.   The insubordination was for filing a complaint.

23     Q.   So you believe you were retaliated against for

24 filing a complaint with the EEOC?

25     A.   Correct.

129

1      Q.   Okay.  Mr. Lee, prior to 2011 was there ever a
2  time that you were deemed unfit for duty with the City of
3  Moraine Fire Department?
4      A.   Yes.
5      Q.   And what was the reason for being declared unfit
6  for duty?
7      A.   I don't know what the reason specifically was.
8      Q.   Do you recall what they conveyed, anybody
9  conveyed to you about being unfit for duty?
10     A.   No.  It had to do with that disciplinary action,
11  so --
12     Q.   Wasn't it a psychological issue?  Didn't they
13  determine you were unfit for duty due to a certain
14  psychological assessment you had received?
15     A.   I received a psychological assessment but --
16     Q.   You don't know --
17     A.   I don't know.
18     Q.   -- is what you're saying?
19     A.   I'm not a doctor, so --
20     Q.   Who would have assessed you at that time; do you
21  recall?
22     A.   Some doctor in Columbus, I believe.
23     Q.   Do you remember that individual's name?
24     A.   No, I don't.
25     Q.   And that individual, whoever it was in Columbus,

David Brian Lee - July 17, 2014

130

1   never explained to you why they determined that you were
2   psychologically unfit for duty?
3       A.   No.
4       Q.   But is it your understanding that you were
5   determined to be unfit for duty due to psychological
6   reasons?
7       A.   No.
8       Q.   That's not your understanding?
9       A.   No.
10      Q.   And that assessment and that determination of
11  unfit for duty occurred around the same time that you were
12  disciplined for harassing female employees within the fire
13  department, correct?
14           MR. WEBBER:  Objection.
15           THE WITNESS:  Yes.
16           MR. SCHIERLOH:  Okay.  I have no further
17  follow-up.
18           MS. MECHAK:  I have a few.  I apologize.
19                        - - -
20               CONTINUED CROSS EXAMINATION
21  BY MS. MECHAK:
22      Q.   When you spoke with Lieutenant Sinewe in his
23  capacity as your supervisor on or about January 30, 2012
24  did you ask him to notify the executive committee or the
25  executive board of the Union of your complaint?

David Brian Lee - July 17, 2014

131

1      A.   No.

2      Q.   And the Union did not place you on

3  administrative leave, correct?

4      A.   No.

5      Q.   Okay.  And the Union did not terminate your

6  employment with the City of Moraine, correct?

7      A.   No.

8      Q.   And you did not hold a paid position with the

9  Union, correct?

10      A.   Hold a what?

11      Q.   Paid position.

12      A.   Paid?

13      Q.   Yes.

14      A.   No.

15      Q.   You were not an employee of the Union, correct?

16      A.   No.

17           MS. MECHAK:  That's all I have.  Thank you.

18           MR. WEBBER:  I just have one question to clarify

19  a question that I think you both were asking.

20                        -  -  -

21                      EXAMINATION

22  BY MR. WEBBER:

23      Q.   David, were you asked for family medical

24  information by anyone through this process or was there

25  any request for that information by anyone?

David Brian Lee - July 17, 2014

132

1        A.    I believe so.  Again, I don't remember.

2        Q.    Would you elaborate on that.

3        A.    Well, obviously the doctor asked for, you know,

4   family, does the -- you know, did your parents have heart

5   disease, stuff like that, so -- and I can't remember if

6   there's a form you filled out at the doctor's office or if

7   it's something separate, so --

8        Q.    Okay.  So was there something else in addition

9   to the pamphlet or the -- or Exhibit F that you were given

10  to fill out?

11            MR. SCHIERLOH:  The questionnaire?

12            MR. WEBBER:  The questionnaire.

13            THE WITNESS:  I don't recall, but I believe

14  there was something we filled out at the doctor's office,

15  so, again, I don't recall.

16            MR. WEBBER:  All right.

17                      - - -

18            CONTINUED CROSS EXAMINATION

19  BY MR. SCHIERLOH:

20       Q.    Whatever additional document you were required

21  to fill out it's your testimony that was provided to you

22  at the doctor's office?

23       A.    Yeah, I believe there was a form we had to fill

24  out there.

25       Q.    That was a form provided by Dr. Lovett and his

David Brian Lee - July 17, 2014

133

1    clinic or his facility?

2         A.    Yeah.

3         Q.    Do you have a copy of that form?

4         A.    No, I don't.

5         Q.    Do you remember if you even filled it out?

6         A.    I filled out some paperwork when I was down

7    there, and I don't recall exactly what was on it, so --

8         Q.    Would that have been the day that you would

9    have --

10        A.    That would have been the thirtieth.

11        Q.    January 30, 2012 you were given this document to

12   fill out?

13        A.    That's what I recall.

14        Q.    Do you recall what questions were asked of you

15   in this document?

16        A.    Not specifically.

17        Q.    So you don't remember what you were required to

18   fill out on that particular document that was given to you

19   at Dr. Lovett's office?

20        A.    Correct.

21             MR. SCHIERLOH:  Okay.

22             MS. MECHAK:  Nothing further.

23             MR. WEBBER:  That's it.

24             THE REPORTER:  Signature?

25             MR. WEBBER:  Oh, David, you have the right to

134

1   review the document, review Mrs. Jay's transcription of

2   your testimony and review it for accuracy.  You can choose

3   to waive that or you can go to her office and review it.

4   You can always change your mind later.  At this point I

5   would advise you to review it, but you have the option of

6   waiving it.

7              THE WITNESS:  Okay.  Then I'll review it.

8              (Deposition concluded at 12:11 p.m.)

9                               - - -

10

11                    _____

                            DAVID BRIAN LEE

12                               - - -

13  (LJ)

14

15

16

17

18

19

20

21

22

23

24

25

135

```
 1   STATE OF OHIO          :
                            : ss      C E R T I F I C A T E
 2   COUNTY OF MONTGOMERY   :

 3

 4          I, LORI JAY, a Registered Professional Reporter

 5   and Notary Public in and for the State of Ohio at large,

 6   duly commissioned and qualified;

 7          DO HEREBY CERTIFY that the above named DAVID

 8   BRIAN LEE, was by me first sworn to testify to the truth,

 9   the whole truth, and nothing but the truth; that his

10   testimony was recorded by me in Stenotype and thereafter

11   reduced to typewriting; that the signature of the witness

12   to the deposition was not waived, and was taken at the

13   time and place hereinabove set forth, by notice and

14   agreement of counsel as stated.

15          I FURTHER CERTIFY that I am not a relative or

16   attorney of either party, nor in any manner interested in

17   the event of this action.

18          IN WITNESS WHEREOF I have hereunto set my hand

19   and affixed my seal of office on the 28th day of July,

20   2014.

21

22                      _____
                        LORI JAY, RPR, CMRS
23                      NOTARY PUBLIC, STATE OF OHIO
                        My Commission Expires 11-25-16
24                               - - -

25
```

Case: 3:13-cv-00222-TMR Doc #: 39 Filed: 10/20/14 Page: 137 of 150 PAGEID #: 865
David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

## $

**$100,000 (1)**
80:23

## A

**ability (2)**
27:13;32:2
**able (7)**
53:23;54:3,16;
56:10;96:19,20,21
**above (1)**
127:17
**absolve (1)**
54:15
**Academy (1)**
8:17
**accepted (1)**
11:12
**accident (2)**
20:9;28:4
**accommodation (1)**
75:12
**accomplished (1)**
67:9
**according (2)**
65:18,21
**account (1)**
80:12
**accrued (1)**
77:23
**accurate (3)**
23:13;73:20,22
**accusations (1)**
88:6
**acknowledge (1)**
85:8
**acknowledging (1)**
103:10
**action (7)**
73:7;92:12;126:4,
18,19;128:18;129:10
**activities (5)**
26:11,15;27:25;
30:6;99:24
**actual (1)**
30:7
**actually (9)**
22:14;24:4;44:2;
47:10;51:25;52:4;
53:6,17;125:2
**Adam (1)**
21:25
**addition (2)**
83:14;132:8
**additional (7)**
8:20;10:18;13:25;
14:5;55:14;102:12;
132:20
**adequately (2)**
32:2,10

**administered (1)**
56:19
**administration (3)**
50:21;53:10,10
**Administrative (7)**
24:12;66:14;68:21;
73:11,15;117:5;131:3
**administrator (1)**
68:5
**admit (1)**
21:20
**admonitions (1)**
7:2
**adopted (1)**
49:19
**adopting (2)**
74:21;124:1
**advance (2)**
88:1,11
**advanced (1)**
10:15
**advancing (1)**
33:11
**advice (1)**
59:16
**advise (1)**
63:21
**advised (5)**
5:24;44:14;46:19;
48:4;70:9
**advises (1)**
48:19
**advising (1)**
44:23
**affect (1)**
32:23
**affidavit (2)**
41:15,18
**again (21)**
20:12;23:19;27:25;
31:20;43:13;56:9;
61:5;63:18;67:20,21;
85:14;86:7;88:23;
94:25;105:3,9;
111:21;116:13;
123:17;132:1,15
**against (14)**
58:5;86:8;92:13;
111:6;112:2,21;
117:1,8;124:7;
125:15;128:13,15,18,
23
**age (16)**
5:5;21:4;32:14;
33:4,5,7,11,23;39:1,7;
43:10;77:19;107:6;
111:10;113:25;119:3
**agency (5)**
16:2,3;17:13;112:1,
2
**aging (1)**
32:22
**ago (6)**

**12:21,21;20:22,24;**
**88:8;95:1**
**agree (13)**
30:14,18;31:12,15,
25,25;32:5,7,13,20,
22;33:1;71:24
**agreed (9)**
74:16;119:6,13,18;
123:11,12,12,14,16
**Agreement (18)**
23:3,14;24:3;34:15,
24;35:4,5,8,9,14;36:6;
37:5,13;40:14;50:16;
98:3,6;119:6
**ahead (7)**
21:20;50:1;59:24;
77:5;94:15;95:14;
103:12
**air (5)**
91:22;100:23;
101:9,17;102:11
**alleged (2)**
21:6;82:17
**allegedly (1)**
85:19
**alleges (1)**
21:1
**alleging (1)**
117:8
**allowance (3)**
77:2;78:15;81:19
**allowed (4)**
25:18;75:7;90:20;
94:23
**allowing (1)**
128:17
**always (1)**
104:23
**ambulance (2)**
15:21,25
**amount (2)**
77:23;79:1
**annual (1)**
76:8
**answered (2)**
92:17;125:8
**Anthem (1)**
79:24
**Anthony (1)**
126:1
**anymore (1)**
14:9
**apologize (2)**
110:10;130:18
**appear (5)**
23:13;47:25;51:19;
74:21;123:25
**appearing (1)**
34:20
**appears (7)**
23:18;51:23;66:25;
69:17;87:8;111:5,24
**applied (2)**

**122:4,7**
**applying (2)**
122:3,15
**appointment (4)**
49:13;106:17;
107:8,11
**appreciate (1)**
23:25
**Apprenticeship (1)**
112:1
**approached (1)**
74:1
**appropriate (1)**
27:16
**approval (1)**
103:5
**approved (2)**
103:3;120:8
**approving (1)**
102:24
**approximately (6)**
8:18;9:11;19:12;
20:17;26:25;80:23
**April (4)**
22:16;38:24;73:16,
17
**arbitrate (1)**
74:20
**arbitrating (1)**
74:5
**arbitration (11)**
74:13;122:24;
123:9;124:8,25;
125:12,15,18,19;
126:3,8
**area (3)**
9:1;13:1;73:7
**around (7)**
14:3;25:4;61:9;
92:16;95:23;101:24;
130:11
**arthritis (2)**
90:8,16
**Article (5)**
24:4;35:24;36:9;
37:16;119:17
**████ (2)**
19:9,10
**aspect (1)**
56:24
**aspects (2)**
29:12,22
**assessed (1)**
129:20
**assessment (3)**
129:14,15;130:10
**assistance (3)**
42:20;122:23;123:8
**associate (1)**
25:13
**associated (2)**
42:15;114:4
**associating (1)**

**34:9**
**Association (6)**
23:16,21;34:11;
42:7,10;111:14
**assume (9)**
6:23;19:24;20:21;
25:18;29:10;41:14;
67:25;80:24;98:10
**assumption (1)**
34:13
**assure (1)**
31:17
**attached (5)**
98:11,21,24;99:4;
120:1
**attachment (1)**
98:2
**attacks (1)**
33:22
**attend (2)**
7:23;124:22
**attended (1)**
7:17
**attorney (6)**
5:24;72:12;82:11;
92:12;122:10;123:5
**attorneys (1)**
5:15
**attorney's (2)**
21:6;22:14
**audible (1)**
6:11
**August (9)**
16:7,8,9,12;18:7,12,
14,18;24:14
**auto (1)**
20:8
**automatically (1)**
126:20
**available (2)**
49:22;75:22
**avenues (1)**
49:22
**average (2)**
26:23;104:20
**averaging (1)**
104:24
**aware (9)**
43:5,9;44:3,7;47:6;
68:4;70:2;120:18;
121:23
**ax (2)**
25:14;26:16

