**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| **DAVID LEE,** | : | **CASE NO. 13-CV-222** |
| | : | |
| *Plaintiff,* | : | |
| | : | **JUDGE THOMAS M. ROSE** |
| **vs.** | : | |
| | : | **MAGISTRATE JUDGE** |
| **THE CITY OF MORAINE FIRE** | : | **SHARON L. OVINGTON** |
| **DEPARTMENT,** *et al.,* | : | |
| | : | |
| *Defendants.* | : | |

---

**PLAINTIFF'S OMNIBUS REPLY IN SUPPORT OF HIS**
**MOTION FOR SUMMARY JUDGMENT AND**
**IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

This brief shall serve as Plaintiff's responsive memorandum to The City of Moraine's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 40) and the Union's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. 43).

There is just one of Plaintiff's causes of action for which there is a genuine issue of material fact—the question of whether the City of Moraine retaliated against Lee for participating in a protected activity—his filing of his EEOC charge. On the other three causes of action, the parties agree that there are no genuine issues of material fact, and summary judgment for Plaintiff is warranted.

## TABLE OF CONTENTS AND SUMMARY

I.    **Overview**……………………………………………………………………...4

II.   **Retaliation**……………………………………………………………5

*Lee was retaliated against by the City for opposing the physicals policy.*

    A.  Plaintiff's *prima facie* case……………………………………………5

        1)  **The City admits that Lee's opposition was a "protected activity," admits that it was aware he was engaged in that protected activity, and admits that it took an adverse employment action against him**………6

        2)  **Lee has demonstrated a causal-connection between his oppositional conduct and his termination**……………………………7

    B.  Defendant's Non-Discriminatory Reason……………………………....8

*The City has failed to state a legitimate, non-discriminatory reason for terminating Lee. There is no difference between firing someone for protected, oppositional conduct and firing someone for insubordination for engaging in that conduct.*

        1) **Insubordination can be a legitimate, non-discriminatory reason for termination . . . except when it's a protected activity**……………11

        2) **Fire and police departments are not exempt from the ADEA's and GINA's retaliation provisions**……………………………13

        3) **The City's purported "honest belief" that its actions were not illegal is not a defense**……………………………………..14

III.  **ADEA and GINA Direct Discrimination**…………………………………...17

*The City and the Union discriminated against Lee by requesting and requiring him to participate in a physicals policy that discriminated against him and violated the ADEA and GINA.*

    A.  The Union and the City have created a genuine issue of material fact between themselves, but one that does not ultimately concern Lee……………..17

    B.  The City and the Union discriminated against Lee when they collaborated to create the 2011 S.O.G., which violated GINA……………………19

C. <u>The City and the Union discriminated against Lee when they collaborated to create the 2011 S.O.G., which violated the ADEA</u>.....................**22**

    1) **The Union cannot escape liability by claiming it wasn't responsible for the creation of the 2011 SOG**......................................**22**

    2) **The SOG is not a bona fide occupational qualification**...........................**23**

        a. <u>Defendants have no basis in fact for believing that age discrimination was reasonably necessary to the operation of the fire department</u>.......... **24**

        b. <u>Defendants have not shown that there are no reasonable alternatives to the discriminatory policy</u>......................................**26**

        c. <u>The City's medical "evidence" is inadmissible and should be stricken</u>...**29**

IV.    **CONCLUSION** ……………………………………….........................................**30**

I.      **Overview.**

Consider: Black and Latinos generally are at greater risk of heart disease or stroke as compared to whites.[1] What if the City and the Union had crafted a physicals policy that only required Black and Latino firefighters to get invasive, humiliating physicals?  Would that be lawful?

Or consider: Women are more likely to be obese than men.[2]  What if the City and the Union had crafted a physicals policy that only required female firefighters to get invasive, humiliating physicals?  Would that be lawful?

The answer to these questions is reflexively obvious: of course not.  Such policies evoke a visceral, negative reaction (and rightly so).  Yet, Defendants believe that their age-based and genetic information-based physicals policy is somehow different—somehow less offensively discriminatory.  It is not, and this Court should not lose sight of this basic fact.  The physicals policy crafted by the City is discriminatory on its face.

As a firefighter over the age of 40, David Lee was discriminated against on the basis of his age.  He was subject to adverse job requirements that a 35-year old firefighter was not, and Lee was also illegally required to disclose genetic information.  Moreover, when Lee opposed this discrimination, he was fired in direct retaliation for his opposition.

---

[1] The American Heart Association, "Statistical Fact Sheet, 2013 Update", http://www.heart.org/idc/groups/heartpublic/@wcm/@sop/@smd/documents/downloadable/ucm _319572.pdf, (last visited October 27, 2014).

[2] The Obesity Society, "2010 Obesity Statistics", http://www.obesity.org/resources-for/obesity-statistics.htm (last visited October 27, 2014).  These statistical observations are offered for hypothetical, argumentative purposes only.

## II.     Lee Was Retaliated Against by The City for Opposing the Physicals Policy.[3]

### A.  The City confuses and conflates the steps of the burden-shifting framework.

The City's brief opposing Plaintiff's retaliation claim is a morass of arguments that confuse the steps of the classic, burden-shifting framework.  Stated in its most simple terms, the classic framework is, of course:

1.  The employee first establishes a *prima facie* case by alleging facts that are adequate to support a legal claim;

2.  The employer then must articulate some legitimate, nonretaliatory reason for the employee's termination; and

3.  **If** the employer meets its burden of production, then the employee must show that the employer's response is merely a pretext for discrimination.

See, generally, *Yeschick v. Mineta*, 675 F.3d 622, 632 (6th Cir. 2012)(citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)("If the employer meets its burden, then the plaintiff must rebut the proffered reason by showing that it was pretext intended to mask discrimination)).

In his Motion for Summary Judgment, Lee argues that he has established his *prima facie* case and argues that he is entitled to summary judgment because The City has not and cannot fulfill its obligation under the second prong of the burden-shifting framework.  That is, Plaintiff's position is that The City's *stated* reason for terminating Lee *is itself retaliatory*.