## B

**back (11)**
16:20;54:2;55:24;
56:7;57:6;60:23;
61:19;96:17;100:25;
107:10;116:19
**bankruptcy (5)**
19:24;20:1,2;97:3,

Case: 3:13-cv-00222-TMR Doc #: 39 Filed: 10/20/14 Page: 138 of 150 PAGEID #: 866
David Lee v.
City of Moraine Fire Department, et al.
David Brian Lee
July 17, 2014

16

**Bargaining (9)**
23:3,14;24:3;34:23;
37:13;40:14;50:15;
98:3,5

**barriers (1)**
25:21

**based (3)**
21:4;111:10;126:23

**bases (1)**
122:19

**basic (1)**
10:6

**basically (13)**
13:9;17:22;33:15;
56:14;57:22,24;
59:13,22;60:6;63:10;
74:12;96:1;126:18

**basis (6)**
24:24,25;89:4;
95:25,25;102:19

**Bates (2)**
22:15;34:7

**bears (1)**
22:14

**became (7)**
9:6;10:1;15:4,7;
43:4,19;44:7

**become (7)**
8:12,15,25;11:21;
43:9;44:3;77:15

**becomes (1)**
6:7

**begin (4)**
6:5;7:3;8:7;16:6

**behalf (3)**
34:15;74:2,20

**belief (3)**
107:23;112:2;
116:25

**benefits (12)**
76:23,24;77:1,20;
79:3,6,20;81:1;90:16,
22,25;91:11

**best (2)**
6:19;63:3

**beyond (3)**
14:1;33:11,11

**big (1)**
101:10

**binder (1)**
99:12

**bit (3)**
13:6;24:22;104:24

**bitch (2)**
86:11,15

**blank (1)**
112:11

**blocked (1)**
52:5

**blood (8)**
45:19;46:20,22;
47:19;55:25;105:22;

106:1;116:21

**board (9)**
107:4;114:16,22;
115:13,16,17,21;
123:21;130:25

**boots (1)**
100:8

**both (4)**
73:10;118:19;
131:19

**bottle (4)**
100:23;101:5,9;
102:11

**bottom (1)**
64:11

**bought (1)**
78:21

**box (1)**
111:24

**boxes (1)**
112:5

**break (3)**
89:21;92:25;93:3

**breaking (1)**
25:21

**BRIAN (2)**
5:4,19

**brief (1)**
89:23

**brought (1)**
9:22

**build (1)**
30:5

**building (3)**
25:19,25;30:7

**bunker (1)**
100:5;102:3

**burn (4)**
28:21,21;29:1;30:4

**burning (2)**
25:19;30:7

**business (11)**
12:4,5,9;13:14;
15:1;16:19,19;17:3;
82:25;83:1,6

**businesses (3)**
14:21,22;15:24

**Butler (22)**
9:5,7,9,15;10:1,22,
24;11:2,2,5,6,8,9,15,
18;93:9,14,23;94:4,7;
95:3,6

**C**

**call (6)**
13:20;17:1;48:24;
49:6,8;110:19

**called (2)**
100:5,13

**calling (2)**
49:11;110:17

**came (3)**

55:24;56:7;107:10

**can (42)**
10:18;15:5,19;
26:13,19;29:16;
32:10;35:11;36:2,13,
25;37:2;42:9;43:18;
45:17;46:3;53:20;
54:4;63:3;71:8;73:7,
18;75:6;76:22;81:6,7;
82:10,15;84:5;86:13;
89:20;91:17,24;
94:16;96:18;100:22;
105:11;110:19;117:3;
118:13;119:19;124:6

**cancer (1)**
33:22

**capacity (4)**
13:13;107:18;
114:9;130:23

**card (2)**
56:12;89:11

**cardiopulmonary (1)**
33:21

**care (8)**
10:18;15:22;20:14;
25:1;27:16,24;80:16;
82:21

**Carlisle (1)**
15:23

**carry (2)**
26:1;29:6

**case (3)**
5:17;70:10;125:18

**cases (4)**
25:22;26:16;
125:19;126:7

**cautioned (1)**
5:6

**CBA (5)**
98:11,15,21;120:1,
4

**certain (19)**
15:25;21:2,8;25:12,
24;29:12,22;32:14;
33:10,21;40:8;50:9;
61:15;85:17;86:17;
87:20;88:25;90:22;
129:13

**Certainly (3)**
43:8;83:11;84:7

**certificates (1)**
9:21

**certification (7)**
10:8,11;85:1,2;
103:17,18,22

**certifications (2)**
10:9,15

**certified (2)**
89:9;104:3

**chain (3)**
71:10,12;72:1

**change (1)**
31:12

changes (2)
32:14;38:11

**Charge (6)**
111:1,5,13;122:1;
123:3;128:9

**charged (2)**
72:5;111:20

**Charges (1)**
112:14

**check (2)**
87:20;88:10

**checks (1)**
88:2

**Chief (36)**
48:6;55:15,15;
57:17,21;58:2,7,21,
25;60:24;61:1,22;
62:3,7,25;63:10,20;
65:1,7,14;66:5;69:7,
18;70:9;72:6;79:24;
80:1;85:16;106:13;
107:22;108:9,14,18;
109:9;112:22;120:13

**chiefs (1)**
42:15

**Chuck (1)**
37:1

**cited (2)**
84:18,24

**City (111)**
5:16;11:3,22;12:1,
3,11;14:18;15:22;
21:1;23:15;24:19,23;
26:7,18,24;27:22;
29:2,20;30:15,22;
31:3,7,12,15,20;32:1;
33:15;34:23;35:4,6,7;
36:1,11;37:6;38:13;
40:5,19,24;41:4,6,12,
17;42:24;44:14,22;
49:18,19;50:22;
51:22;53:9,15,17;
54:10;55:8,9,15;56:9;
57:13;61:25;62:13,
21;66:5,10;68:6,13;
70:9,12;71:2,5;73:24;
74:25,25;75:10,18;
76:2,19,24;77:1;79:4,
19,22;80:25;81:2,5,
17,23,24;83:17;
88:25;89:7,10,14,15;
90:9;91:8,14;92:13;
95:12;96:25;97:9;
102:20;103:20;111:6;
112:8;113:3;119:19,
22;127:25;128:17;
129:2;131:6

**City's (17)**
21:7;24:5;29:21;
30:21;38:20;39:18;
43:5,11;44:8,24;
48:20;60:12;62:17;
72:13;75:13;88:6

**claim (12)**
82:16;84:25;90:8,
11,14,15,20,23;91:13;
95:8;127:21;128:5

**claims (1)**
95:11

**clarify (1)**
131:18

**class (1)**
95:25

**classes (1)**
8:5

**clear (2)**
21:11;59:9

**climb (1)**
28:23

**climbing (2)**
25:16;26:16

**clinic (1)**
133:1

**coat (1)**
100:7

**Code (1)**
24:12

**coiled (1)**
29:6

**collecting (1)**
78:7

**Collective (9)**
23:3,14;24:2;34:23;
37:13;40:14;50:15;
98:3,5

**College (4)**
7:20;16:24;18:23;
95:20

**colonoscopy (1)**
33:4

**Columbus (2)**
129:22,25

**column (3)**
34:11;35:10,15

**comfortable (2)**
47:1,2

**coming (1)**
104:5

**command (4)**
71:11,12,14;72:1

**Committee (7)**
50:11,14;112:1;
121:19;123:21;
124:17;130:24

**committees (1)**
50:9

**commonly (1)**
25:13

**communicating (1)**
58:24

**Community (4)**
7:20;16:23;18:22;
95:20

**comp (8)**
90:8,9,11,14,23;
91:1,11,14

**company (2)**
20:11,14
**comparable (1)**
79:18
**compensation (2)**
95:8,11
**complain (3)**
49:17;50:24;92:6
**complained (5)**
50:5,16,19,21;
121:15
**complaining (1)**
128:13
**complaint (22)**
51:4;57:12,13;58:8;
59:25;60:25;61:25;
62:8,18;65:2;66:2;
68:17;108:9,14;
110:1,3,8;112:21;
128:19,22,24;130:25
**complete (17)**
39:15;51:9,21,25;
56:1,8,15;61:15;
63:24;64:2;65:19;
87:20;99:24;106:11;
107:5;109:2;116:9
**completed (5)**
55:1;56:13;60:22;
106:21,25
**completely (1)**
80:14
**comply (5)**
24:11;65:22;66:13;
72:5;109:13
**computer (8)**
13:5,7,9;14:25;
83:7;118:6,19,21
**computers (1)**
83:1
**conceivable (1)**
40:3
**concern (2)**
31:16;32:1
**concerned (1)**
31:8
**concerns (5)**
59:15;60:24;61:20;
63:11;69:11
**conclusion (1)**
67:15
**condition (1)**
30:5
**conditioner (1)**
91:22
**confirmation (1)**
54:6
**consider (2)**
10:5;27:2
**consists (1)**
100:7
**consulted (1)**
40:18
**contact (3)**

**contacted (4)**
63:21;66:5,9;68:5
**contacting (1)**
54:9
**contained (4)**
35:14;52:10;53:11,
18
**content (1)**
98:14
**contention (1)**
120:22
**contents (1)**
35:4
**contest (1)**
20:19
**contesting (1)**
74:24
**CONTINUED (3)**
127:5;130:20;
132:18
**continuing (2)**
84:5;94:13
**contract (7)**
56:8;119:12,13,14;
121:1,2,2
**contribution (1)**
82:1
**conversation (2)**
63:19;109:9
**conversations (2)**
35:21,22
**conveyed (2)**
129:8,9
**Cooper (19)**
48:6;49:1,15;55:15;
57:17,21;58:2,7,25;
60:25;61:1,23;62:3,7;
106:13;107:22;108:9,
14;112:22
**Cooper's (1)**
58:21
**coordinate (1)**
96:19
**copies (1)**
110:11
**copy (20)**
22:4,10;23:13;46:6;
51:19,23;54:19,21;
55:8,23;59:13;85:8;
106:21,25;108:14;
109:22,23;110:7,25;
133:3
**correctly (4)**
15:11;17:24;62:24;
90:2
**correlation (1)**
33:5
**cost (3)**
75:17,19;76:2
**costly (1)**
74:13
**cot (1)**

28:5
**Counsel (1)**
121:8
**counseling (1)**
126:20
**County (2)**
7:17;8:16
**couple (3)**
5:23;78:20,21
**course (10)**
9:15;26:7;38:9;
55:9;67:12,19;83:16,
19;84:16;85:9
**court (2)**
6:8;91:22
**coverage (2)**
79:17,19
**created (1)**
53:1,3;85:15
**Creek (11)**
12:14,15,20;13:4,8,
13,18;14:1,4,8;96:23
**criticisms (2)**
49:18;55:17
**CROSS (5)**
5:8;92:9;127:5;
130:20;132:18
**crux (1)**
39:10
**curb (1)**
94:24
**current (1)**
79:8
**currently (4)**
7:5;16:18;76:6;
105:3
**curriculum (1)**
8:12
**CVA (1)**
35:24

# D

**daily (2)**
24:24,25
**damages (2)**
81:3,8
**date (22)**
14:2;16:10;18:13,
15,19;43:20,24;
44:10;49:16;58:13;
59:2;64:1;65:5;66:19;
68:22;70:5;91:4;97:6;
107:7,8;116:1;125:22
**dated (1)**
70:18
**dates (2)**
12:16;116:13
**Dave (4)**
67:11,18,25;115:2
**DAVID (9)**
5:4,19;67:5,6;68:5,
7,9;131:23;133:25

**day (15)**
17:18;60:2,5;61:20;
63:20,23;73:7;85:25;
95:24;96:13,13;
105:5,9;108:12;133:8
**days (5)**
65:6,19;109:3,13;
116:9
**Dayton (1)**
7:11
**dead (1)**
30:8
**dealing (3)**
35:24;37:17;128:16
**deals (1)**
39:4
**dealt (2)**
66:2;85:18
**December (21)**
44:5;47:11,22;
48:15;49:15;51:2,5;
55:13;58:18,21,25;
59:12;61:8,9;62:10,
10;69:20,24;106:12;
116:13,15
**decided (1)**
128:17
**decision (1)**
14:11
**declared (1)**
129:5
**declined (1)**
122:13
**deductible (2)**
80:12,17
**deemed (1)**
129:2
**deems (1)**
39:24
**defendant (2)**
19:23;20:7
**Defendant's (27)**
22:3,6;23:7;40:20;
41:1,23;45:4;48:10,
11;51:11,13;58:21;
64:6;66:21;68:23;
70:15;71:17,19;72:9;
83:24;84:9;85:11,13;
87:1,3,9;88:15
**definition (1)**
120:25
**deliver (1)**
67:6
**delivered (2)**
64:21;67:12
**demanding (2)**
26:10;28:1
**denied (3)**
73:23;74:8;117:12
**dental (2)**
81:9,11
**department (31)**
5:16;9:1,4,5;22:11;