Confusingly, the City begins its argument by accusing Lee of "ignoring" caselaw relating to a legal theory that simply does not apply in this case.  (Doc. 40; PageID #984).  Citing the Supreme Court cases of *Nassar* and *Gross*, the City engages in a long discussion about what the evidentiary standard is for evaluating cases where there are multiple alleged reasons for an

---

[3] As explained in its Motion for Summary Judgment, this retaliation cause of action is being sought against only Defendant the City of Moraine.  (Doc. 37, PageID # 196).  The Union's protestations that it "did not order Lee to undergo the City's physical he claims is discriminatory, or terminate his employment" are correct, but unnecessary.  (Doc. 43; PageID #1214).

adverse employment action—what are known as "mixed motive" cases.  *Id.; and see Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009).  These cases, however, are wholly inapplicable here because there is no dispute about the reason for Lee's termination.    There are no "mixed-motives" to sift through.  <u>All parties agree that the City's stated reason for terminating Lee was because he refused to take a physical that he opposed as discriminatory.</u>

For this cause of action, there is no question to be resolved on the third-prong of the burden-shifting framework.  On the question of oppositional retaliation, this Court must only decide whether The City's stated reason for terminating Lee was legal or illegal.

> **1)  The City admits that Lee's opposition was a "protected activity", admits that it was aware he was engaged in a protected activity, and admits that it took an adverse employment action against him.**

The City's and Lee's briefs agree that there are four prongs to establishing a plaintiff's prima facie case for retaliation.  (compare Doc. 37; PageID #205 and Doc. 40; PageID #984).  The City concedes the first three.  (Doc. 40; PageID 985).

Critically, The City concedes that Lee's opposition to the physicals policy constituted a "protected activity" under the ADEA.   The City never challenges Lee's contention that opposition can include "refusing to obey an order because the worker thinks it is unlawful" and "communicat[ing] to [his] employer a belief that the employer has engaged in a form of employment discrimination."  See Doc. 37; PageID #206 (citing *Butts v. McCullough*, 237 Fed. Appx. 1, 5 (6th Cir. 2007) and *Crawford v. Metro* Gov't, 555 U.S. 271. 276 (2009)).   Nor does The City dispute that Lee's opposition was reasonable or in good faith.

Further, The City admits that it knew Lee was engaged in protected activity and was exercising his right to oppose discrimination.  And it admits that its termination was an adverse employment action.  Importantly, therefore, The City has conceded that Plaintiff has met the first three prongs of its prima facie case.

**2) Lee has demonstrated a causal-connection between his oppositional conduct and his termination.**

Though it concedes the first three prongs of Lee's *prima facie* case, The City challenges the fourth prong.  The City's brief, however, confuses its analysis with arguments that only apply to other levels of the burden-shifting framework.

In order to establish the fourth-prong of a prima facie case, Lee must establish that there is "a causal connection" between his protected activity and his termination.  This is really a straight-forward question that is "easily met" so long as the plaintiff can show that the "protected activity" and the "adverse action" were not "wholly unrelated."  *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir. 1997)(citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) and *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)).  This Court held just weeks ago that, "[a] causal connection is established by showing that the employer would not have taken the action but for the employee's protected activity."  *Yontz v. Dole Fresh Vegetables, Inc.,* 2014 U.S. Dist. LEXIS 145666 (S.D. Ohio Oct. 10, 2014)(Rose, J.)(citations and quotations omitted).

Here, Lee easily clears this evidentiary hurdle.  Lee's protected activity—his oppositional refusal to comply with the physicals policy—is related to Moraine's decision to fire him.  Indeed, it was precisely why he was fired.  But for his protected opposition and refusal, he would not have been considered insubordinate.  Not only was Lee's protected, oppositional conduct not "wholly unrelated" to the reason for his termination, they are the same thing.

In challenging the causal-connection prong, the City's briefs raise a number of arguments supporting its semantic argument that firing for insubordination is different that firing for protected oppositional conduct.  These arguments, however, are misapplied at this *prima facie* stage.  "[A] court may not consider the employer's alleged nondiscriminatory reason for taking

an adverse employment action when it is analyzing the plaintiff's prima facie case. *Schoonmaker v. Spartan Graphics Leasing, LLC,* 595 F.3d 261, 264-265 (6th Cir. 2010)(citing *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 574 (6th Cir. 2003)(en banc)). Therefore, <u>at this point in the burden-shifting analysis</u>, to decide whether there is a "causal connection" between Lee's protected, oppositional conduct and his termination, this Court need only find that the two were related; it should not consider the separate issues raised by the City relating to its defense of "insubordination."

Indeed, just the temporal proximity between Lee's oppositional conduct and his termination is enough to demonstrate a prima facie case. "When an adverse employment action occurs close in time to when an employer learns that an employee engaged in a protected activity, temporal proximity alone is enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Weaver v. City of Twinsburg*, 2014 U.S. App. LEXIS 18014, \*11-12 (6th Cir. 2014)(citing *Williams v. Zurz*, 503 Fed. Appx. 367, 2012 U.S. App. LEXIS 22604, at \*14-15 (6th Cir. 2012)). In this case, Lee was ordered to take the physical or face discipline <u>the very same day</u> he announced he would be filing a charge with the EEOC. (Cooper Depo. p. 99, 101; Ex. G).

Therefore, this Court should find that Plaintiff has met all prongs of his *prima facie* case.

B. <u>There is no difference between firing someone for protected, oppositional conduct and firing someone for insubordination for engaging in that conduct.</u>

At this stage, of the burden-shifting analysis, the burden shifts to the City to demonstrate that it actually terminated Lee for a legitimate, non-retaliatory reason. The City raises a number of arguments, but its position really boils down to one issue: is there a difference between firing an employee for engaging in protected activity or firing an employee for insubordination for

engaging in protected activity. The City thinks there is. Plaintiff submits that logic, this Court's precedent, and the Sixth Circuit precedent require the opposite conclusion.

The City concedes that Lee was engaged in protected, oppositional activity by refusing to comply with a discriminatory physical. It concedes that it knew about it, and yet it ordered him to stop his opposition and comply with the discriminatory policy. When he didn't, the City terminated him for insubordination.

Since the City agrees that Lee engaged in a "protected activity", it necessarily must agree (and the ADEA and GINA compel) that it would have been illegal to terminate him <u>solely</u> for that activity. For example, had Lee done what he did on January 30, 2012—refused to submit to the over-40 physical and stated his (and the EEOC's) concerns about the legality of the physicals policy—and had he been terminated on-the-spot for that act, the termination would have been clear, textbook retaliation. No retaliation case could be simpler.

The City, however, claims that because it *ordered* him to cease his protected conduct and Lee did not comply, this somehow transforms textbook, illegal retaliation into a perfectly-acceptable termination for insubordination. It does not. The City also argues that because it did not really *intend* for its termination to be retaliatory, that this makes it not retaliatory. This argument is also unpersuasive.