27:12;28:16;39:1;
53:10;60:23;61:19;
64:23;66:10;71:20;
85:18;86:9;87:23;
89:8;93:10;99:7;
102:16;111:7;112:9;
121:3,5,9;127:9,13,
18;129:3;130:13
**department's (1)**
23:2
**depending (4)**
30:3;40:4;96:5;
105:10
**depends (1)**
120:25
**deposition (1)**
5:20
**Deputy (19)**
49:1,15;55:15;
57:17,20;58:2,7,20,
25;60:24;61:1,22;
62:3,7;106:13;
107:22;108:9,14;
112:22
**derogatory (1)**
86:8
**describe (1)**
42:9
**described (2)**
60:8;80:23
**describing (1)**
71:21
**description (1)**
84:20
**designation (1)**
72:24
**designed (2)**
31:16;100:9
**detailing (1)**
85:16
**details (3)**
87:5;88:9,23
**determination (2)**
40:5;130:10
**determine (1)**
129:13
**determined (3)**
40:8;130:1,5
**determining (1)**
32:8
**develop (4)**
29:21;32:14;42:18,
19
**developing (6)**
31:16;40:19,25;
41:5,19;42:25
**devise (1)**
42:21
**difference (7)**
10:3;76:22;80:24;
81:1,20,25;82:5
**different (11)**
10:9;26:6;29:1;

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

40:13;50:25;77:9;
78:18;80:13,14,15;
101:6
**difficult (1)**
6:7
**direct (2)**
63:23;64:1
**directed (4)**
65:4;66:4,8,14
**directive (2)**
65:22;72:6
**directly (1)**
8:14
**disagree (1)**
127:18
**disagreed (2)**
47:17;116:22
**discharge (1)**
97:14
**disciplinary (5)**
73:6;126:4,18,19;
129:10
**discipline (12)**
70:10;73:7;83:18;
84:1,13;85:17;86:18,
22;94:9,19,25;126:7
**disciplined (7)**
93:20;94:3,7;95:2,
5;105:15;130:12
**discomfort (1)**
82:22
**discovery (2)**
41:7;80:23
**discriminated (4)**
112:2;117:1,1,8
**discrimination (9)**
75:25;111:1,6,10,
13;112:14;122:1;
123:3;128:10
**discriminatory (8)**
21:4;58:5;59:23;
63:14;67:22;76:3;
107:23;108:6
**discuss (7)**
33:10;35:4;37:12;
63:15;106:5;109:8;
122:22
**discussed (14)**
35:7,13;36:13;
37:22;38:15,19;
40:12,16;57:20,22;
63:9,10;67:18;76:5
**discussing (2)**
38:1;61:3
**discussion (18)**
36:15,16,19;37:16,
18;38:2,10;62:20;
63:20;64:25;65:3,7,
14;67:24;110:4,16;
123:7,9
**discussions (2)**
36:4,8;55:14;62:13
**disease (1)**

132:5
**dishonesty (2)**
87:15;95:5
**displayed (1)**
38:3
**dispute (3)**
41:13;85:5;88:6
**distress (2)**
82:18,21
**division (5)**
12:1;24:13;31:5;
38:13;71:25
**doctor (8)**
33:3;75:1,8,19;
76:1;129:19,22;132:3
**doctors (1)**
80:8
**doctor's (3)**
132:6,14,22
**document (44)**
6:14;22:8;23:10;
33:17;34:4,20;37:24;
38:1,3,4,4;39:2;42:2;
43:19;44:3;45:10;
51:14,17,25;52:3,7;
64:9,17;65:10,15;
66:4,7,24,25;67:2;
69:1,3,15;70:19,23;
71:23;86:4;98:23;
103:4;111:1;132:20;
133:11,15,18
**documentation (1)**
87:20
**documents (3)**
60:8;73:18;88:1
**dollars (1)**
78:25
**done (8)**
17:20;18:24;49:24;
75:2,8;80:7;96:7;
113:9
**door (2)**
71:1,3
**Dose (1)**
114:11
**down (19)**
6:8;13:10;28:24;
29:6;30:4;43:17,18;
55:22;58:13;59:13;
60:7;61:2;69:17;73:5;
114:7;118:6,18,19;
133:6
**Dr (29)**
39:18;40:4;41:15,
18;47:25;49:9,11,17;
52:1,8,9,14,23;53:3,4,
8,22;54:7,15;55:5,17;
56:19,25;57:2;61:14;
65:20;75:5;132:25;
133:19
**draft (1)**
117:24
**draw (6)**

46:20,23;47:19;
55:25;105:22;106:1
**drawn (1)**
116:21
**draws (1)**
45:19
**drive (1)**
94:23
**due (5)**
48:6;90:8;104:6;
129:13;130:5
**duly (1)**
5:5
**during (23)**
8:24;9:15;12:3;
14:20;16:15;18:10;
38:9,10;40:12;41:7;
49:23;67:12,16,18;
68:7;74:24;83:16,18;
95:20;108:1,23;
109:1,19
**duties (3)**
25:3;27:21;88:12
**duty (9)**
56:12;84:19;129:2,
6,9,13;130:2,5,11

**E**

**EAP (1)**
126:21
**earlier (9)**
48:15;87:5;93:6;
96:24;98:17;99:23;
102:14;120:1;126:7
**easier (1)**
23:24
**education (4)**
7:16;8:3,4,20
**educational (2)**
7:9;8:25
**EEOC (29)**
41:9,13;58:8,9,12,
22,24;59:11;60:2;
61:7;62:11,12;63:21;
66:1,4,9;67:23,23;
68:4,8,10,12,13;
110:1,5,7;111:18;
128:17,24
**effectiveness (1)**
27:13
**efforts (1)**
25:7
**either (7)**
14:22;19:22;20:6;
28:17;37:24;54:9;
125:15
**EKG (1)**
113:17
**elaborate (1)**
132:2
**elapsed (1)**
65:13

**elevator (1)**
25:19
**else (8)**
16:13;82:13;
113:19;118:8;122:5,
12;126:24;132:8
**e-mail (14)**
13:10;45:1,12,16,
18;46:1,11,17;48:17,
19;49:3;58:21;
106:12;116:20
**emergencies (1)**
100:18
**Emergency (5)**
15:9;24:13;27:14;
100:4,13
**emotional (2)**
82:17,22
**employed (23)**
8:25;9:6,9;11:1,7,
21,25;15:4,7,25;16:9,
13;18:13;24:23;31:5;
38:25;42:14;76:6;
94:4;95:12;96:25;
97:9;99:18
**employee (10)**
13:16,17;30:24;
31:22,23,24;53:19;
119:19;121:3;131:15
**employees (5)**
17:3;31:21;86:9;
107:6;130:12
**employees' (1)**
24:5
**Employer (1)**
111:25
**employment (21)**
9:15;11:6;12:8;
14:7,17;16:21;18:8,
14;26:7;76:23,25;
78:19;81:16;83:17,
19;84:3;91:7;93:13,
14;111:25;131:6
**employs (1)**
32:2
**EMS (1)**
15:22
**EMT (8)**
9:17,20,24,25;10:3,
5,5,11
**EMT/Firefighter (1)**
9:23
**EMT-B (1)**
10:5
**EMTs (1)**
17:10
**encrypted (1)**
52:4
**end (6)**
8:18,23;14:8;43:22;
91:3,7
**ended (3)**
14:4,13;116:12

**ending (1)**
91:7
**endurance (1)**
30:6
**engage (2)**
39:1;56:24
**engaged (1)**
40:13
**enough (2)**
6:15;20:4
**entail (2)**
38:21;113:14
**entailed (1)**
102:22
**entirety (2)**
55:2,3
**entitled (1)**
22:11
**entity (1)**
16:4
**enumerated (1)**
73:5
**equipment (5)**
25:4;28:11;87:20;
88:2,10
**Erby (3)**
37:2;116:20,21
**essentially (3)**
42:20;48:23;53:16
**establish (1)**
119:19
**established (2)**
50:10,15
**evaluate (1)**
17:23
**Even (8)**
44:2;76:1;78:4;
103:9;105:11;113:24;
117:14;133:5
**evening (1)**
37:22
**events (1)**
85:20
**everybody (3)**
36:23;123:17;
124:10
**evidence (1)**
69:12
**exact (13)**
43:20;44:10;57:12;
58:13;59:2;65:5;
68:14,22;70:5;78:22;
86:21;91:4;97:6
**exactly (6)**
38:15,19;65:16;
113:20;126:11;133:7
**exam (2)**
39:2;120:24
**EXAMINATION (38)**
5:8;40:7;43:10;
44:14,23;47:15,22,25;
48:5,21;49:9,12,17;
51:8,22;55:16,21,22;

Charlene Nicholas & Associates, LLC - (937) 836-7878
www.CharlieNicholasCourtReporting.com

(4) difficult - EXAMINATION

57:15;58:16;60:22;
61:10,13;62:22;
63:24;64:3;65:19;
75:2,8,19,22;76:3;
92:9;127:5,23;
130:20;131:21;
132:18
**example (1)**
17:21;81:7;100:3
**examples (1)**
17:19
**exams (1)**
39:5
**Excuse (5)**
12:7;21:13;55:2;
73:17;85:24
**executed (2)**
23:4,14
**executive (12)**
107:4;114:16,22;
115:13,17,21;121:19;
123:21,21;124:17;
130:24,25
**exercise (1)**
29:5
**exhibit (63)**
21:21,22;22:3,6;
23:7;33:25;38:5;
40:20;41:1,23,25;
43:15,24;45:4,7;
48:10,11;51:11,13;
58:22;59:6;64:6,8;
65:11;66:21,23;
68:23,25;70:15,19;
71:17,19;72:9,11,11,
15;83:24;84:9,10;
85:11,13;87:1,3,9,11;
88:15,17;97:25;
98:14,19,25;99:1;
102:15,23;106:19;
110:23;111:2;118:15;
119:8,9,15;128:10;
132:9
**exhibits (1)**
97:20
**expenses (1)**
81:14
**experience (1)**
8:25
**expertise (1)**
41:18
**Explain (10)**
11:5;13:6;15:20;
58:2;71:8;76:22;
80:15;92:19;106:8;
128:14
**explained (3)**
84:22;107:22;130:1
**extent (1)**
45:17
**extra (2)**
46:5;104:23
**eye (1)**

56:21

## F

**facility (1)**
133:1
**fact (6)**
21:5;22:10;48:4;
49:8;117:14;120:12
**factors (2)**
33:10,21
**failed (2)**
84:20;89:2
**failing (2)**
66:13;72:5
**fair (18)**
6:5,6,15,25;7:1;
10:22;13:23;20:4,21;
23:13;26:3;30:1,9;
34:16,18;42:16,22;
67:25
**fairly (1)**
73:22
**familiar (2)**
42:6;43:19
**family (4)**
120:20;128:1;
131:23;132:4
**far (8)**
32:19;40:2;91:17;
98:4,12;99:19;
112:13,16
**fashion (3)**
52:5;54:2;66:2
**fast (1)**
92:7
**February (6)**
64:15;66:8;72:6;
85:24;109:12;116:10
**federal (1)**
21:4
**feel (1)**
75:4
**felt (6)**
49:2;57:23;59:22;
66:1;74:12;76:3
**female (3)**
85:19;86:9;130:12
**few (6)**
65:6;89:25;90:5;
92:13;127:2;130:18
**fifteen (3)**
12:17,21;77:13;
101:19
**fifth (1)**
85:6
**fifty (2)**
33:4,7
**file (15)**
51:4;57:11,13;
59:24;85:10;90:8,11;
95:12;109:25;112:20;
116:25;117:7,11;

126:20;127:18
**filed (16)**
20:1;50:6;58:8;
73:10,15,16;90:14;
92:12;97:5,16;111:6,
14;116:24;117:18;
121:25;123:2
**filing (3)**
128:19,22,24
**fill (12)**
45:23;96:20;
105:11,11;106:17;
127:23;128:7;132:10,
21,23;133:12,18
**filled (7)**
54:21;111:17;
112:17;132:6,14;
133:5,6
**filling (2)**
87:25;88:10
**financial (1)**
81:3,7;123:8
**fine (3)**
21:24;59:4;110:22
**finish (2)**
6:4;52:18
**fire (54)**
5:16;7:25;8:7,8;9:1,
3,5;12:1;22:10;23:2;
24:13,25;25:6;27:12,
14;28:16;31:5;38:13;
39:1;42:6,10,13;
53:10;66:10;71:20,
25;77:2,9,12,16,20,
23;78:2;85:18;86:9;
87:23;89:6,8,11;
93:10;99:7;100:4,8,
13,20;102:3,16;
111:7;112:8;127:9,
13,18;129:3;130:12
**firefighter (14)**
8:17;24:23;25:8,14;
26:6;27:8;28:17;32:8,
10,11;69:21;86:15;
99:15;102:2
**firefighter/EMT (1)**
9:19
**firefighter/paramedic (3)**
10:1;24:20,21
**Firefighters (18)**
23:15,21;25:18;
29:11;30:16,25;31:4,
9,17;32:1;33:11,23;
34:10;38:25;42:15;
99:24;100:3,12
**firefighter's (2)**
85:1,2
**firefighting (2)**
7:18;42:16
**fireman (2)**
8:11,13
**fires (2)**
25:10;99:25