Yet, for all the City's arguments, it never answers the one question that really matters: what is the difference between firing someone for protected, oppositional conduct (which is plainly illegal) and firing someone for insubordination for engaging in that same conduct (which the City claims is legal)? Perhaps its lack of a response demonstrates the lack of a good answer. Every "protected activity"—whether it is filing a charge with the EEOC, filing a lawsuit, complaining to management, refusing to comply with an order—is in some sense disloyal and insubordinate. As one court has noted:

9

> Almost every form of 'opposition to an unlawful employment practice' is in some sense 'disloyal' to the employer, since it entails a disagreement with the employer's views and a challenge to the employer's policies. Otherwise the conduct would not be 'opposition.' If discharge . . . may be imposed based simply on 'disloyal' conduct, it is difficult to see what opposition would remain protected . . .

*EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1019 (9th Cir. 1983). The City simply fails to articulate any real distinction between its course of action and bald retaliation.

At deposition, Deputy Chief Cooper was asked what he believed to be the distinction between firing someone for protected, oppositional conduct and firing someone for insubordination for engaging in that conduct:

> Q. [F]irst let me ask: do you know whether or not there are any laws that say [if someone refuses to do something that they think is discriminatory that they can't be retaliated against for that.]
> …
> A. No, I do not.
> Q. Then I would like you to assume hypothetically that there are such laws. What is the difference in your mind between retaliating against someone who opposes discrimination who opposes a discriminatory order, and somebody who is insubordinate and is disciplined for being insubordinate?
> …
> A. I can't honestly answer that. I can give you an opinion, if that's all you're looking for.
> Q. Yes, because in this case there seems to be a distinction being drawn that Mr. Lee wasn't fired because he opposed something as being discriminatory, but rather he was fired for being insubordinate, and I would like to hear from you whether you believe there is a difference between the two?
> …
> A. Yes, I believe he was terminated for being -- insubordinate. . . . I'm not making the distinction . . . (Cooper Depo p. 132).

The same question was put to Chief Trick:

> Q. What is the difference in your mind, if any, between Mr. Lee saying "I object to this and will not do it because I believe it's discriminatory", and him saying -- and him not doing it and being insubordinate?
> . . .
> A: No difference. (Trick Depo p. 78-79).

The City's wholesale inability to articulate a difference between protected oppositional activity and unprotected insubordination drives right to the heart of this matter.  Its exemplified in this passage from the City's brief:

> [R]egardless of whether Mr. Lee voiced his opposition to the SOG or not, he would have faced the same action if he failed to follow the direct order of the Chief. . . [H]ad Mr. Lee . . . not taken the physical and said nothing as to why he had not done so, the Chief would have still ordered him to take the physical or face the same action by the City."  (Doc. 40; PageID #986).

The trouble with this statement is that it completely ignores that Congress has declared that some activities *are protected* and employers must treat those activities differently.  Lee was protected from retaliation because he engaged in protected activity and the City may not ignore that reality.

### 1) Insubordination can be a legitimate, non-discriminatory reason for termination . . . except when it's a protected activity.

The City's brief recites a number of cases which all hold that insubordination can constitute a legitimate, non-discriminatory reason for terminating an employee.  (Doc. 40; PageID# 987).  Not one of these cases, however, addresses a situation where the "insubordination" is the employee's engagement or participation in a protected activity.  All the cases in the City's brief have one distinguishing fact in common: all of them involve plaintiffs who were fired for insubordination but who allege that insubordination was pretext for a *real* reason, their protected activity.  See *Russell v. Univ. of Toledo*, 537 F.3d 596, 609 (6th Cir. 2008)(nurse fired for disobeying medical orders and had no evidence that her termination was related to her filing of an EEOC charge);  *Hibbler v. Reg'l Med.Ctr. at Memphis*, 12 Fed. Appx. 336, 340 (6th Cir. 2001)(plaintiff refused to comply with order and there was no connection between her insubordination and her filing of an EEOC charge).  Here, there is no allegation by Lee that he was fired for a pretextual reason; all parties agree that the stated reason for his termination was because he refused to cease his protected, oppositional activity.

Indeed, the dichotomy is best shown in *Fullen v. City of Columbus*, a case relied on by the City. In *Fullen*, a firefighter refused to cooperate with investigators who were trying to probe into potential criminal and civil misconduct in the Columbus fire department. *Fullen,* 514 Fed. Appx. 601, 603 (6th Cir. 2013). The *Fullen* plaintiff merely claimed that the interview was "illegal," but critically, "he provided no legal authority supporting such a premise…" *Id.* at 606. In contrast to the *Fullen* plaintiff, Lee explained to the City over and over why he (and the EEOC) believed the physicals policy to be illegal discrimination under the ADEA and GINA. The City confirmed repeatedly in emails that it knew Lee was objecting to the physicals policy and the legal grounds of his objection. (Ex. 25; Ex. 27; Ex. 28). Moreover, the City's brief concedes that it knew the basis for Lee's objections. Unlike the *Fullen* plaintiff who gave no legal basis for his refusal, Lee repeated his legal basis to his supervisors over and over again.

Lee's case and others cited in Lee's Motion for Summary Judgment involve situations where the protected activity *was* the act that allegedly constituted insubordination. Lee's Motion cites numerous cases (including precedent from this Court and the Sixth Circuit) where courts have granted *judgment to plaintiffs* whenever an employer tries to claim that a protected EEO activity constituted insubordination. (See Doc. 37; PageID #208). Indeed, two other district courts have deemed the City's argument to be "definitively unworthy of credence." See *Harris v. Richards Manufacturing Co., Inc*., 511 F.Supp. 1193, 1203-05 (W.D. Tenn. 1981); and see *Reeder-Baker v. Lincoln Nat'l Corp.*, 649 F.Supp. 647, 660 (N.D. Ind. 1986)(granting judgment to an employee and holding that the employer's argument that an employee's complaint about a discriminatory act constituted insubordination "is not worthy of credence"). There is no reason why this Court should give the City's argument any more credence here.

### 2) Fire and police departments are not exempt from the ADEA's and GINA's retaliation provisions.

The City makes much of the fact that it considers itself a "paramilitary" organization where discipline and following orders is paramount.  (Doc. 40; PageID #987-88).  Although the City's brief doesn't go so far as to actually complete the argument, the implication is clear: it believes this is an argument that "insubordination" is a non-discriminatory reason for terminating an employee who in engaged in protected, oppositional activity.

Notably, the City does not offer any caselaw supporting its belief that its "paramilitary" status somehow excuses what would otherwise be retaliation.  Moreover, the City overlooks the fact that two of the favorable cases cited in Lee's brief involve "paramilitary" organizations.  See *Moyo v. Gomez*, 40 F.3d 982, 984-85 (9th Cir. 1995)(a state prison guard's refusal to comply with a discriminatory order was held to be protected, oppositional activity); and see S*wanson v. Civil Air Patrol*, 37 F.Supp.2d 1312, 1329-30 (M.D. Ala. 1998)(summary judgment granted to a employee of the civil air patrol[4] holding that the "disobedience of an order, which appears to be in conflict with an employee's right to oppose employment practices" is protected activity).