**first (24)**
5:5,25;9:3;24:18;
36:21;42:1;43:4,9,17;
45:16,18;47:24;
58:12;73:6;112:8;
113:1;114:3,21,25;
115:12;119:18;
121:15,22;127:12
**Fit (1)**
56:12
**fitness (1)**
56:10
**five (2)**
29:4;95:17
**fix (1)**
54:3
**flowers (1)**
27:6
**focus (1)**
25:6
**folks (5)**
115:18;117:9;
123:11,25;125:8
**follow (5)**
71:13;84:21;99:8;
119:12;121:1,2
**following (9)**
8:24;15:3,6;58:20;
66:3;73:1;74:25;
85:24;86:4
**follows (1)**
5:6
**follow-up (3)**
90:5;126:22;130:17
**follow-ups (1)**
127:3
**forgot (1)**
16:21
**form (6)**
26:19;111:21;
132:6,23,25;133:3
**formal (4)**
60:25;108:8;110:1;
111:16
**format (1)**
80:13
**former (4)**
69:7,18;70:9;85:16
**forms (2)**
18:8
**forth (6)**
24:12,12;42:25;
43:11;44:15;74:16
**forty (18)**
33:7,12,23;39:1,8,
20;40:4,6;43:11;
47:15;56:2;58:6;
63:15;107:6;113:25;
117:2,9;119:4
**Forty-eight (3)**
77:21,22;105:6
**forty-six (2)**
7:5,6

**forward (1)**
124:7;128:17
**found (1)**
114:25
**four (3)**
9:11,12;29:4
**frame (3)**
12:24;69:23;116:10
**Franklin (1)**
15:22
**free (1)**
28:9
**front (5)**
71:1,3;120:13;
122:8;126:17
**full (8)**
39:1,13;40:6;47:14,
21;56:8,13;77:20
**functions (1)**
71:25
**further (6)**
19:22;39:24;40:1;
74:4;130:16;133:22

## G

**Gambill (1)**
37:1
**garden (1)**
27:5
**Gary (2)**
123:18;124:5
**gauge (1)**
31:16
**gave (3)**
46:5;60:10,11
**gear (2)**
100:5;102:3
**general (4)**
5:23;7:8;8:4;25:3
**generally (6)**
7:7;15:19;21:1;
24:22;43:21,22
**genetic (4)**
21:8;111:10;
120:16;128:5
**gentleman (1)**
110:5
**GINA (3)**
21:8;59:24;128:5
**given (11)**
64:1;65:19;66:19;
72:6,12;85:2,5;125:5;
132:9;133:11,18
**gives (1)**
119:22
**giving (1)**
118:10
**Good (8)**
5:10,11,13,14;
11:18;14:13;92:11;
93:2
**government (3)**

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

16:2,3;112:2
**grab (1)**
97:23
**graduate (2)**
8:16,22
**graduated (3)**
7:10;17:11;93:6
**graduation (1)**
93:13
**great (1)**
110:14
**grievance (15)**
50:6;51:5;73:10,14,
16;74:4;116:25;
117:8,12,24;118:4,5,
11,24;125:15
**grievances (2)**
73:23;117:17
**groans (1)**
6:13
**grocery (1)**
93:15
**ground (2)**
126:15,16
**group (7)**
15:24;34:14;42:11;
72:24;73:3,6;74:15
**groups (1)**
50:25
**grunts (1)**
6:13
**guess (5)**
82:24;115:20;
120:25;126:15,15
**guideline (32)**
21:12;22:11,20;
23:1;38:6,13,24;
39:21;40:7,12,19,25;
41:5,19;43:6,14;
49:19;50:7,12,17;
51:6;53:13;58:4;
62:14,23;65:2;69:13;
70:3;74:17,24;99:8,
11
**guidelines (15)**
21:2,2,7;23:2;
42:21,25;43:11;44:5,
9,15,24;48:20;49:2;
55:17;62:1
**guys (3)**
26:24;29:5;91:23

**H**

**hand (6)**
23:9;64:21;67:6,11;
68:25;109:16
**handling (2)**
66:1;67:24
**happen (1)**
125:21
**happened (4)**
55:20;63:8;118:16;

124:21
**happening (1)**
99:21
**harassing (2)**
85:19;130:12
**harassment (1)**
87:5
**hard (3)**
32:16;54:21;91:19
**Harris (8)**
35:18,23;36:4,14,
16;37:1;118:1;125:23
**hat (1)**
78:21
**head (1)**
37:3
**health (66)**
21:2,14,17;22:12;
24:6,6,14;30:16,23,
23;31:4,8,17,21;32:7,
23;33:6;35:25;36:10;
37:17,18,22;38:1,12,
20,23;40:8;41:5;43:1,
5,11;44:4,8;47:5,7;
49:19;50:14;51:6,21;
53:13;55:16;57:22;
63:24;64:2;65:1,19;
74:17;75:22;80:12,
16,17;82:21;98:18;
105:18;107:5;111:14;
113:2,8,9,9,11;114:5;
115:14;119:20;
127:23;128:6
**hear (1)**
91:25
**heard (1)**
77:17
**hearing (8)**
66:19;68:19;69:4;
70:8;85:16,24,25;
86:5
**heart (2)**
33:22;132:4
**heavy (3)**
28:11;32:19;101:12
**held (2)**
67:10;110:16
**helmet (1)**
100:8
**help (3)**
29:21;30:5,5
**helping (1)**
42:21
**Here's (1)**
22:4
**hey (1)**
54:10
**Hicks (9)**
67:5,6,11,18;68:1,5,
7,9;115:2
**high (5)**
7:8,10,16,24;80:12,
17;93:7,13

**hired (8)**
9:22,24,25;13:17;
14:16;105:13;122:4,
12
**historical (1)**
128:1
**history (2)**
7:9;120:20
**hit (1)**
20:9
**hold (7)**
9:14;13:4;114:11,
13;118:13;131:8,10
**holding (1)**
26:16
**home (1)**
71:3
**hoofing (1)**
30:8
**hose (4)**
26:17,17;27:5;29:6
**hoses (2)**
25:13;26:23
**Hospital (3)**
79:16,18;80:6
**hospitals (1)**
15:25
**host (1)**
26:5
**hour (1)**
76:10
**hourly (1)**
104:13
**hours (4)**
86:24;93:25;
104:16,23
**house (1)**
25:3
**huh-uhs (1)**
6:13
**hundred (2)**
78:25;79:2

**I**

**IAFF (5)**
23:21;34:11;
111:19;120:19,23
**III (3)**
72:24;73:3,6
**illegal (3)**
57:23;117:15;
121:16
**implemented (1)**
38:12
**implied (1)**
68:15
**implying (1)**
111:23
**important (2)**
27:9;71:13
**impression (3)**
75:16;82:25;89:13

**improper (1)**
69:12
**incident (3)**
87:4;88:24;112:14
**incidents (3)**
84:3;86:8;87:6
**include (3)**
25:10,12;118:24
**included (3)**
73:2;98:15;106:19
**includes (3)**
25:16,21,24
**income (6)**
16:15;17:4;18:9,17;
83:2;96:24
**Incompetency (1)**
84:19
**incorporated (2)**
23:2;120:4
**incorrect (3)**
70:1;88:3,4
**incur (1)**
81:15
**incurred (2)**
81:3;82:14
**indicate (5)**
74:14,15,19;75:1;
120:7
**indicated (11)**
18:9;61:14;69:16,
18;104:13;105:21;
111:9;116:24;123:10,
24,25
**indicates (5)**
22:16;69:3;86:14;
99:5;119:18
**indicating (1)**
116:21
**indicator (1)**
103:2
**individual (18)**
31:22,23,23;32:5,8,
9,23;33:6;38:10;
39:25;40:4,6;53:12;
56:23;60:14;62:21;
66:9;129:25
**individuals (14)**
25:24;32:13;34:14;
35:3,9,15;37:6;38:25;
39:7,20;40:18;43:10;
47:15;50:25
**individual's (1)**
129:23
**information (19)**
21:8;52:9,14,23;
53:6,11,17,23;54:11;
82:10;111:10;120:16;
122:9;127:8;128:1,1,
5;131:24,25
**informed (2)**
127:12,17
**infractions (1)**
83:18

**inherent (1)**
30:15
**initially (1)**
9:17
**injured (1)**
28:5
**input (1)**
118:10
**inspection (1)**
89:11
**inspections (3)**
88:25;89:5,10
**Inspector (1)**
89:7
**instance (4)**
30:4;50:5;80:12;
81:9
**instead (1)**
128:16
**insubordination (9)**
68:21;70:13;72:5;
73:2;84:20;88:23;
95:2;128:20,22
**insurance (10)**
20:11,14;79:8,22;
80:3,7;81:12,12,21;
82:3
**insured (1)**
79:11
**intended (1)**
24:11
**intention (1)**
107:4
**interest (2)**
30:15;31:4
**interesting (1)**
80:5
**interests (2)**
12:4,9
**into (6)**
8:12;23:2;63:13;
78:1,8;88:9
**Intravenous (1)**
18:3
**introduced (1)**
38:6
**invasive (1)**
119:2
**invested (1)**
30:15
**investigation (1)**
85:18
**investigator (8)**
59:18;60:1,7,15;
61:7;62:11;66:9;68:4
**involved (10)**
12:5;19:21,24,25;
20:6;36:22;97:2;
113:20
**involving (1)**
86:8
**isolated (1)**
127:22

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

**issue (3)**
52:3;128:16;129:12
**issued (2)**
63:23;99:12
**items (1)**
100:9
**IV (3)**
17:22,25;18:5

## J

**James (2)**
60:16,17
**January (24)**
49:16;51:2,5;54:24;
55:13,21;56:19;58:3,
16;60:19,21;61:11;
62:6,11;69:20,24;
74:25;106:16;107:3,
8;112:22;127:14;
130:23;133:11
**jaws (1)**
28:8
**JEMS (25)**
15:4,7,19,21;16:6,
9;18:13,15;76:6,9,25;
77:6,7;78:11,13,15,
19;79:6;81:1,2;
104:11;105:1,13,15;
122:4
**job (10)**
9:3;10:22;11:3,8,9,
12;29:12,23;89:7;
99:15
**jobs (1)**
122:15
**Joint (4)**
7:17;8:16;15:9,21
**Josh (2)**
59:5;83:25;115:9,
20
**Joshua (1)**
5:15
**judged (1)**
27:12
**jump (1)**
92:16
**June (6)**
23:4,16;24:18;
36:18;49:12;120:13
**jurisdiction (1)**
97:16
**jurisdictions (1)**
42:20

## K

**keep (2)**
21:15;23:19
**kids (1)**
19:18
**kind (5)**
13:2;15:19;61:3;

82:25;120:24
**knowledge (9)**
40:18,23;53:16,20;
102:21,25;106:24;
107:2;123:22

## L

**labeled (3)**
22:13;110:21;111:2
**Labor (2)**
50:10;111:25
**last (5)**
17:21;19:2;34:3;
69:16;96:9
**law (2)**
21:4;59:24
**lawful (1)**
5:5
**lawsuit (4)**
19:20;20:25;21:1;
39:10
**lawsuits (1)**
19:21
**learn (1)**
99:8
**learned (2)**
47:10,13
**least (5)**
46:14;47:6;82:17;
85:20;99:20
**leave (10)**
57:2;66:15;68:21;
73:11,15;93:17;
117:5,19,25;131:3
**leaving (1)**
10:24
**led (1)**
88:6
**Ledford (2)**
86:12,15
**LEE (41)**
5:4,19,20;7:4;13:6;
19:6,21;20:25;22:8,
15,15,19;23:10;
24:18;30:14;32:13;
33:9,25;34:7;40:17;
41:25;43:4;46:9;48:9;
51:13;53:2;64:8;
66:23;69:21;72:21;
76:5;82:24;83:16;
84:24;85:14;87:13;
88:18;89:25;92:11;
128:14;129:1
**left (8)**
10:21;11:2,2,5,18;
56:17;61:17;101:17
**legal (1)**
20:5
**legalities (1)**
63:13
**legitimate (1)**
31:15