The absurdity of this "paramilitary" argument was fully displayed at the depositions of Chief Trick and Deputy Chief Cooper.  When asked about whether there is ever an acceptable reason for insubordination, they testified that there was basically never a good reason to disobey an order.  Cooper testified that if he were ordered to plant evidence of a misdeed on an African-American firefighter and refused, then the City would be within its rights to terminate him for insubordination.  (Cooper Depo. p. 130).  He also stated that that the City would be within its rights to fire him if he refused an order to falsify a fire investigation report (though he hoped that the law would "step in and protect" him).  (Cooper Depo. p. 104-05).

---

[4] The Court may wish to take judicial notice that the Civil Air Patrol is an auxiliary of the U.S. Air Force.  http://www.gocivilairpatrol.com/about/ (last accessed October 28, 2014).

When asked whether there was ever any illegal or immoral order that a firefighter could refuse and not be deemed "insubordinate," Chief Trick testified that he expects his firefighters to follow all orders whether "illegal or not" with the only exception being if one thinks "a building's going to fall on you, you think your life is in extreme danger…that's my only exception." (Trick Depo. p. 80-81).  Trick continued:

> Q. [So] you would expect [a firefighter] to follow [an illegal order from you]?
> A. Yes.
> Q. If he refused to do it, something that he thought was illegal but you thought was legal, and it was later determined that what you asked him to do was indeed illegal, your supervisors determined that you were wrong, would he still be insubordinate and need to be disciplined because he didn't follow the order in the first place?
> …
> A.  Isn't that what we're here about?
> Q. You hit the nail on the head.  That's what I'm asking you…in your mind no matter whether an order is legal or illegal if you don't follow it you are insubordinate, correct?
> …
> A.  Yes.  (Trick Depo. p. 81-82).

Irrespective of the Moraine Fire Department's peculiar self-perception of itself as "paramilitary" organization where every order—no matter how immoral or illegal—must be followed, this does not excuse it from following the law.  There is no "paramilitary" statutory or regulatory exception in the ADEA or GINA that excuses retaliation against protected, oppositional activity.  Nor has the City cited any cases that assert such an exception.  Therefore, this argument must be held to be without merit.

### 3) The City's purported "honest belief" that its actions were not illegal is not a defense.

In its brief, the City next makes the incredible argument that because it had an "honest belief" that its actions did not constitute illegal retaliation, then it cannot be held liable for illegal retaliation.  Not only does this argument find no place in the law, such an argument was recently derided by this Court.

14

First, it is important to note what the "honest belief" defense is. The "honest belief" defense is a legal concept used by courts in the "pretext stage" of the burden-shifting analysis. *Murphy v. Ohio State Univ.,* 549 Fed. Appx. 315, 322 (6th Cir. 2013). It arises when an employee has alleged discrimination but the employer has asserted an alternative, non-discriminatory reason for termination. If the employee offers evidence that the employer's reason "has no basis in fact" (for example: the employee shows that he wasn't really absent for the day he was fired for absenteeism), then the employer may offer evidence that it *honestly believed* in its reason (for example, the employer honestly, albeit mistakenly, thought the employee was absent). *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998).

Here, there is no dispute about what the City's rationale was for terminating Lee; all parties agree that the City's stated reason for terminating Lee was for insubordination because he refused to take a physical that he opposed as discriminatory. There is no need for the Court or a jury to determine what the "real," non-pretextual reason was. The honest belief defense should have no place in deciding this case.

But the City's then attempts to mutate the "honest belief" defense into something altogether different. The City asserts a number of facts that it claims excuses its illegal act: it claims that it "consulted with legal counsel" before firing Lee; that Chief Trick "reviewed the disciplinary policy and determined that Lee's actions constituted insubordination;" that Chief Trick "reviewed information on the EEOC website and reviewed the website of an attorney in Cincinnati who is a firefighter;" and that it relied on the alleged legal opinions of a "competent physician" and the City "Law Director." (Doc. 40; PageID # 989-90). The City states that these facts are evidence that it "honestly believed that the actions it took were not retaliatory." *Id*.

Whereas the "honest belief" defense is properly used to examine whether an employer honestly believed an ultimately mistaken *factual* proposition, the City incorrectly perverts it into

a defense for a mistaken *legal* proposition. In other words, the City apparently believes that, so long as it "honestly believed" that what it was doing was not illegal retaliation, then it cannot be illegal retaliation. This argument should be given as much credence as telling a police officer "I honestly believed the speed limit was 55." Mistake of the law is not an excuse. Nor is getting arguably bad or misguided legal advice from websites, doctors, or attorneys. The City cannot escape liability for a discriminatory and illegal action by claiming "But we honestly believed it was legal…"

Indeed, this Court recently addressed—and rejected—this very argument in *Yontz v. Dole Fresh Vegetables, Inc.,* Case No. 3:13-cv-066, 2014 U.S. Dist. LEXIS 145666 (S.D. Ohio Oct. 10, 2014)(Rose, J.). In *Yontz*, the employee alleged that he had been terminated in retaliation for taking FMLA leave. *Id*. at 28. As this Court noted, the taking of FMLA leave is a "protected activity" for retaliation purposes. *Id*. The employer asserted that it had an "honest belief" that it was justified in terminating the employee for taking FMLA leave. *Id*. This Court correctly held:

> [The employer's] stated non-discriminatory reason for terminating [the employee] is facially discriminatory. Just as protection under the honest belief rule would only be afforded if the honest belief was unrelated to the right protected, so must the non-discriminatory reason be unrelated to the forbidden discrimination. [The employer] has failed to state a non-discriminatory reason for terminating [the employee].

*Id.*

The same result[5] should apply here. The City's alleged "honest belief" in the righteousness of its conduct is directly related to the rights protected by the ADEA and GINA:

---

[5] In *Yontz,* this Court held that there was a genuine issue of material fact as to whether the employer retaliated against the employee and set the matter for trial. In this case, the disposition should be somewhat different and summary judgment should be awarded to plaintiff for two reasons: (1) because this Plaintiff moved for it and the *Yontz* plaintiff didn't and (2) in *Yontz* there remained a factual question as to whether the plaintiff's requested days off were *actually* used for proper FMLA purposes, e.g. was the plaintiff really caring for his sick, disabled child during his FMLA leave. In this case, that question has already been conceded by the City—the

the right to not be retaliated against for opposing discriminatory conduct. As in *Yontz,* the honest belief rule has no place here and this employer has failed to assert a non-discriminatory reason for terminating Lee.