**LENTZ (3)**
46:7;72:15,18
**less (5)**
10:6;12:19;65:16;
78:25;79:2
**letters (1)**
22:2
**license (1)**
103:16
**Lieutenant (15)**
57:8,9;60:24;61:20;
62:25;64:20;104:12;
105:13;107:12;
108:18;109:10,14;
124:9,12;130:22
**life (1)**
28:8
**lift (2)**
28:4;32:19
**lifting (1)**
25:24
**light (1)**
70:1
**lines (2)**
18:3,5
**link (1)**
54:13
**list (2)**
111:19;122:8
**listed (3)**
35:10,15;111:22
**lists (1)**
112:8
**literature (3)**
33:9;40:24;41:4
**little (3)**
13:6;24:22;104:24
**Local (8)**
23:16,21;34:11;
42:20;111:19;112:1;
120:19,23
**long (3)**
9:9;19:10;88:8
**longer (3)**
11:7,15;116:10
**look (12)**
43:15;51:14;59:16;
73:5;84:10;99:6;
103:1;118:13;119:14;
128:9,11,12
**looked (1)**
43:18
**looking (3)**
98:1;102:23;103:4
**looks (1)**
86:1
**lose (2)**
103:18,22
**lost (1)**
103:24
**lot (2)**
27:1,2
**Lovett (23)**

39:18;47:25;49:9,
11,17;52:8,9,14,23;
53:3,4,22;54:7,15;
55:5,17;56:3,19,25;
61:14;65:20;75:5;
132:25
**Lovett's (7)**
40:4;41:15,18;52:1;
53:8;57:2;133:19

## M

**maintain (2)**
12:8;16:18;103:16
**maintained (4)**
13:15;14:18;18:13;
89:11
**maintains (1)**
21:1
**maintenance (1)**
25:4
**makes (1)**
23:24
**making (6)**
34:13;76:8;80:25,
25;82:16;83:2
**Management (1)**
50:10
**manager (2)**
50:22;66:10
**manual (3)**
72:13,14,20
**many (10)**
29:1,1;77:11,15;
93:25;94:6;95:11;
96:3;101:10;104:16
**March (21)**
11:25;14:17;15:3,6;
16:12;18:7;68:1,3,3,
19;69:4;70:18;73:15;
86:1,2;91:10;115:3;
116:10;117:7;121:17;
122:1
**mark (3)**
22:14;37:2;116:21
**Marked (22)**
22:6;23:7,9;41:23;
45:4,6;48:9,11;51:11;
64:6;66:21;68:23;
70:15;71:17;72:9;
83:24;84:9;85:11;
87:1,9;88:15;110:23
**marriage (1)**
19:16
**married (3)**
19:6,10,13
**materials (6)**
33:10,18,20;40:24;
41:4,12
**math (1)**
76:11
**matter (3)**
10:7;20:5;126:2

**may (21)**
5:24;6:14;8:6,6;
15:14,17;25:25;28:5;
44:2;84:21,23;85:3,6;
90:5;94:13;96:5,14;
103:23;113:19;
116:13;123:18
**maybe (4)**
45:21;77:14;78:22;
95:23
**McDonald's (1)**
93:15
**McKensey (3)**
60:16,17,18
**Meadowdale (3)**
7:10,12,13
**mean (12)**
17:3,9;15;39:10;
71:8;78:24,25;94:21;
114:17;118:3,5;
127:24
**means (2)**
10:14;71:10
**MECHAK (35)**
22:5;51:15;90:1,3;
91:19,24;92:3,6,10,
11;94:15,17,18;
95:16;101:8;102:8;
103:14,15,25;104:1;
110:12,14,22,24;
116:18;121:8,11,20,
24;126:22;128:11;
130:18,21;131:17;
133:22
**Medical (22)**
15:9;25:1;27:24;
39:2,4,18;40:7;44:23;
47:14,21;48:20;
57:15;60:22;79:3,6,8,
19;119:2;120:20,24;
127:25;131:23
**meet (2)**
58:24;75:13
**meeting (36)**
36:16,22,24;37:4,7,
9,12;38:10;40:12;
60:3;62:7;63:2,4,5,8;
67:10,11,13,15,16,19,
25;68:7;108:2,4,18,
24;109:1,8,16,18,20;
115:2;122:22;124:21,
25
**meetings (2)**
35:3;62:12
**Megan (2)**
22:4;92:11
**member (21)**
34:21;49:18;53:8;
55:5,9,15;61:14;
62:13;66:5,8;68:5,10;
74:14;77:16;103:7;
114:10,16,19,22;
124:16;127:25

**members (5)**
37:5;40:13;62:12;
85:19;99:7
**membership (1)**
125:3
**memo (1)**
116:20
**memorandum (9)**
85:15,21,23;86:14,
16;87:5;109:2,13,23
**memory (1)**
20:19
**meniscus (1)**
90:19
**mentioned (1)**
95:8
**met (14)**
35:6,7;58:22;59:11,
18;60:1,6,7,18;61:7;
62:11,24;74:15;96:12
**methods (2)**
29:11,22
**Miami (4)**
79:16,18;80:3,6
**Michael (3)**
35:18,23;36:4
**middle (2)**
126:15,16
**might (2)**
52:18;126:23
**Mike (3)**
37:1;116:20;118:1
**mind (2)**
91:23;110:17
**mine (1)**
128:12
**minute (2)**
89:20;118:13
**minutes (2)**
101:11,17
**misheard (1)**
8:6
**Miss (5)**
86:12,15;90:1;
91:19;128:11
**missed (2)**
48:6;61:6
**mistakenly (1)**
48:14
**moment (1)**
23:10
**money (3)**
78:17;83:2,7
**monitor (2)**
24:5;119:19
**Montgomery (2)**
7:17;8:16
**month (2)**
43:25;93:25
**monthly (1)**
99:16
**Moraine (43)**
5:16;11:1,3,7,12,

22;12:1,3,11;14:18;
22:10;23:15,20;
24:13,19,24;26:8,18,
24;27:22;29:3;30:15;
31:3,7;34:10;38:13;
66:10;71:6,20;80:18;
83:17;89:7,8;91:8,14;
95:12;96:25;97:10;
99:7;111:6;112:8;
129:3;131:6
**more (17)**
12:17,21;13:6;
20:21;27:5;33:10,22;
43:7,13;89:25;95:17;
101:17,19,21,23;
104:25;123:7
**morning (4)**
5:10,11;23:20;
92:11
**most (3)**
22:20;123:18;
124:10
**motor (1)**
28:4
**much (5)**
23:19;65:13;67:24;
76:12;78:17
**myself (2)**
37:2;118:1

## N

**name (9)**
5:18;14:23,23;19:8;
34:9;60:14;92:11;
110:3;129:23
**named (1)**
110:6;111:25
**name's (1)**
46:14
**National (9)**
16:23;17:10,12;
18:23;42:6,10;95:20;
96:15,22
**nature (1)**
99:25
**necessary (2)**
8:12;105:12
**need (13)**
6:3;14:9;16:20;
17:17,23;25:25;46:7;
92:19,25;93:3;102:6;
105:10;116:21
**needed (5)**
11:8,15;13:9;39:25;
57:11
**needles (2)**
47:2,18
**Neglect (1)**
84:19
**negotiated (2)**
102:15,20
**negotiates (1)**

102:17
**negotiating (3)**
34:15;37:5;40:21
**negotiation (5)**
34:23;35:8,13;
37:12;40:15
**negotiations (2)**
36:5;102:22
**network (1)**
13:9
**new (1)**
17:10
**next (3)**
57:5;62:20,24
**NFPA (2)**
42:1,25
**night (3)**
37:15;38:10;105:9
**ninth (2)**
68:3;115:3
**nominal (1)**
79:1
**non (1)**
24:13
**None (1)**
35:1
**notice (5)**
66:17;67:12;68:20;
70:18;71:3
**notified (5)**
114:3,7,21;115:12;
116:8
**notify (6)**
106:13;108:4;
115:7;116:22;121:25;
130:24
**November (13)**
44:11,13,22;46:2,
11,15,16;47:6;51:20,
24;53:24;70:3;116:20
**Number (5)**
73:2;78:22;84:18;
86:7;87:6
**numbered (2)**
22:15;34:7
**numbers (2)**
21:25;76:15

## O

**oath (1)**
5:6
**object (2)**
49:23;50:7
**objected (2)**
56:9;127:18
**objecting (1)**
49:1
**Objection (21)**
22:21;26:12,19;
29:14,24;30:10;
32:17;44:17;49:25;
70:4;84:6;94:11,13;

95:13;103:11;121:7,
18,23;127:10,13;
130:14
**objections (2)**
55:25;67:21
**obviously (8)**
58:15;68:16;69:3;
70:8;72:12;73:2;77:9;
132:3
**occasionally (1)**
17:8
**occur (2)**
20:17;85:25
**occurred (4)**
62:6;65:3;68:1;
130:11
**off (8)**
37:2;102:24;103:8,
9;105:6,9;110:15;
120:10
**offense (1)**
73:6
**offenses (3)**
72:24;73:3,7
**offered (1)**
75:10
**offhand (4)**
82:7,9;97:8;123:19
**office (8)**
52:1;56:5;57:3;
109:18;132:6,14,22;
133:19
**offices (1)**
53:8
**officially (1)**
105:8
**off-the-record (1)**
110:16
**often (1)**
96:2
**Ohio (3)**
7:11;24:12;97:18
**old (2)**
7:4,6
**older (1)**
32:16
**once (2)**
17:2,6
**one (34)**
5:15;6:18;7:24;
9:19;16:20;20:8;25:7;
26:20;27:8;45:14;
46:8;47:13;48:14;
80:18;89:20;90:7;
91:16;93:1,4;94:22,
24;95:8;96:18;
106:18;111:16,16;
112:8,11,17,21;
117:18,21;126:7;
131:18
**ones (2)**
29:2;101:11
**ongoing (1)**

85:18
**only (18)**
19:16;20:5,8;37:8;
39:21;41:8;56:1;
60:18,22;61:15;77:6;
89:25;91:13,16;
111:13,16,16;112:17
**open (2)**
54:16;105:3
**opened (1)**
125:3
**opening (1)**
105:10
**operate (1)**
71:10
**Operating (10)**
22:11;23:1;38:6;
39:21;41:19;50:11;
53:13;69:13,19;70:3
**opinion (7)**
21:6,6;28:13,14;
60:10,11;108:5
**opportunity (3)**
69:11;75:10;125:5
**order (17)**
63:24;64:2,2;65:4,
18,21;66:4,8,14;
75:13;84:21;85:3,5;
109:2;116:8;121:9,12
**ordered (5)**
106:11;112:25;
113:2,4;121:5
**ordering (1)**
109:13
**orders (1)**
27:24
**organization (6)**
71:6,13,21,22;72:1;
111:25
**others (3)**
91:15;95:9;112:3
**Otherwise (1)**
6:7
**out (25)**
7:24;26:1;45:23;
46:5;54:21;55:24;
88:1,10;97:19;
106:17;111:17;
112:17;115:1;126:19;
127:23;128:7;132:6,
10,14,21,24;133:5,6,
12,18
**outlined (1)**
40:7
**out-of-pocket (1)**
81:3
**outspoken (1)**
124:7
**over (17)**
5:25;33:23;39:1,7;
43:10;47:15;58:5;
63:14;67:20;69:7;
94:24;101:11;107:6;

**David Lee v.**
**City of Moraine Fire Department, et al.**

**David Brian Lee**
**July 17, 2014**

113:25;117:1,9;119:3
**overall (1)**
32:23
**overwhelmingly (1)**
125:14
**own (8)**
14:23;16:4;42:21;
75:1;76:1;80:7;123:5;
128:14
**owner (1)**
13:14
**oxygen (6)**
100:16,20,22,24;
101:3,5

**P**

**PA (1)**
55:23
**Page (11)**
24:2,4;34:3,6;
35:24;36:9;69:15;
72:23;73:1;87:7;
119:15
**paid (9)**
77:2,2;78:11,13,17;
95:24;131:8,11,12
**pairs (1)**
78:20
**pamphlet (1)**
132:9
**pants (2)**
78:20;100:8
**paper (1)**
109:17
**paperwork (1)**
133:6
**paragraph (2)**
69:17;73:5
**paramedic (12)**
10:4,11,14;27:20,
22,23;28:1,18;
103:16;104:3,12;
122:16
**paramedic/firefighter (1)**
9:20
**paramedics (4)**
7:21;17:11;29:11;
38:25
**paramilitary (3)**
71:6,22;72:1
**paramount (1)**
72:2
**parents (1)**
132:4
**part (25)**
11:15;13:12;14:11;
29:6;34:14;37:6;
39:14;51:8,21;52:16,
24;53:6,12;54:11;
56:1;63:15,20;76:23,
25;85:17;87:22;
88:11;93:23;119:12;