III.    **The City and the Union Discriminated Against Lee By Requesting and Requiring Him to Participate in a Physicals Policy that Discriminated Against him and violated the ADEA and GINA.**

    A.    <u>The Union and the City have created a genuine issue of material fact between themselves, but one that does not ultimately concern Lee.</u>

The briefs of the City and the Union have now illuminated a conflicting issue of fact: who is to blame for creating the discriminatory physicals policy. The City argues that it was the Union who clamored for the physicals policy. (Doc. 40; PageID #981). The City claims that the Union reviewed and approved the changes to the 2011 SOG and its incorporation into the SOG. (Doc. 40; PageID #982).

The Union, however, points the finger at The City and claims that union president Harris was bamboozled by the City, who told him that the City had to change the SOG just to "address legal issues" (how right that was!). (Doc. 43; PageID #1206). Harris claims he never saw the revised SOG until after it was implemented. (*Id.*).

Further clouding this issue are facts not mentioned by either Defendant: At a union meeting in March 2011, Union President Mike Harris discussed proposed revisions to the physical policy as part of a new CBA. (Lee Dec. ¶2). The union members voted this down. (Lee Dec. ¶3). When the final draft of the CBA was presented to the union members at a meeting on May 5, 2011, it contained the reference to the revised 2011 SOG. Lee asked Harris what the revised SOG said. (Lee Dec. ¶4). Harris told Lee and other Union members that he had not seen it, but assured the members that Chief Trick wouldn't "screw" the union. (Lee Dec. ¶4;

---

City does not dispute that Lee's refusal to take the physical was a protected activity. Therefore, there is no genuine issue of material fact to resolve on Lee's retaliation claim.

Cooper Depo. p. 90-91; Ex. 27). Contrary to what he had told Lee and the other union members, Harris had received a draft copy of the revised SOG on March 23, 2011 in an email from the City. (Cooper Depo. p. 38-40; Ex. 4). Lee voted against accepting the new CBA, but it was passed by a majority of the union membership. (Lee Aff. ¶4; Ex 12). As a Union Trustee, Lee was required to sign the CBA. (Lee Depo. p. 34). And there is some indication that the 2011 SOG was not made available to the union membership until many months after it was incorporated into the CBA. (Harris Depo. p. 41, 48; Lee Aff. ¶4-5).

What is undisputed, however, is that the 2011 SOG would not have and could not have become a mandatory policy unless and until it was incorporated into the CBA. The first, 2008 SOG only became effective when it was incorporated into the parties' then-CBA through a "Memorandum of Understanding." (Harris Depo. p. 11). The 2011, revised SOG was similarly incorporated into the CBA—something that could not have occurred without the Union's and Employer's assent.

It is immaterial to this matter to determine whether the City is more culpable than the Union for the creation of the 2011 SOG. The City and the Union are jointly and severally liable for the creation and implementation of the discriminatory 2011 SOG. Defendants' finger-pointing only creates questions of contribution or indemnity between themselves—it does not excuse their joint conduct and should not impede this Court's resolution of this motion in Plaintiff's favor.

B. The City and the Union discriminated against Lee when they collaborated to create the 2011 S.O.G., which violated GINA on its face and in practice.

As argued in Lee's Motion for Summary Judgment, the 2011 S.O.G. illegally required Lee to disclose his genetic information to the City's hired physician, Dr. Lovett, and illegally required firefighters to submit to additional tests because of their family medical histories.[6]

First, it is important to note what Defendants have conceded: in their responses, neither Defendant contests that Dr. Lovett's questionnaire requested the disclosure of genetic information, as that term is defined under GINA. Nor do Defendants contest that, by requiring additional testing for firefighters with a family history of prostate cancer, the 2011 SOG is illegal on its face. Finally, neither Defendant contests that they were fully aware that both of these illegal requirements were imposed on Lee but did nothing to change them.

Defendants each raise one argument in defense of this cause of action. Defendants' arguments are essentially similar—both defendants seek to excuse their conduct on the grounds that they didn't actually *receive* any genetic information about Lee. Even if true, the argument is not a defense to liability.

The City argues that 42 U.S.C. § 2000ff-1(b)(2) is a defense.[7] (Doc. 40; PageID #999, Doc. 45; PageID #1267). This statute provides a defense to GINA if all four[8] of its provisions

---

[6] Gallingly, the 2011 SOG also require additional tests for African-American firefighters—an issue that is equally offensive but not at issue in this case as Lee is Caucasian.

[7] It is presumed that the City's citation to 42 U.S.C. § 2000ff-2 is a typo. That statute applies to "employment agencies," not "employers." The quoted language in The City's briefs appear to come from 42 U.S.C. §2000ff-1, which applies to "employers."

[8] The use of the conjunctive "; and" following 42 U.S.C. § 2000ff-1(b)(2)(C) means, as a matter of statutory interpretation, that all of the listed requirements must be satisfied. See, e.g., *Pueblo of Santa Ana v. Kelly*, 932 F. Supp. 1284, 1292 (D. N. Mex. 1996)(citing *United States v. O'Driscoll,* 761 F.2d 589, 597-98 (10th Cir.1985) (conjunctive terms indicate that all requirements must be satisfied), *cert. denied, O'Driscoll v. United States,* 475 U.S. 1020, 106

are met. The City, however, never explains how (or even if) this statute applies to this case, and it doesn't allege any facts which could support the application of this statute. Neither Lee nor this Court should have to do this work for The City. Nevertheless, the most obvious issue with the applicability of this statute is that 42 U.S.C. § 2000ff-1(b)(2)(D) states that the defense only applies when "the employee provides prior, knowing, voluntary, and written authorization" for the collection of his genetic information. This Lee never did. At all times relevant to this case, he specifically and explicitly objected to his production of this information. The City also fails to mention that the regulation covering this statute, 29 C.F.R. § 1635.8(b)(2)(i)(B), lays out the <u>mandatory</u> content and form for such a "prior, knowing, voluntary, and written authorization." No such form has ever been seen in this case.

Moreover, the regulations also provide that the exception in 42 U.S.C. § 2000ff-1(b)(2) only applies when "[t]he provision of genetic information by the individual is <u>voluntary</u>, meaning the covered entity neither requires the individual to provide genetic information nor penalizes those who choose not to provide it." 29 C.F.R. § 1635.8(b)(2)(i)(B)(emphasis added). Here, Lee was required to complete Dr. Lovett's form as part of his <u>mandatory</u> physical and he was required to complete additional testing if he had a family history of prostate cancer.[9] As this case amply demonstrates, the City certainly didn't consider Lee's physical to be "<u>voluntary</u>."