127:23
**partial (1)**
105:11
**participate (16)**
46:19,22;47:19;
105:21,25;106:2,4,5,
9;113:7,21;114:4,23;
115:7,14;116:8
**participated (1)**
115:6
**participating (2)**
74:1;106:14
**particular (5)**
23:1;32:9;72:4;
88:24;133:18
**parts (1)**
61:6
**part-time (5)**
11:8,9;13:2;14:3,7
**party (4)**
19:22;20:6,13;
111:20
**pass (2)**
90:1;91:18
**past (3)**
33:4,7;123:23
**patients (1)**
10:18
**pay (5)**
75:17;81:16,21,24;
82:8
**paying (2)**
81:15;82:6
**peace (1)**
125:6
**people (13)**
25:13;28:5,20;
42:11,14,14,15;83:7;
92:6;105:10;117:1;
123:14,19
**per (6)**
27:24;62:22;95:24,
25,25;96:1
**perform (8)**
13:20,25;32:2,10;
40:6;44:15;45:1;89:9
**performed (1)**
56:25
**performing (4)**
29:12,22;30:6;89:4
**perhaps (1)**
12:6
**period (1)**
14:20
**permission (1)**
119:22
**PERS (6)**
77:6,7,7;78:1,7,8
**person (3)**
20:11;100:9;123:18
**personally (1)**
20:6
**personnel (3)**

72:13,14;85:10
**pertinent (2)**
69:19,22
**petitioned (1)**
20:2
**petitioner (1)**
20:7
**Phil (3)**
114:7,9;124:9
**Phipps (1)**
126:1
**physical (41)**
21:2,14;22:12;
38:12,23;39:13;41:5;
43:1,6;44:3,4,9;45:2;
54:19,20,22;55:1;
56:2,8,13,15;65:1;
74:17;105:18,19;
106:12,14,17;107:5;
109:3;111:15;112:25;
113:2,8,9,11,14,21;
116:9;121:6,13
**physically (2)**
26:10;28:1
**Physicals (14)**
24:14;35:25;36:10;
37:17,23;38:20;
43:12;49:20;53:14;
113:10;114:5,24;
115:8,15
**physician (3)**
39:18,24;40:5
**physicians (1)**
82:21
**physiological (1)**
32:14
**piece (1)**
28:11
**place (2)**
36:18;131:2
**placed (6)**
37:25;66:14;68:20;
85:9;99:12;117:4
**places (1)**
91:23
**placing (1)**
71:2
**plaintiff (2)**
19:22;20:6
**Plaintiff's (4)**
110:18,23;111:2;
128:10
**plan (5)**
79:18;80:11,13,17,
19
**planned (2)**
114:23;115:13
**plans (1)**
96:14
**play (1)**
34:22
**plays (1)**
32:8

**please (13)**
5:1,18;6:19;15:5;
31:10;33:25;34:1,3;
36:2;46:3;51:14;
92:19,23
**point (22)**
8:10,24;9:19;10:12;
11:13;15:3,6;31:1;
56:14;59:17;67:16,
17;104:2;107:22;
108:8;114:1;115:7;
116:7;118:23;123:2;
124:13,24
**Police (9)**
77:2,9,11,16,20,23;
78:1;85:15,16
**policies (2)**
42:21;60:12
**policy (24)**
38:20;47:2,4,7,13;
49:23;59:14,15,23;
63:14;67:22;72:13,
14,20;74:16,21;
99:12;107:23;116:22,
25;123:12,13,15,16
**poorly-wooded (1)**
6:17
**portion (5)**
41:25;56:18;60:22;
71:20;72:20
**portions (1)**
61:15
**position (21)**
10:5;13:2,4;14:4;
24:19;81:4;89:13,15,
16,18;93:23;95:22;
114:11,13;115:23;
123:21;124:1,12,14;
131:8,11
**positions (7)**
9:14;93:17,20;
114:17;115:19;
122:13,17
**possible (2)**
20:8;65:6
**Possibly (1)**
58:19
**post (1)**
7:16
**potentially (1)**
74:4
**pounds (5)**
101:17,19,21,23;
102:12
**PowerPoint (2)**
37:24;38:4
**Premier (1)**
80:6
**premium (1)**
82:1
**present (3)**
33:6;63:1;69:11
**presented (2)**

38:22;64:20
**presided (1)**
69:7
**president (5)**
115:17,18;123:23;
125:23,25
**pressure (2)**
26:17,23
**presumably (1)**
98:8
**pretty (3)**
28:11;67:24;79:1
**prevail (1)**
126:10
**prevalent (1)**
33:23
**prevented (1)**
52:9
**previous (1)**
45:24
**print (1)**
54:19
**prior (29)**
5:21;8:7;19:20;
36:18;43:23,24,24;
44:5;45:14,24;47:10;
58:15;60:19;65:3;
66:7;68:3;83:17;84:1;
91:7,10;105:17,25;
107:3;108:4;117:4;
122:1;125:18;127:16;
129:1
**private (7)**
12:5;16:18;75:1,7,
19;83:1,6
**privately (1)**
14:22
**probably (7)**
12:19;101:22,24;
104:20,24;115:1;
124:10
**problem (3)**
54:3;92:4;107:15
**problems (1)**
54:15
**proceed (1)**
125:12
**proceeding (1)**
125:15
**proceedings (1)**
41:9
**process (7)**
32:22;41:7;74:24;
75:22;84:22;128:17;
131:24
**Profession (1)**
23:20
**Professional (2)**
23:15;34:10
**professionals (1)**
82:21
**program (4)**
24:5,11;31:16;

**David Lee v.**
**City of Moraine Fire Department, et al.**

**David Brian Lee**
**July 17, 2014**

119:19
progress (1)
  10:10
progressed (2)
  9:20,25
projector (1)
  37:25
prominent (1)
  33:11
pronouncing (1)
  90:2
proper (2)
  29:11,21
proposed (2)
  38:16,19
proprietor (3)
  13:14;14:21;16:19
protect (1)
  100:9
Protection (2)
  42:7,10
provide (12)
  10:18;13:8;15:25;
  17:14;24:25;27:16,
  23;42:19;55:8;56:10;
  106:21;108:14
provided (27)
  13:13;14:4,22;
  33:15;35:25;36:10;
  39:7;41:6;53:24;
  54:11,13;55:3,5,22;
  60:8;66:17;69:10;
  76:15;78:20;100:24;
  108:13;111:18;
  112:22;122:9;127:8;
  132:21,25
provides (1)
  15:21
providing (2)
  41:25;123:7
PSI (1)
  26:25
psychological (4)
  129:12,14,15;130:5
psychologically (1)
  130:2
public (2)
  25:1;98:18
pull (1)
  97:19
pulled (1)
  94:22
purports (1)
  111:1
purpose (5)
  29:9;37:11;63:2,4,5
pursuant (3)
  23:3;39:20;44:24;
  48:19;50:15
pursue (1)
  10:22
put (5)
  57:24;62:3;118:4,5,

20

**Q**

qualify (1)
  19:22
quarter (1)
  7:24
questionnaire (34)
  39:15,17,22,25;
  40:9;45:22,23;51:9,
  20;52:10,17,24;53:2,
  7,12,18,24;54:12,16;
  55:2,11,23;59:14;
  98:18;106:17,18,22,
  25;113:16;127:22,24;
  128:6;132:11,12
quickly (2)
  27:9,13
quietly (1)
  92:7
quizes (1)
  99:16
quote (1)
  19:11

**R**

ran (3)
  13:10;15:1;94:24
rank (1)
  127:17
read (7)
  24:10;33:14,18;
  54:4;69:18,22;98:8
really (3)
  20:18;80:8;114:6
reanswer (1)
  92:17
reason (7)
  10:24;31:7;34:19;
  48:6;82:24;129:5,7
reasons (2)
  47:18;130:6
recall (103)
  9:6;12:16;19:2;
  20:20;29:8;33:17;
  35:20,22;36:23,25;
  37:2;38:9,15,22;
  40:11,16;43:18,20,21;
  44:7,12,13,22,25;
  45:2,17,21;46:17;
  48:17;49:10,11;54:9;
  55:14;59:2;60:14;
  62:15,24;63:3,18;
  64:17;65:3,5,13,16;
  66:23;67:1;68:14,22;
  70:22;76:12,17,19;
  77:3,16,19;79:23;
  82:15;84:13;85:20,
  23;86:4,20,21,22;
  87:12;88:8,10;91:17;
  94:1,2,8,9,19;95:15;

96:3,4,9;97:5,6,7,17;
98:10;99:22,25;
102:16;108:11,16;
113:15,20;118:9,22;
119:1;124:6;125:22,
25;126:3;129:8,21;
132:13,15;133:7,13,
14
receipt (1)
  66:3
receive (16)
  17:4;28:15;64:19;
  67:4;70:25;76:24,25;
  79:17;81:1;83:18;
  86:17,20;90:22;
  97:14;100:22,23
received (34)
  10:15,16;29:20;
  45:16;46:1,11,13;
  54:6;64:12,14,17;
  65:14;66:25;67:1,5;
  70:19,22;76:23;77:1;
  85:8,17;86:22;88:18;
  94:10,20;106:12,25;
  109:2,12,14,23;
  116:19;129:14,15
receiving (14)
  18:18;48:17;65:4,7,
  8;66:7,23;77:7;79:19;
  84:13;85:23;86:4;
  87:12;90:25
recently (1)
  95:9
recertify (5)
  84:21,23,25;85:6;
  103:19
recess (1)
  89:23
reciting (1)
  21:15
recommendation (1)
  85:15
recommended (1)
  59:24
record (6)
  5:18;19:12;59:5,9;
  84:14;87:4
records (1)
  126:19
recovered (1)
  87:12
refer (9)
  21:14;23:20;28:20;
  30:25;33:25;73:18;
  85:14,20;87:6
reference (1)
  68:16
referenced (3)
  33:21;64:25;119:25
referencing (1)
  101:10
referred (5)
  38:5;41:17;42:24;

86:14;87:4
referring (12)
  21:12,18;23:22;
  24:7;39:3;45:12;46:8;
  47:4;86:11;98:25;
  121:19;128:4
refers (2)
  86:7;87:15
refusal (8)
  62:22;105:25;
  106:5;114:22,23;
  115:7,14,14
refuse (1)
  113:24
refused (4)
  89:12;106:4;114:4;
  116:7
refusing (1)
  106:9
regarding (1)
  62:13
regards (2)
  28:16;68:20
Registry (7)
  16:23;17:10,12;
  18:23;95:20;96:16,22
regular (1)
  88:12
Regulations (2)
  71:21;72:17
reimburse (2)
  75:18;76:2
rejected (1)
  122:17
rejections (1)
  122:20
related (2)
  7:25;128:6
relating (6)
  112:14;116:25;
  117:18,21,24;118:11
relationship (1)
  14:13
relevance (3)
  84:6;94:14;95:13
relevant (1)
  99:20
relief (1)
  20:2
relieve (1)
  54:15
remain (1)
  9:9
remedy (1)
  75:4
remember (17)
  8:5;38:18;45:18,22;
  52:5;57:12;58:13;
  81:23,24;94:22;
  123:17,19;129:23;
  132:1,5;133:5,17
remind (1)
  15:17

removed (2)
  72:13;126:20
renew (1)
  104:8
renewed (2)
  103:23;104:5
repeat (13)
  15:5;29:16;31:10;
  35:11;36:2;44:19;
  46:3;50:2;58:23;61:5;
  86:13;94:16;117:3
rephrase (1)
  6:19
Report (2)
  71:21;85:14
reported (2)
  60:23;61:20
reporter (6)
  6:8;21:24;83:23;
  91:22;92:4;133:24
representation (3)
  108:1,23;109:19
representing (1)
  37:6
Reprimand (3)
  84:14;85:9;88:17
request (5)
  120:17,19;122:23;
  128:5;131:25
requested (2)
  21:7;127:25
requesting (1)
  125:18
require (3)
  40:6;119:3;120:23
required (18)
  27:23;39:13;51:9,
  21;56:2;78:18;87:19;
  104:22;107:5;113:7;
  114:23;119:5,9;
  121:1;127:22;128:7;
  132:20;133:17
requirement (1)
  75:13
requirements (5)
  24:11;43:5,10;44:4,
  8
requires (2)
  38:24;43:19
rescue (1)
  25:7
residence (1)
  25:25
resistant (1)
  100:8
respect (7)
  36:5,9;44:15;51:6;
  62:22;127:8,21
respond (5)
  6:3,10;27:13;30:7;
  49:1;59:17;100:3,12
responded (4)
  49:15;54:2;55:21;