As to the Union's brief on the GINA issue, most of it appears to be a copy-and-paste of its Motion to Dismiss for Failure to State a Claim filed earlier (and overruled) in this case.

---

S.Ct. 1207, 89 L.Ed.2d 320 (1986); Norman J. Singer, Statutes and Statutory Construction, Vol. 1A, § 21.14 (same).

[9] The City also submits that Lee had "the option of providing the information to his own physician who will then turn over the test results to Dr. Lovett." In support of this contention, The City cites to the **2008** SOG. (Ex. 1). The plain text of the discriminatory **2011** SOG, however, makes clear that Lee can only "choose another physician" if "he is unable to attend a scheduled physical examination by" Dr. Lovett. (Ex. A, p. 3). It also requires Lee to "complete [the] questionnaire[] supplied by" Dr. Lovett. (*Id.* at p. 2).

(Compare Doc. 43; PageID #1216-18 and Doc. 15; PageID #97-98).  The argument—that the

Union didn't actually request or obtain genetic information from Lee—is as unavailing now as it

was when this Court overruled it six months ago, holding:

> The CBA therefore not only permitted the City to establish a 'program to monitor
> employee safety and health' but also noted that such a program 'is intended to
> comply with the requirements set forth in [the 2011 SOG].' . . . [which] requires
> a firefighter/paramedic over the age of forty to complete a "Health Status"
> questionnaire as well as appears to seek information about whether an employee's
> 'primary relative' has a history of prostate cancer.  . . . As such, and accepting the
> reasonable inference that Defendant Local 2981 was involved in drafting and/or
> implementing S.O.G 100.5.13, Plaintiff plausibly claims that Defendant Local
> 2981 violated section 2000ff-3(b) of GINA.  (Doc. 24; PageID #151-52)(internal
> citations omitted).

Discovery has only confirmed what the Complaint alleged: the Union was involved in approving

the revisions to the 2011 SOG and implementing the SOG through the CBA.  Although Harris

claims he never saw a final, signed SOG until after the CBA was passed, he does not dispute that

he reviewed a draft containing all the changes well before that.  (Harris Depo. p. 27-28; Ex. 4).

Harris was also sent the proposed changes to the CBA, which references and incorporates the

2011 SOG.  (Cooper Depo. 39-45; Ex. 5).  The City also orally discussed the proposed changes

to the SOG with Harris.  (Cooper Depo. p. 35-36; Harris Depo. 31).  Not once did Harris or the

Union object to the changes.  (Cooper Depo. p. 41).

Finally, neither the Union nor the City address the most pertinent GINA regulation: 29

CFR 1635.8(d).  That regulation addresses mandatory medical examinations for employment.  It

requires that "covered entities" (which the Union and the City concede they are) "must tell health

care providers not to collect genetic information, including family medical history, as part of a

medical examination intended to determine the ability to perform a job, and must take additional

reasonable measures within its control if it learns that genetic information is being requested or

required."  29 CFR 1635.8(d).  The Union and the City collaborated in selecting Dr. Lovett as

the physicals physician. (Cooper Depo. p. 33-34). Trick, Cooper, and Harris were all aware that Dr. Lovett's "Health and Wellness" form required by the SOG requested family medical history; they completed it for their own physicals! (Cooper Depo. p. 66; Trick Depo. p. 34; Lovett Depo. p. 85). Yet they did nothing to stop the collection of genetic information by Dr. Lovett.

Defendants' failure to comply with 29 CFR 1635.8(d) undermines their collective protest that they did not specifically or directly "request [or] require" genetic information from Lee. As this Court has already held, Defendants requested and required this illegal disclosure when they created and passed the SOG and CBA which required these illegal disclosures. This is a direct violation of 42 U.S.C. §2000ff-1(b) and -3(b). Defendants have stated no genuine issue of material fact that should dissuade this Court from granting judgment to Plaintiff on this cause of action.

C. The City and the Union discriminated against Lee when they collaborated to create the 2011 S.O.G., which violated the ADEA.

Summary judgment remains warranted on Plaintiff's cause of action regarding Defendants' ADEA discrimination. First and critically, neither Defendant disputes that the 2011 SOG is age discrimination on its face, and neither disputes that the only defense to such discrimination is for them to overcome their burden of proving that age was a bona fide occupational qualification ("BFOQ"). Each defendant opposes summary judgment with different arguments: the Union claims the discriminatory SOG wasn't its idea, and the City claims that it was justified on safety grounds. Neither of these arguments are persuasive.

1) The Union cannot escape liability by claiming it wasn't responsible for the creation of the 2011 SOG.

The Union's sole argument against this cause of action is that it didn't discriminate against Lee because it had nothing to do with the creation or implementation of the 2011 SOG. As argued above, the question of *how much* the Union had to do with the creation of the 2011

SOG may be an open question, but there can be no doubt that it had *something* to do with it. Moreover, this Court has already overruled this argument when it was made in the Union's Motion to Dismiss for Failure to State a Claim. (Doc. 15; PageID 94-95; Doc. 24; PageID #147-48). This Court has already held that, by incorporating the offending SOG into the CBA, the Union was "involved in the drafting and/or implementation of the allegedly discriminatory revisions [to the SOG]." *Id*.

And again, all the facts obtained in discovery now back that up:  the Union president, Mike Harris, discussed and reviewed the changes to the SOG and the CBA prior to the implementation of both.    (Harris Depo. p. 27-28; Cooper Depo. 39-45; Ex. 4-5).  The SOG could not have been altered from the 2008 version (which was incorporated into the former CBA through a memorandum of understanding), and the CBA could not have been changed without the Union's assent.  Precisely how active the Union's involvement was may be an open question, but there can be no doubt that the SOG and CBA would not have changed without the Union's cooperation and assent.

### 2) Age is not a bona fide occupational qualification to be a Moraine firefighter.

The City's entire argument in support of its claim that it can demonstrate a BFOQ rests on an illegal premise.  Under 29 U.S.C. § 623(f), a BFOQ defense may only stand where age *itself* is a bona fide occupational qualification. *Intl. Union v. Johnson Controls*, 499 U.S. 187, 201 (1991) (citing *Western Air Lines, Inc.* v. *Criswell*, 472 U.S. 400 (1985)); *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 87 (U.S. 2000).  The City can only claim that age is a BFOQ for safety reasons when an employee's age "actually interferes with the employee's ability to perform the job." *Johnson Controls* at 204; *Everson*, at n15.