**Charlene Nicholas & Associates, LLC - (937) 836-7878**
**www.CharleneNicholasCourtReporting.com**

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

102:2
**responding (6)**
6:5;25:10;27:9;
28:3;99:25;100:18
**response (11)**
41:11,13,16;48:23;
58:20;62:17,19;74:7,
9;76:13;84:22
**responsibilities (9)**
24:23;25:8;26:6;
27:17,21;28:17;32:3,
11;87:22
**responsibility (4)**
30:22,22;99:6,8
**responsible (3)**
27:22;31:21,22
**rest (1)**
63:18
**restate (1)**
75:6
**resubmit (1)**
54:18
**result (3)**
66:13;70:8;81:4
**retained (1)**
123:5
**retaliated (3)**
128:13,15,23
**retaliation (1)**
111:11
**retire (1)**
77:20
**retirement (1)**
77:3
**Rettig (4)**
123:18,20;124:5,6
**returned (1)**
57:7
**review (3)**
23:10;52:23;54:10
**reviewed (4)**
40:25;41:4;42:2;
60:10
**reviewing (1)**
40:8
**revised (4)**
22:16;24:14;38:24;
47:7
**revisions (4)**
35:23;37:16;38:16,
19
**right (81)**
6:1;7:2,16,19,22,
24;9:14,18;10:14,21;
11:21;16:12;18:6,17,
21;19:14,18,20;20:10,
17,21,24;21:11,21;
23:22;27:6;28:11,13,
15;29:9;30:12;32:16;
39:6,9,10,11,14;
41:22;48:4;58:17;
60:6,21;61:5;64:14;
71:16;73:14;77:4,13,

23;78:7;79:3;81:20;
93:7,10,23;96:8,15;
98:3;99:13;101:4,24;
102:12;104:6;105:23;
106:19;107:24;
108:21;110:25;
117:12,20;119:10,16;
122:23;123:8,11;
124:2,3;126:16;
128:8;132:16;133:25
**risk (1)**
33:10
**risks (5)**
33:6,21,22,22;40:8
**road (1)**
77:13
**role (3)**
32:8;34:22;104:11
**rollover (1)**
78:1
**roughly (4)**
9:12;14:3;77:13;
78:10
**rude (1)**
15:18
**rule (2)**
5:25;6:10
**rules (3)**
5:23;71:20;72:16
**run (4)**
17:4;32:19;37:25;
105:2
**running (1)**
105:3

**S**

**safely (2)**
32:2,10
**Safety (10)**
24:6,6;30:23;50:14;
89:5,6,6,11;98:18;
119:20
**sake (1)**
91:21
**salary (2)**
76:8,19
**same (10)**
14:20;60:2,4,5;
61:19;79:21;80:11;
108:12;118:16;
130:11
**sat (4)**
43:17,18;118:18,19
**saw (4)**
43:24;98:24;120:1,
7
**saying (4)**
15:11;54:3,10;
129:18
**SCBA (1)**
100:13;102:9
**schedule (4)**

49:9;96:12,13;
104:22
**scheduled (9)**
47:21,24;48:5;
49:13,16;61:10;
104:16;105:8,22
**schedules (1)**
105:11
**scheduling (2)**
49:12;96:6
**Schenck (5)**
69:8,18;70:9,9;
85:16
**SCHIERLOH (71)**
5:1,9,15;19:4,5;
21:20,25;22:2,7,22,
24,25;23:8;26:14,21,
22;29:18,19,25;30:12,
13;32:18;41:24;
44:21;45:5,9;46:5,8;
48:13;50:4;51:12,16;
52:21;59:7,10;64:7;
66:22;68:24;70:7,17;
71:18;72:10,16,19;
80:2;83:11,12,22;
84:2,4,7,8;85:12;87:2,
10;88:16,22;89:20,
24;90:2,4;91:18;
103:11;110:19;121:7;
127:2,6;130:16;
132:11,19;133:21
**school (8)**
7:8,10,16,18,24;
17:11;93:7,13
**scope (1)**
26:7
**screen (1)**
37:25
**second (5)**
6:10;24:10;87:7;
110:15;112:11
**secretary/treasurer (2)**
114:17;115:18
**Section (15)**
24:3,4,7,8,9;35:24;
36:9;37:16;39:3,4;
43:1;44:16;72:11;
74:16;119:17
**seeking (1)**
90:15
**sees (2)**
53:11,15
**send (1)**
51:25
**sent (4)**
46:15,16;51:20;
121:12
**sentence (3)**
24:10;69:16;119:18
**separate (4)**
89:7,13,15;132:7
**September (1)**
19:15

served (1)
71:2
**service (4)**
13:8;15:14,21;
42:13
**services (9)**
13:12,21,25;14:5,
22;15:9,14;16:1;
17:14
**sessions (1)**
29:10
**set (12)**
13:9,11;17:22;
24:12,12;42:11,25;
43:11;44:15;74:16;
91:25;96:13
**shall (1)**
7:2
**sheets (1)**
88:11
**shift (2)**
105:1,5
**shifts (2)**
105:2,11
**shirts (1)**
78:21
**Shoot (1)**
126:17
**shoreline (1)**
94:22
**show (8)**
45:6;48:9;84:10;
85:13;87:3,11;
109:22;118:7
**showed (1)**
48:14
**showing (1)**
59:6
**sick (2)**
77:2;78:13
**side (4)**
12:5;14:25;82:25;
83:14
**sign (1)**
102:24
**signature (6)**
34:6,9,20;64:11;
84:16;133:24
**signed (8)**
98:5,8;103:8,9;
112:18,19;120:10,13
**signs (1)**
113:17
**similar (2)**
106:18;112:21
**simply (1)**
119:22
**Sinclair (6)**
7:20;8:19,22,25;
16:23;95:19
**Sinewe (17)**
57:8,9;60:24;61:20;
62:25;64:20;107:12,

13,14;108:19,20;
109:10,14;114:7,9;
124:9;130:22
**S-I-N-E-W-E (1)**
57:8
**Sinewe's (1)**
124:12
**sit (1)**
118:6
**sitting (1)**
77:24
**situation (4)**
27:14;72:4;105:6;
118:17
**sixteen (2)**
77:13,14
**sixty (1)**
105:9
**size (1)**
101:9
**skills (6)**
10:6;17:13,15,22,
22
**slow (1)**
61:2
**SOG (29)**
21:3,13;24:13;
69:22;97:25;98:2,11,
14,24;99:5;102:16,
23;103:1,3;108:5;
117:1,8;119:8,25;
120:7,12,22;121:16,
23;124:1;127:9,13,19,
24
**SOGs (1)**
99:16
**somebody (1)**
20:9
**someone (1)**
115:13
**sometime (3)**
12:22;61:8;62:10
**somewhat (4)**
73:20;126:13
**Somewhere (3)**
13:1;79:13;95:23
**sorry (20)**
7:23;12:20;15:14,
16;24:8;29:17;45:8;
46:4,9;58:23;72:18;
74:10;77:5;86:1;
88:21;89:17;102:7;
104:4;107:14;123:12
**sorts (1)**
84:1
**sought (1)**
82:20
**sound (3)**
73:17,20,22
**sounds (1)**
20:14
**source (1)**
107:1

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

sources (4)
18:9,17;83:2;96:24
speak (6)
35:17;57:7,17;
58:12;60:2;63:5
special (1)
124:24
specific (6)
21:12;35:20;43:5,7,
13;63:19
specifically (15)
33:20;37:4,15,19;
38:17;40:21;45:2;
77:17;99:22;101:14;
102:1;110:5;120:17;
129:7;133:16
specifics (3)
40:11,16;102:21
specified (1)
44:25
spending (1)
80:12
spirometer (1)
56:22
spoke (8)
56:5;60:24;61:22;
107:11,18,21;124:11;
130:22
stack (1)
97:23
staff (2)
55:6;61:14
stagnant (1)
77:24
Standard (12)
21:14,18;22:11;
23:1;38:6;41:19;
53:13;69:13,19,19;
70:2;80:19
standards (5)
27:24;42:11,13,18,
19
standing (1)
27:24
start (4)
93:14;95:22;96:2;
116:2
started (4)
63:13;93:1,9;
101:16
starting (1)
7:7
state (11)
5:18;7:23;8:7,11;
17:12;21:4;27:24;
45:17;55:24;112:1;
128:12
stated (7)
39:2;41:18;56:2,7;
68:8,9,11
statement (4)
30:14,18;32:25;
33:1

states (3)
39:13;72:3;84:20
stating (1)
37:11
station (5)
17:17;25:4;28:21;
57:6;99:12
status (1)
77:22
step (1)
62:24
steps (6)
25:16;26:16;28:23;
29:6;30:4,8
stickers (1)
21:22
still (6)
18:22;76:3;90:25;
96:17,18;103:16
stop (1)
96:11
stopped (1)
91:11
stores (1)
93:16
stories (1)
29:1
street (1)
28:5
strenuous (1)
26:15
stress (1)
113:17
strictly (1)
37:9
strike (1)
32:6
stroke (1)
33:21
studies (1)
8:7
stuff (5)
13:5,7,10;25:3;
132:5
subject (2)
126:2,22
subjects (1)
10:19
submission (1)
62:7
submit (4)
39:17,21;53:12;
62:22
submitted (9)
39:25;41:12;52:8,
11,16,24;53:6,18,23
submitting (1)
88:11
Subsection (3)
71:25;72:23;128:12
subsequent (2)
60:3;64:1
substitute (1)

75:5
suffered (1)
82:17
Sugar (11)
12:14,15,20;13:4,8,
13,17;14:1,4,7;96:23
suitable (2)
75:4,12
superior (1)
62:21
superiors (4)
50:19;55:16;127:9,
12
supervisor (3)
107:16;114:9;
130:23
supposed (3)
27:17;84:23;88:24
suppression (2)
25:1,6
sure (14)
17:2;26:21;29:18;
31:11;35:12;36:3;
62:19;75:7;89:22;
92:4;94:17;117:4;
124:10;127:7
suspension (6)
73:8;86:23;87:4,12;
88:7;117:19
swear (1)
5:1
switch (1)
92:1
switching (1)
91:23
sworn (1)
5:6
system (2)
13:10;77:3

**T**

talk (6)
5:25;20:25;21:5;
56:3;92:6;97:25
talked (7)
38:11;47:14;58:9,
14;81:19;82:14;99:23
talking (8)
23:19;43:14;81:8;
94:21;112:15;114:9;
119:7;122:24
talks (1)
24:5
tank (2)
100:16,20
taped (1)
71:1
tasks (1)
24:25
teach (1)
29:10
tear (1)

90:19
techniques (2)
29:12,22
tells (1)
33:3
ten (7)
12:17,21;20:22;
73:7;77:17,19;101:17
tend (1)
6:17
term (2)
99:19;116:12
terminate (1)
131:5
terminated (4)
70:12;81:4;128:18,
20
Termination (7)
70:18;73:8,11,16;
103:19;117:22;
118:12
terminology (1)
68:14
terms (16)
10:15;11:19;14:14;
27:12;35:5,8,8,13;
36:5;37:12,13;40:15;
80:13;82:5;86:8;
127:17
test (7)
17:17;56:18,21;
61:15;95:25;96:1;
113:17
tested (1)
17:12
testified (12)
5:6;61:4;83:10;
93:6,22;95:19;96:23;
97:2,21;102:14;
107:21;117:17
testimony (5)
6:8;43:23;70:2;
119:11;132:21
testing (11)
17:13,13,15,15;
39:24;40:1;56:24;
95:20;96:22;119:2,16
tests (5)
56:23;57:23;96:3,4;
99:16
Thanks (1)
22:5
thereafter (5)
15:7;23:17;51:24;
53:25;54:14
therefore (4)
34:13;40:3;71:12;
94:22
third (2)
69:17;105:9
thirtieth (1)
133:10
thirty (6)

65:19;101:11,17;
109:3,13;116:9
thirty-six (2)
104:20,24
though (6)
15:15;33:18;44:2;
54:13;76:1;113:25
thought (4)
69:12;83:13;
117:15;118:10
three (4)
78:9;93:15;104:9,
10
thus (1)
72:1
timeline (1)
127:8
times (2)
72:2;94:6
tired (1)
30:8
title (1)
89:8
today (4)
5:21;20:25;21:12;
91:17
today's (5)
16:10;18:12,14,18;
70:1
together (5)
118:4,5,6,7,20
told (15)
56:1,14;57:11,23,
24;58:9;59:14,22;
61:25;62:3;63:15;
67:21,22;74:12;
117:14
Tom (4)
69:8;70:9,9;85:16
took (6)
8:5;20:14;54:19,21;
59:13;92:25
tool (1)
42:20
tools (2)
25:12,14
top (1)
37:2
total (1)
95:17
toward (1)
82:1
tower (3)
28:21;29:2;30:5
Township (25)
9:5,7,10,15;10:1,22,
25;11:2,3,5,6,9,16,18;
12:14;13:20;15:22;
93:9,14,23;94:4,7;
95:3,6;96:23
trade (1)
14:23;25:13;42:16
trailer (2)