In this case, the City never actually argues that a firefighter's age *in and of itself* interferes with the ability to perform the job. Rather, the City argues that its age discrimination is justified because age is a risk factor or predictor of *possible* health conditions that *might* interfere with a firefighter's job. Indeed, the City's expert, Dr. Lovett specifically attests that age itself has nothing to with a firefighter's ability to perform the job safely. (Lovett Depo. p. 89). The City's use of age only as a proxy for another, actually relevant characteristic does not make age a BFOQ. *Hazen Paper Co.* v. *Biggins,* 507 U.S. 604, 611 (1993).

This impermissible, discriminatory assumption—that firefighters over the age of 40 *might* have a condition that prevents their safe performance of the job—requires the immediate conclusion that the City cannot show that age itself is an actual occupational qualification. Nevertheless, the City also fails to meet most—if not all—of the Sixth Circuit's tests for showing a BFOQ.

    a.   Defendants have no basis in fact for believing that age discrimination was reasonably necessary to the operation of the fire department.

Neither Defendant challenges that the Sixth Circuit requires them to prove three distinct elements in establishing a BFOQ. *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737 (6th Cir. 2004). The first asks whether the defendants had a "basis in fact" for believing that the discriminatory physicals policy was "reasonably necessary" to the operation of the fire department.

This requires evidence of three things: (i) that all or substantially all members over a particular age would be unable to perform safely and efficiently the duties of the job involved; (ii) that it is impossible or highly impractical to determine on an individualized basis the fitness for employment of members over a particular age; or (iii) the very age of an employee undermines his capacity to perform a job satisfactorily. *Everson v. Mich. Dep't of Corr.*, 391 F.3d 737, 748 (6th Cir. 2004)(citations and quotations omitted).

24

<u>Defendants offer no evidence that actually addresses any of these three elements</u>. There is no evidence that firefighters over the age of 40 "would be unable to perform safely and efficiently the duties of the job involved."

Nor is there any evidence that "it is impossible or highly impractical to determine on an individualized basis the fitness for employment of members over a particular age." In fact, all the evidence is to the contrary. Dr. Lovett testified that he is perfectly capable and qualified to do an individualized physical for each firefighter. (Lovett Depo. p. 89). Mike Harris agreed with this. (Harris Depo. p. 69). In fact, Dr. Lovett said that an "individualized physical" would be his standard way of evaluating a firefighter. (*Id*. at 44-45).

The City's only defense to this is that Dr. Lovett speculated that giving full physicals to firefighters over the age of 40 might save the department money and prevent "false positives" – i.e. firefighters failing their stress tests without any physiological cause. (Ex. 7). On the "cost savings" issue, the City, however, has not produced or cited to any evidence that the 2011 SOG actually saved the City a dime. Cooper has never even looked to see whether the new policy saved any money. (Copper Depo. 29).

On the "false positive" issue, when asked about this at his deposition, Dr. Lovett admitted he could not recall there ever having been a single "false positive" for any Moraine firefighter. (Lovett Depo. p. 42-43). Nor could he cite any medical or scientific data quantifying the risk of "false positives." (*Id.* at 48-49).

Even if there was evidence that verified these speculative concerns of "cost" and "false positives," they certainly do not show that an "individualized assessment" of each firefighter is "impossible or impractical." Indeed, the City does not dispute that the 2008 SOG physicals policy was an "individualized assessment" and that Dr. Lovett conducts just such "*a la carte*" physicals for the City of Dayton. At best, the City's only defenses for discriminating against

over-40 year olds are that it *might* save money and it *might* prevent false positives—a problem that has never once occurred at Moraine. The City never even bothers to quantify either of these benefits.

Finally, the City produces no evidence that the very age of a firefighter undermines his capacity to perform a job satisfactorily. In fact, the City concedes the point: "When Plaintiff argues that age has nothing to do with a firefighter's ability to safely or efficiently perform their jobs (sic) . . . That is true of a 'healthy' firefighter." (Doc. 40; PageID #997). This concession demonstrates precisely why its use of age as a factor in the physicals policy is illegal and discriminatory. In the City's mind, age is a stand-in for "unhealthy" which is itself a proxy for "unsafe."[10]

The City simply cannot show any evidence that it had a basis in fact for believing that its discriminatory policy was reasonably necessary to the operation of the fire department. The uncontested evidence in this case is that age has absolutely nothing to do with a firefighter's ability to actually perform the job safely or efficiently. Therefore, Defendants have failed to demonstrate that discriminating against firefighters over the age of 40 by giving them extra testing is "reasonably necessary" to its operations.

> b. Defendants have not shown that there are no reasonable alternatives to the discriminatory policy.

It is, of course, Defendant's burden to convince this Court that there are no reasonable alternatives to the facially discriminatory policy. This, they have not done. In fact, Plaintiff's brief suggested two perfectly reasonable alternatives to this age discrimination: (1) a return to the

---

[10] In fact, Dr. Lovett admitted that "age" may not even be the best factor to use to decide who gets full physicals and who gets partial physicals. He stated that obesity and high blood pressure—two totally non-discriminatory factors—might better predict who should get full physicals. (Lovett Depo. p. 80).

2008 SOG or (2) an *a la carte*, individualized assessment for every firefighter, as the City of Dayton does.

Neither Defendant disputes that giving an *a la carte* assessment to each individual firefighter based on his or her private physical examination would be perfectly workable. Dr. Lovett admits he can and does do it for the City of Dayton. There is no evidence that such a system would cost more or have any other negative effects.

Instead, the City argues that the 2008 SOG was deficient because "allowed a firefighter to choose what testing he or she wanted." (Doc. 40; PageID #997). The City then makes the (unqualified and unquantified) speculation that the firefighter might not elect an important test or they might "choose tests that were not medically warranted, thus causing an unneeded expense to the City." (*Id*). This latter point, however, undermines the City's entire case. If the City is worried about "unnecessary tests," does it really think that every test given to every over-40 firefighter is absolutely "necessary"? Why not let a doctor decide that? Because of the discriminatory policy, even the healthiest, most physically fit 40-year-old firefighter would have to get a battery of unnecessary tests each year solely because of age.

Moreover, the City never presents evidence that it could not afford to give full physicals to everyone, regardless of age.[11] Simply speculating that a non-discriminatory alternative *might* be more expensive does not make it "unreasonable"—especially when that expense is never quantified.