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

55:24;57:2
**trained (1)**
  29:2
**training (13)**
  7:25;8:8,17,20;
  10:7,10,16;25:4;
  28:16;29:7,10,20;
  30:3
**translate (2)**
  6:14;10:11
**treating (1)**
  10:19
**treatment (1)**
  82:20
**Trent (1)**
  124:9
**Trick (14)**
  55:15;62:25;63:11,
  21;65:1,7,14;66:5;
  72:6;79:24;80:1;
  108:18;109:9;120:13
**truck (1)**
  94:24
**true (3)**
  23:4;58:10;83:4
**trustee (9)**
  114:11,13;115:10,
  23,24,25;116:2,11;
  124:19
**trustees (1)**
  34:21
**try (2)**
  54:14;91:24
**trying (2)**
  15:17;29:21
**t-shirts (1)**
  78:21
**turn (7)**
  24:2;34:3;69:15;
  72:23;73:1;105:19;
  119:15
**turning (2)**
  88:1;119:17
**turnout (2)**
  100:5;102:3
**twelve (2)**
  105:6,8
**twenty (1)**
  101:21
**twenty-five (2)**
  101:23;102:11
**twenty-four (1)**
  86:24
**twenty-fours (1)**
  104:23
**twice (2)**
  17:2,6
**two (13)**
  18:25;56:23;78:8,8;
  80:16;93:15;96:4;
  104:8;105:2;112:5;
  117:17;118:18;
  124:10

**type (14)**
  13:8;14:23,25;
  16:18;17:14;25:25;
  71:22;82:17;83:6;
  89:9;105:6;114:17;
  118:6,7
**typed (1)**
  118:19
**types (12)**
  12:8;9:25:14;27:21;
  28:17;30:6;80:16;
  81:14;94:9,19;
  115:19;122:15
**Typically (8)**
  17:17;56:19;96:3,4;
  99:11;100:7,12;
  101:16
**typing (1)**
  118:9

**U**

**uh-huhs (1)**
  6:13
**ultimately (9)**
  46:22;53:22;61:22;
  70:12;73:23;86:17;
  109:25;125:11;
  128:18
**Umm (1)**
  81:18
**unacceptable (1)**
  61:17
**under (15)**
  14:23,23;21:2;
  34:10;39:20;40:4,6;
  56:2;71:25;72:23;
  73:2;82:24;99:5;
  127:21,23
**undergo (10)**
  40:1;56:18;113:1,2;
  119:3,10;120:24;
  121:6,10,12
**underneath (1)**
  112:5
**understood (4)**
  6:23;17:25;64:12;
  119:18
**undoubtedly (1)**
  25:7
**Unemployment (3)**
  16:16,17;18:10
**unfit (7)**
  129:2,5,9,13;130:2,
  5,11
**uniform (3)**
  77:1;78:15;81:19
**uniforms (1)**
  78:18
**Union (76)**
  23:21;34:15;35:10,
  15;36:16,17;37:5,8,9;
  38:11;40:13;49:18;

50:6,6;51:4;74:1,15;
102:15,17,20,24;
103:3,5,7,8,9;106:1,6,
8,13,22,25;107:4;
108:1,5,15,23;109:10,
19,23;110:3,4;
111:19;112:21;114:4,
10,14,19,22;116:22;
117:11;119:2,5,9;
120:8,10,16,17;
121:12,16,18,25;
122:22;123:22,23;
124:13,16,22;125:2,
17;126:10;130:25;
131:2,5,9,15
**Union's (3)**
  74:7;92:12;115:13
**unlawful (8)**
  21:3;49:3;58:3;
  60:12;65:2;69:13;
  74:22;124:2
**unlawfully (1)**
  21:7
**unless (1)**
  56:13
**unpaid (5)**
  66:14;73:11,15;
  117:18,25
**up (20)**
  13:10,11;14:17;
  16:10,20;18:12,14,18;
  28:23;29:6;30:4,8;
  37:25;68:3;91:25;
  118:6,7,9,20;125:3
**updated (1)**
  22:20
**use (10)**
  17:12;22:2;25:18;
  26:18,24;27:5;28:8,
  20;80:8;118:21
**used (4)**
  21:25;32:20;41:7;
  82:8
**using (3)**
  25:12;26:16;86:8
**usually (1)**
  92:6

**V**

**vacation (4)**
  48:3,6;77:2;78:11
**Valley (4)**
  79:16,18;80:4,6
**varies (2)**
  101:15;104:18
**variety (1)**
  26:5
**various (2)**
  99:16,23
**vehicle (2)**
  28:4,9
**verbal (1)**

6:11
**version (1)**
  22:20
**vested (1)**
  77:16
**vice (1)**
  115:18
**view (4)**
  52:14;53:6,20,23
**viewed (1)**
  52:4
**viewing (1)**
  52:9
**views (2)**
  53:17;74:21
**Village (1)**
  15:23
**violation (4)**
  21:8;59:23;86:18;
  88:23
**violations (1)**
  84:19
**vision (2)**
  81:9,11
**vital (1)**
  113:17
**vocal (2)**
  123:18;124:10
**vocally (1)**
  124:7
**Vocational (2)**
  7:17:8:16
**voice (1)**
  69:11
**voluntarily (1)**
  93:18
**Voluntary (1)**
  42:13
**vote (5)**
  124:24,25;125:3,
  11,14

**W**

**W-2 (1)**
  76:14
**wage (1)**
  104:13
**wages (1)**
  80:22
**wait (1)**
  52:18
**warranted (1)**
  70:10
**water (3)**
  26:17,23;27:6
**way (4)**
  8:1;34:22;66:11;
  105:8
**wear (5)**
  78:18;100:13,16,
  20,25
**wearing (2)**

100:4,9
**WEBBER (47)**
  18:22;19:1;22:1,21;
  26:12,19;29:14,24;
  30:10;32:17;44:17;
  45:8;49:25;52:18;
  59:5,8;70:4,16;83:9,
  25;84:3,5;88:20;
  91:21;92:2;94:11,13;
  95:13;101:3,7;102:6;
  103:24;110:11,13,17,
  21;116:15,17;121:18,
  21;130:14;131:18,22;
  132:12,16;133:23,25
**week (4)**
  65:17;93:25;
  104:17,23
**weigh (1)**
  102:1
**weight (3)**
  101:13,14;102:12
**well-being (2)**
  30:16;31:4
**Wellness (41)**
  21:14,17;22:12;
  24:14;31:8,17;32:23;
  35:25;36:10;37:17,
  19,22;38:1,12,20,23;
  41:5;43:1,6,12;44:4,
  8;47:5,7;49:19;51:6,
  22;53:13;57:22;65:1;
  74:17;98:18;105:18;
  107:5;111:15;113:2,
  8,10,11;114:5;115:15
**whatever's (1)**
  105:3
**What's (13)**
  10:3;19:8;26:17,23;
  38:5;53:5;77:22;
  80:15;86:3;100:5,13;
  101:9;102:19
**whatsoever (1)**
  35:1
**When's (1)**
  43:17
**whole (1)**
  26:5
**whose (1)**
  99:15
**wife (2)**
  79:12,13
**wife's (4)**
  19:8;79:17;80:3;
  81:12
**willing (2)**
  75:17;76:2
**Wilson (3)**
  115:9,10,20
**win (1)**
  126:12
**within (13)**
  35:14;65:6;73:3;
  88:25;89:8,13,15;

David Lee v.
City of Moraine Fire Department, et al.

David Brian Lee
July 17, 2014

103:4;109:3,13;
116:9;124:12;130:12
**without (1)**
88:2
**witness (30)**
5:2,5;18:24;19:2;
22:23;26:13;29:16;
30:11;44:19;46:10;
48:12;50:2;52:20;
70:5;79:25;88:21;
89:22;91:20;94:12,
16;95:15;101:5;
102:7;103:13;116:16;
121:9,22;127:1;
130:15;132:13
**Word (4)**
37:24;38:4;120:4,4
**wording (1)**
57:12
**words (1)**
128:14
**work (16)**
11:15;12:15;16:1,6;
79:13,15;83:7;96:3,
23;104:16,17,22;
105:6,7;122:4,7
**worked (4)**
12:14,20;93:15;
96:5
**worker (1)**
90:14
**workers' (9)**
90:8,9,11,23,25;
91:10,14;95:8,11
**working (7)**
13:5,7;68:11,13;
95:19;96:14,15
**works (1)**
111:22
**worry (1)**
30:22
**Wright (3)**
7:23;8:7,10
**writing (2)**
57:25;62:4
**written (11)**
6:14;47:3,4;60:25;
62:8,17;64:2;84:14;
88:17;108:8;112:20
**wrong (2)**
49:2;116:13

**Y**

**year (12)**
7:14;9:6;12:19;
17:2,6;18:25;80:7;
96:5,8;97:7;103:23;
104:6
**years (22)**
7:6;9:11,12;12:17,
18,21,21;20:22;33:4,
7;45:24;47:15;77:11,

15,18,19;78:8;95:1;
104:8,9,10;107:6

**Z**

**Ziegert (1)**
124:9

**0**

**0085 (1)**
34:7
**0094 (1)**
22:15
**0097 (1)**
22:15

**1**

**1 (6)**
22:16;23:16;24:14;
36:18;38:24;71:25
**10 (5)**
24:4;35:24;36:9;
37:16;119:17
**100.5.13 (20)**
21:3,15;22:11;38:7;
40:12;41:19;43:1;
44:16,24;47:7;55:18;
62:14,23;69:13;
74:17;75:13;98:2;
103:1;120:22;121:16
**100.5.3 (1)**
21:13
**11 (2)**
84:23;116:16
**12 (1)**
73:16
**13 (3)**
21:13;24:4;73:2
**13th (2)**
68:19;69:4
**14 (4)**
24:2,4;36:9;119:15
**14.30 (1)**
104:14
**14.50 (1)**
76:10
**15 (2)**
73:15;85:24
**150 (1)**
26:25
**1582 (2)**
42:1,25
**1986 (2)**
7:15;93:7
**1992 (1)**
93:10
**1993 (1)**
9:8
**1994 (1)**
96:2
**1996 (3)**

11:23,24,25
**1997 (2)**
10:21,25

**2**

**2 (3)**
69:15;73:17;86:2
**2004 (1)**
12:23
**2006 (9)**
12:24;14:1;85:24;
86:1,2
**2008 (1)**
84:21
**2009 (2)**
19:13,15
**2010 (3)**
113:12,24;116:6
**2011 (47)**
22:16;23:4;24:14,
18;36:18;38:24;
43:22,23;44:5,11,13,
22;47:6,11,22;48:15;
51:5,20,24;53:24;
55:13;58:18,21,25;
59:12;61:8;69:20,22,
24;70:3;76:20;83:17;
90:7,11,12,13;91:16;
98:15;99:20;105:22;
113:1;114:13;116:6,
15,20;120:14;129:1
**2012 (61)**
11:25;14:17;15:3,6;
16:7,8,10,12,13;18:7,
7,12,14,18;23:16;
49:12,16;51:2,5;
54:24;55:13,21;
56:20;58:3,15,17;
60:19,21;61:11;62:6;
64:15;66:8;68:1,4;
69:4,20,22,24;70:19;
72:7;73:15,17;74:25;
76:12,17;85:3;91:10;
99:20;106:17;107:3,
8;109:12;112:23;
113:1;116:10;117:7;
121:17;122:1;127:14;
130:23;133:11
**2014 (1)**
98:15
**23 (2)**
47:6;116:20
**23rd (2)**
46:2,11,15,16
**27th (1)**
106:12
**28 (6)**
48:15;51:5;55:13;
58:21,25;70:18
**28th (3)**
49:15;51:2;91:10
**29 (1)**

57:6
**2981 (6)**
23:16,21;34:11;
111:19;120:19,23

**3**

**3 (2)**
56:19;128:12
**30 (20)**
49:12;51:2,5;54:24;
55:13,21;58:3,16;
60:19,21;61:11;62:6;
74:25;106:16;107:3,
8;112:22;127:14;
130:23;133:11
**30th (2)**
49:16;62:11
**31st (2)**
116:13,15
**32 (4)**
110:18,23;111:2;
128:10
**36 (1)**
34:7

**4**

**4 (1)**
35:24

**5**

**5 (10)**
24:3,4,8,9;35:24;
36:9;37:16;84:21;
85:3;119:17
**5A (3)**
105:2,2,4
**5P (3)**
105:2,2,3

**6**

**6 (2)**
86:1;120:13

**7**

**7 (2)**
47:22;72:11

**8**

**8 (4)**
64:15;66:8;72:6;
109:12

**9**

**9 (4)**
68:1,4;121:17;
122:1

**9:00 (1)**
69:4
**90/10 (1)**
80:19
**91 (1)**
72:23
**92 (1)**
8:18
**93 (2)**
8:23;93:11
**94 (1)**
95:23
**97 (1)**
9:12