Finally, the City's brief states that "[t]here are other fire departments that follow *similar* testing" and "developed to be consistent with the…recommendations of [national safety organizations]." (Doc. 40; PageID #981, 98). This, however, is disingenuous. The City cannot

---

[11] Full physicals for every firefighter, every year is the recommendation of the National Fire Protection Association ("NFPA") and the International Association of Firefighters ("IAFF").

point to a single fire department in America or a national safety organization that recommends the same discriminatory policy toward firefighters over the age 40. These other policies are similar to Moraine's, *except in the very characteristic at issue*. Incredibly, the two fire department policies that the City points to—the City of Phoenix and the Department of Defense—require annual physicals for <u>all</u> firefighters regardless of age; they just give a few tests more frequently to older firefighters (for example, treadmill running is required every three years for firefighters in their 20s, every two years in their 30s, and every year for those over 40).[12] See https://www.iaff.org/HS/wfiresource/PhoenixDocs/Medical/AnnualPhysicalComponentsPhoenix .pdf, p. 10; and http://www.dtic.mil/whs/directives/corres/pdf/605505mp.pdf, p. 39). Such a policy is not discriminatory because a 35-year is still subject to the same requirements as a 45-year old. Moreover, it should be noted that a policy doesn't become less discriminatory just because others endorse it.

In addition to the two reasonable, non-discriminatory alternatives in Plaintiff's Motion— (i) the City of Dayton's *a la carte* system or (ii) the 2008 SOG—the City's brief raises the notion that there are several alternative ways to structure a firefighter physical policy: (iii) the City of Phoenix's policy; (iv) the Department of Defense's policy; and (v) full, annual physicals for everyone as recommended by the national safety organizations. Yet, the City of Moraine presents no argument whatsoever as to why any of these policies are not reasonable alternatives

---

[12] The City's citation to these two fire department policies should not be considered admissible evidence. Nor should any of the "medical" evidence and journals cited by the City's brief be considered evidence. These alleged policies and publications have not been authenticated by any person with knowledge. They have not been made exhibits or made part of the record in this matter. They have not been relied upon or stated as being authoritative by Moraine's expert witness. Nor has Plaintiff ever been given an opportunity to question or cross-examine these documents' authors or anyone who might have relied upon them in forming an opinion. Their use as evidence does not comply with Evid.R.901, and there is no basis for their introduction in this case. Moreover, because neither of these documents can be found in the record of this case, they cannot defeat a motion for summary judgment. See Fed. R. 56(c)(1)(A).

to its discriminatory policy. The City merely speculates that one of these five might be more expensive but presents no evidence that quantifies the expense or any evidence that the City could not have afforded that expense. Having presented no evidence that would suggest that any of these non-discriminatory alternatives would not be workable, The City has failed to prove this essential element of its BFOQ defense.

c. The City's medical "evidence" is inadmissible and should be stricken.

Something must be said about the City's medical "evidence" which it claims justifies treating firefighters over 40 less favorably than firefighters under 40. The City's brief expends over two pages reciting medical studies, medical journals, magazine articles, and other such publications all extolling the health risks faced by firefighters. Amazingly, none of this is part of the record. None of it is evidence that this Court can consider under Rule 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ). Lee formally objects to their use here.[13] Similarly, the City's citation to other court cases's records is also faulty. Evidence that was part of a record in another case is not part of this record.

Nor were any of these articles cited by the City's "expert," Dr. Lovett, as sources he relied on in forming his opinion. When asked what he relied on to establish age-40 as a cut-off, he *suspected* it came from an article that cited some FEMA data but could not recall the article's date or where it was published. (Lovett Depo. p. 70-71). He also admitted he had no data that would quantify the efficacy of Moraine's physical policy. (*Id.* at 74).

---

[13] *See* Fed. R. Civ. P. 56(c)(2) (according to the new rules, a party opposing a exhibits for motion for summary judgment can file an objection if it believes that supporting materials "cannot be presented in a form that would be admissible in evidence");Fed. R. Civ. P. 56 (2010 Advisory Committee comments)(noting that, when a party objects in this manner, it "functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated").

Finally, all of these online articles cited by the City miss the point. None of them actually demonstrate that Defendants' policy is "reasonably necessary." It is not enough to show that firefighting is a dangerous, strenuous occupation. Lee agrees with that. Nor is it enough to argue that firefighters should be able to physically perform their jobs safely and efficiently— both for themselves and the public. Lee agrees with that, too. Instead, the City has to show that there is an evidentiary basis for its *specific* discriminatory and that there is no alternative to it. On that question, the City has cited no evidence.

## IV.    CONCLUSION

The City of Moraine has two sins to answer for in this case. The Union has one.

The City of Moraine violated the law and discriminated against Plaintiff David Lee when it crafted, implemented, and enforced a discriminatory policy. That policy—regardless of the motives behind it—violated the ADEA and GINA. The Union is jointly and severally liable for its part in crafting and implementing that policy. The record is clear that there were several, non-discriminatory alternatives to this policy existed and that there was no good reason to discriminate against older firefighters , yet the City and the Union plowed ahead anyway—at best, thoughtlessly, and at worst, with an intent to discriminate.

The City of Moraine, however, doubled-down on its illegal act by then retaliating against Lee for speaking out against the policy and for refusing to comply with it, as was his protected right to do. None of these facts are in doubt, and there is no genuine issue of material fact that should prevent this Court from following the precedent in *O'Donnell v. Burlington Coat Factory Warehouse, Inc*, 656 F. Supp. 263, 264 (S.D. Ohio 1987) and *Allen v. Lovejoy*, 553 F. 2d 522, 523 (6th Cir. 1977) and granting judgment in Plaintiff's favor on the three causes of action at issue here.

Respectfully submitted,


/s/ Adam R. Webber_____
Adam R. Webber (0080900)
FALKE & DUNPHY, LLC
30 Wyoming Street
Dayton, Ohio  45409
Tel:     (937) 222-3000
Fax:     (937) 222-1414
Email: webber@ohiolawyers.cc
Trial Attorney for Plaintiff


## CERTIFICATE OF SERVICE


The undersigned hereby certifies that a copy of the foregoing has been served upon the following this 7th day of November, 2014, via the Court's CM/ECF system.

EDWARD J. DOWD
DAWN M. FRICK
JOSHUA R. SCHIERLOH
Surdyk, Dowd & Turner Co., LPA
One Prestige Place, Suite 700
Miamisburg, Ohio 45342

JAMES H. GREER
TRISHA M. DUFF
Bieser, Greer & Landis, LLP
400 PNC Center
6 North Main Street
Dayton, Ohio 45402

MEGAN KATHLEEN MECHAK
Woodley & Mcgillivary LLP
1101 Vermont Ave., N.W., Suite 1000
Washington, DC 20005

/s/ Adam R. Webber
Adam R. Webber (#0080900)
Attorney for Plaintiff